UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DAVID JOSEPH PITTMAN,

        Petitioner,

v.                              Case No. 8:12-cv-1600-T-17EAJ
                                        DEATH PETITION
SECRETARY, DEPARTMENT OF
CORRECTIONS,

        Respondent.

_____

## O R D E R

This cause is before the Court on Petitioner David Joseph Pittman's timely-filed 28 U.S.C. § 2254 petition for writ of habeas corpus. Pittman is proceeding on his amended petition and amended memorandum of law.  (Docs. 14 and 15). Pittman is a Florida prisoner under penalty of death.

For the reasons set out below, Pittman's petition will be **denied.**

## BACKGROUND

Pittman is in the lawful custody of the State of Florida, Department of Corrections. Pittman was charged in a seven count Indictment with the first degree murders of Bonnie Knowles, Barbara Knowles, and Clarence Knowles; Pittman was also charged with two counts of arson, with burglary, and with grand theft. (A24/4636-4640). On April 19, 1991, Pittman's jury trial resulted in guilty verdicts on six of the seven counts – three counts of first degree murder, the two counts of arson, and the one count of grand theft. (A26/5108-

5114). Following the penalty phase, the jury returned death recommendations by a vote of 9-3. On direct appeal, the Florida Supreme Court affirmed Pittman's multiple convictions and sentences. *Pittman v. State*, 646 So. 2d 167 (Fla. 1994).

## PROCEDURAL HISTORY

### The Trial, Penalty Phase and Sentencing

The facts adduced at trial are summarized in the Florida Supreme Court's opinion on direct appeal, *Pittman v. State*, 646 So. 2d 167 (Fla. 1994), as follows:

> The record reflects that, shortly after 3 a.m. on May 15, 1990, a newspaper deliveryman in Mulberry, Florida, reported to law enforcement authorities that he had just seen a burst of flame on the horizon. When the authorities investigated they found the home of Clarence and Barbara Knowles fully engulfed in fire. After the fire was extinguished, the police entered the house and discovered the bodies of Clarence and Barbara, as well as the body of their twenty-year-old daughter, Bonnie. Although all of the bodies were burned in the fire, a medical examiner determined that the cause of death in each instance was massive bleeding from multiple stab wounds. In addition, the medical examiner testified that Bonnie Knowles' throat had been cut. A subsequent investigation revealed that the fire was the result of arson, that the phone line to the house had been cut, and that Bonnie Knowles' brown Toyota was missing.

> A construction worker testified that, when he arrived at work at 6:30 a.m. on the morning of the fire, he noticed a brown Toyota in a ditch on the side of the road near his job site. Other testimony revealed that the location of the Toyota was about one-half mile from the Knowles residence. The worker also observed a homemade wrecker, which he later identified as belonging to Pittman, pull up to the Toyota and, shortly thereafter, saw a cloud of smoke coming from that direction. Another witness who lived near the construction site also saw the smoke and observed a man running away from a burning car. This witness later identified Pittman from a photo-pack as the man she saw that morning. Investigators determined that the car fire, like the earlier house fire, was the work of an arsonist.

> At the time of the murders, another of the Knowles' daughters, Marie, was in the process of divorcing Pittman. The divorce was not amicable and the State introduced testimony that Pittman had made several threats against Marie and her family. The State also produced evidence that Pittman had recently learned that Bonnie Knowles had tried to press criminal charges

against him for an alleged rape that had occurred five years earlier.

Carl Hughes, a jailhouse informant, testified that Pittman told him that he had gone to the Knowles' house on the evening of the murders to speak with Bonnie Knowles about the problems he was having with her family. Bonnie let Pittman in the house and, when she refused his sexual advances, he killed her to stop her cries for help. Pittman then admitted to killing Barbara Knowles in the hallway outside Bonnie's bedroom and to killing Clarence in the living room as Clarence tried to use the phone. Pittman also told Hughes that he burned the house, stole the Toyota and abandoned it on the side of the road, and later returned to the Toyota and burned it as well.

The record further reflects that Pittman feared that the police suspected his involvement in the murders, and, at the prompting of his mother, Pittman turned himself in to the police on the day after the murders.

In response to the prosecution's case, the defense presented testimony critical of the police investigation and attempted to establish that Marie, Pittman's former wife, and her new husband had a motive to commit the murders. Pittman testified in his own defense and stated that he had nothing to do with the crimes charged. He also denied that he had told anyone he had committed the murders. The jury found Pittman guilty of three counts of first-degree murder, two counts of arson, and one count of grand theft, and found him not guilty of burglary.

In the penalty phase, the State established that Pittman was convicted of aggravated assault in 1985. In mitigation, Pittman presented the testimony of his mother that he was a difficult child to deal with and that she had disciplined him severely. A clinical psychologist testified that Pittman's father was a paranoid schizophrenic; that as a child Pittman suffered from a severe attention deficit disorder with hyperactivity; and that Pittman has organic personality syndrome, which causes paranoia and an unstable mood. After hearing this testimony, the jury recommended the death penalty for each murder conviction by a vote of 9 to 3. In his sentencing order, the judge found two aggravating circumstances for each murder: (1) previous conviction of another capital or violent felony, and (2) the murders were heinous, atrocious, or cruel.[FN1] The judge then expressly rejected the mitigating factors of Pittman's being under the influence of extreme mental and emotional disturbance and concluded that the aggravating factors outweighed the proven mitigating factors. The judge imposed the death penalty for each murder. [FN2] Pittman has raised ten issues in his appeal to this Court, three of which are directed to the guilt phase of the trial.[FN3]

[FN1] The sentencing order states:

*I. AGGRAVATING CIRCUMSTANCES*

1. As an aggravating circumstance, the Defendant, David Joseph Pittman, was proven beyond and to the exclusion of every reasonable doubt to have a previous conviction of a felony involving the use or threat of violence; to wit: Aggravated Assault. (Case No. CF85–3584A1Sentenced on March 12, 1986.)

2. As an aggravating circumstance, the Defendant, David Joseph Pittman, was proven beyond and to the exclusion of every reasonable doubt to have committed two previous capital felonies as to each of the three murders for which he has been found guilty; to wit: the murders of Bonnie Knowles and Barbara Knowles as to the murder of Clarence Knowles; the murders of Barbara Knowles and Clarence Knowles as to the murder of Bonnie Knowles; the murders of Clarence Knowles and Bonnie Knowles as to the murder of Barbara Knowles.

3. As an aggravating circumstance, the commission of the First Degree Murder of Bonnie Knowles was especially heinous, atrocious or cruel.

By testimony and evidence in the record the court finds that the State proved beyond and to the exclusion of all reasonable doubt that Bonnie Knowles experienced conscious pain and suffering before death as a result of the Defendant cutting and stabbing Bonnie Knowles numerous times with a knife or similar object.

4. As an aggravating circumstance, the commission of the First Degree Murder of Barbara Knowles was especially heinous, atrocious or cruel.

By the testimony and evidence in the record the Court finds that the State proved beyond and to the exclusion of every reasonable doubt that Barbara Knowles [a] experienced pre-death apprehension of physical pain; [b] experienced conscious pain and suffering before death as a result of the Defendant stabbing Barbara Knowles numerous times with a knife or similar object; and [c] that she experienced apprehension of impending death even absent physical pain.

5. As an aggravating circumstance, the commission of

4

First Degree Murder of Clarence Knowles was especially heinous, atrocious or cruel.

By testimony and evidence in the record the Court finds that the State proved beyond and to the exclusion of every reasonable doubt that Clarence Knowles [a] experienced pre-death apprehension of physical pain; [b] experienced apprehension of death even absent physical pain; and [c] experienced conscious pain and suffering before death as a result of the Defendant stabbing Clarence Knowles numerous times with a knife or similar object.

THE COURT concludes from these facts that David Joseph Pittman's actions in murdering each of the three individuals was especially heinous, meaning extremely wicked or shockingly evil; was especially atrocious, meaning outrageously wicked or vile; and was especially cruel, meaning designed to inflict a high degree of pain with utter indifference to, or even with enjoyment of, the suffering of others.

[FN2] The sentencing order states:

*II. MITIGATING CIRCUMSTANCES*

As to mitigating circumstances, the Court finds the following:

1. That the three First Degree Murders for which the Defendant is to be sentenced were not committed while the Defendant was under the influence of extreme mental or emotional disturbances, nor were they mitigated by the use of alcohol as suggested. To the contrary, the Court finds the Defendant [a] arranged the visit to his father's house on the eve of the murders, the first time in months that he had been to his father's house; [b] that he left the house by an outside door from a locked room; [c] walked the short distance in the early morning hours to the victim's home; and [d] there cut the telephone lines to the outside of the house.

The Defendant upon entering the victim's home, systematically killed all the occupants of the house using a weapon that assured the least possibility of drawing the attention of witnesses. He then proceeded in a knowledgeable way to pour gasoline about the house and out into the yard. Testimony at the trial revealed that he understood the use of fire to destroy evidence. Before setting the fire, however, he secured the keys

to Bonnie Knowles' car for the purpose of his getaway.

The Defendant's actions and all other evidentiary circumstances considered show a direct conscious plan to kill and avoid apprehension. These actions do not indicate a person functioning under the influence of extreme mental or emotional disturbances. In regard to the influence of alcohol, other than the expert's opinion, the record does not reflect it to have been a factor in the commission of the murders.

2. Except for the solicited opinions of the Defendant's expert that the Defendant's capacity to conform his conduct to the requirements of the law was substantially impaired, this mitigating circumstance is unsupported by any other evidence in the record.

To the contrary, these facts reveal that all the actions by the Defendant leading up to the killings, the nature of the killings themselves, the methodical steps taken to destroy evidence, to effectuate a getaway, and to establish an alibi were the product of deliberate thought. These actions clearly show that the Defendant knew what he was doing and that it was unlawful. Again the presence of alcohol as a mitigating factor is unsupported by the record except for the expert's opinion.

THE COURT finds there is nothing in the record to demonstrate that the Defendant could not conform his conduct to the requirements of law.

3. The expert has offered an opinion as a mitigating circumstance that the Defendant suffers brain damage. Other than this opinion there exists no corroborating evidence to suggest the presence of this damage or its degree, nor its actual relationship to the murders.

4. Additional mitigating circumstances offered in evidence are that the Defendant was and may still be a hyperactive personality, and that he may have suffered physical and sexual abuse as a child. Also the expert testified that the Defendant was an impulsive person with memory problems and impaired social judgment.

Taking all these mitigating circumstances in a light most favorable to the Defendant, the Court finds they have little if any connection to the murders. The record speaks clearly of an

individual who went about the killings and the destruction of evidence in a deliberate, methodical and efficient manner to such an extent that detection was nearly avoided. But for a lady picking roses early one morning who happened to see the Defendant running from Bonnie Knowles' burning car, the case might not have been successfully prosecuted.

While addressing meaningful facts, the record reflects another that enlightens upon the issues of the Defendant's intentions and his capacity to understand what he was doing was unlawful. That fact was the Defendant's cutting of the telephone lines. This was admitted by the Defendant to witness Hughes as being done before the Defendant entered the home of the victims.

THE COURT, therefore, finds the aggravating circumstances established by the proper burden of proof to substantially outweigh all mitigating circumstances reflected in the record.

[FN3] The issues are as follows: (1) whether the trial court erred in allowing evidence of collateral crimes and bad acts; (2) whether the trial court erred in admitting identification testimony; (3) whether the trial court erred in excluding hearsay statements of a third party's alleged confession; (4) whether the trial court failed to hold a presentencing hearing; (5) whether the trial court rendered a legally insufficient sentencing order; (6) whether the heinous, atrocious or cruel aggravating circumstance is unconstitutionally vague; (7) whether the trial court erred in instructing the jury on the heinous, atrocious or cruel aggravating circumstance; (8) whether the trial court erred in failing to find the two statutory mental mitigating circumstances; (9) whether the trial court erred in failing to find nonstatutory mitigating circumstances; (10) whether the death penalty is disproportionate in this case.

*Pittman*, 646 So. 2d at 168-70.

### Direct Appeal:

Petitioner raised ten issues in his initial brief on direct appeal in *Pittman v. State,*

FSC Case No. SC78605 (*Pittman v. State,* 646 So. 2d 167 (Fla. 1994)):

ISSUE I: THE TRIAL COURT ERRED BY ALLOWING THE STATE TO INTRODUCE A MYRIAD OF EVIDENCE OF

7

COLLATERAL CRIMES AND BAD ACTS BECAUSE THE EVIDENCE WAS IRRELEVANT, EXTREMELY PREJUDICIAL AND BECAME A FEATURE OF THE TRIAL.

ISSUE II: THE TRIAL COURT ERRED BY FAILING TO GRANT DEFENSE MOTIONS TO SUPPRESS THE STATE'S IDENTIFICATION EVIDENCE BECAUSE OF THE UNDULY SUGGESTIVE PRETRIAL IDENTIFICATION PROCEDURES.

ISSUE III: THE TRIAL COURT ERRED BY EXCLUDING THE TESTIMONY OF GEORGE HODGES THAT HIS STEPSON CONFESSED TO THE CRIME FOR WHICH PITTMAN WAS ON TRIAL, AND RELATED EVIDENCE, OR, ALTERNATIVELY, GRANTING A CONTINUANCE FOR FURTHER INVESTIGATION, THUS PRECLUDING THE DEFENSE THAT SOMEONE ELSE COMMITTED THE CRIME.

ISSUE IV: THE TRIAL COURT FAILED TO HOLD A PRESENTENCING HEARING TO CONSIDER EVIDENCE, ARGUMENTS OF COUNSEL, AND PITTMAN'S OWN STATEMENT, PRIOR TO SENTENCING HIM TO DEATH.

ISSUE V: THE TRIAL JUDGE RENDERED A LEGALLY INSUFFICIENT SENTENCING ORDER IMPOSING THREE DEATH SENTENCES.

ISSUE VI: PITTMAN'S DEATH SENTENCE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE THE HEINOUS, ATROCIOUS OR CRUEL AGGRAVATING CIRCUMSTANCE IS VAGUE, ARBITRARILY AND CAPRICIOUSLY APPLIED, AND DOES NOT GENUINELY NARROW THE CLASS OF PERSONS ELIGIBLE FOR THE DEATH PENALTY.

ISSUE VII: THE TRIAL COURT ERRED BY INSTRUCTING THE JURY ON AND FINDING THE AGGRAVATING CIRCUMSTANCE THAT THE CAPITAL FELONY WAS ESPECIALLY HEINOUS, ATROCIOUS, OR CRUEL.

ISSUE VIII: THE TRIAL COURT ERRED BY FAILING TO FIND AND WEIGH THE TWO STATUTORY MENTAL MITIGATING CIRCUMSTANCES ESTABLISHED BY THE EVIDENCE.

8

ISSUE IX: THE TRIAL COURT ERRED BY FAILING TO FIND UNREBUTTED NONSTATUTORY MITIGATION WHICH WAS CLEARLY ESTABLISHED BY THE EVIDENCE.

ISSUE X: THE DEATH PENALTY IS DISPROPORTIONATE BECAUSE OF THE SUBSTANTIAL MITIGATION IN THIS CASE.

(A32).

On September 29, 1994, the Florida Supreme Court affirmed Pittman's convictions and death sentences and rehearing was denied December 19, 1994. *Pittman v. State,* 646 So. 2d 167 (Fla. 1994) (A35; A37). The mandate issued on January 23, 1995. (A38). Pittman filed a petition for Writ of Certiorari in the United States Supreme Court on March 20, 1995 (B1), which was denied on May 15, 1994. *Pittman v. Florida*, 514 U.S. 1119, 115 S. Ct. 1982 (1995). (B3).

**State Postconviction Proceedings**:

Pittman filed his initial Rule 3.850 motion to vacate on March 24, 1997. (D4/553-592). The motion was amended several times. A [second] *Huff* hearing/case management conference was held on January 20, 2006, before a successor judge, the Honorable Harvey Kornstein. (D22/3353-3406). The postconviction court granted an evidentiary hearing on the following claims: #1 [Brady/Giglio & "Newly Discovered" Evidence]; #2 [Brady/Giglio/IAC-Guilt Phase]; #3 [IAC-Guilt Phase]; and #7 [IAC-Penalty/Sentencing]. (D22/3408-3409). Evidentiary hearings were conducted May 8-11, 2006, on claims #1, #2, #3, and #7. The trial court also conducted evidentiary hearings on two additional sub-claims.[1]  On November 5, 2007, the trial court entered a 113-page written order denying

---

[1]  1  On February 15, 2007, a limited evidentiary hearing was held on the prosecutor's handwritten notes of his pre-trial interview with Barbara Marie Pridgen [Marie],

postconviction relief. (D34/5313-5425).

Pittman appealed the order denying postconviction relief to the Florida Supreme

Court. In *Pittman v. State,* FSC Case No. SC08-146 (*Pittman v. State,* 90 So. 3d 794 (Fla.

2011)), Petitioner raised the following two issues and sub-claims:

> ARGUMENT I: MR. PITTMAN WAS DEPRIVED OF HIS RIGHTS TO DUE
> PROCESS UNDER THE FOURTEENTH AMENDMENT, AS WELL AS HIS
> RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS,
> BECAUSE EITHER THE STATE WITHHELD EVIDENCE WHICH WAS
> MATERIAL AND EXCULPATORY IN NATURE AND/OR PRESENTED
> MISLEADING AND FALSE EVIDENCE AND/OR DEFENSE COUNSEL
> UNREASONABLY FAILED TO DISCOVER AND PRESENT EXCULPATORY
> EVIDENCE, AND/OR THE FAVORABLE EVIDENCE CONSTITUTES
> NEWLY DISCOVERED EVIDENCE OF INNOCENCE, ALL OF WHICH
> WHEN CONSIDERED CUMULATIVELY AS REQUIRED UNDERMINES
> CONFIDENCE IN THE RELIABILITY OF THE TRIAL CONDUCTED
> WITHOUT THE EVIDENCE PRESENTED.
>
> ARGUMENT II: MR. PITTMAN RECEIVED A CONSTITUTIONALLY
> DEFICIENT ADVERSARIAL TESTING DURING THE PENALTY PHASE
> BECAUSE EITHER THE STATE WITHHELD FAVORABLE INFORMATION
> AND/OR MR. PITTMAN RECEIVED INEFFECTIVE ASSISTANCE OF
> COUNSEL AND/OR NEWLY DISCOVERED EVIDENCE SHOWS THAT
> THE DEATH SENTENCE SHOULD BE VACATED.

(D 47).

Simultaneously with his initial postconviction brief, Pittman filed a Petition for Writ

of Habeas Corpus in the Florida Supreme Court, Case No. SC08-2486, and raised the

---

Pittman's ex-wife. (D29/4528-4597, D30/4598-4647). On March 8, 2007, Pittman filed an
Amendment to Second Amended Motion to Vacate, alleging a lethal injection claim based
on the December, 2006 execution of *Angel Diaz.* (D30/4695-4716). A case management
hearing was held on April 23, 2007; and the trial court summarily denied this claim in its
final order of November 5, 2007. (D34/5313-5425). On June 1, 2007, Pittman filed a
Second Amendment to Second Amended Motion to Vacate, this time seeking to add a
hearsay witness, Chastity Eagan, as alleged "newly discovered" evidence. (D32/4939-
4947). An evidentiary hearing was held on July 27, 2007, concerning this witness.
(D32/4982-5055).

following six claims:

CLAIM I: APPELLATE COUNSEL FAILED TO RAISE ON APPEAL NUMEROUS MERITORIOUS ISSUES WHICH WARRANT REVERSAL OF MR. PITTMAN'S CONVICTION AND SENTENCE OF DEATH.

CLAIM II: UNDER THE DUE PROCESS CLAUSE, THIS COURT ERRED IN AFFIRMING MR. PITTMAN'S CONVICTION WHEN EVIDENCE THAT A THIRD PARTY HAD CONFESSED TO THE MURDER WAS EXCLUDED FROM HIS TRIAL. TO THE EXTENT THAT APPELLATE COUNSEL INADEQUATELY RAISED OR BRIEF THE ISSUE, HIS PERFORMANCE WAS INEFFECTIVE OF APPELLATE COUNSEL.

CLAIM III: DURING THE DIRECT APPEAL, THE STATE OF FLORIDA FAILED TO DISCLOSE PERTINENT FACTS WHICH WERE NECESSARY TO THIS COURT'S CONSIDERATION OF THE ISSUES RAISED BY MR. PITTMAN, AND AS A RESULT, THE DIRECT APPEAL DID NOT COMPORT WITH THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

CLAIM IV: MR. PITTMAN'S DEATH SENTENCE IS PREDICATED ON AN AUTOMATIC AGGRAVATING CIRCUMSTANCE, CONTRARY TO THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE CORRESPONDING PROVISIONS OF THE FLORIDA CONSTITUTION. APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE FOR FAILING TO RAISE THIS ISSUE OF FUNDAMENTAL ERROR.

CLAIM V: MR. PITTMAN WAS DENIED A FAIR TRIAL AND A FAIR, RELIABLE AND INDIVIDUALIZED CAPITAL SENTENCING DETERMINATION IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE CORRESPONDING PROVISIONS OF THE FLORIDA CONSTITUTION, BECAUSE THE PROSECUTOR'S ARGUMENTS AT THE PENALTY PHASE PRESENTED IMPERMISSIBLE CONSIDERATIONS TO THE JURY, INCLUDING NON-STATUTORY AGGRAVATING FACTORS, MISSTATEMENTS OF THE LAW AND FACTS AND THEY WERE INFLAMMATORY AND IMPROPER. APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THESE ERRORS ON APPEAL.

CLAIM VI: MR. PITTMAN'S SENTENCING JURY WAS MISLED BY COMMENTS, QUESTIONS, AND INSTRUCTIONS THAT UNCONSTITUTIONALLY AND INACCURATELY DILUTED THE JURY'S SENSE OF RESPONSIBILITY TOWARDS SENTENCING IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED

STATES CONSTITUTION. APPELLATE COUNSEL WAS INEFFECTIVE
FOR FAILING TO RAISE THIS ISSUE OF FUNDAMENTAL ERROR.

(D 50).

On June 30, 2011, the Florida Supreme Court affirmed the denial of postconviction
relief and denied Pittman's state habeas petition. *Pittman v. State,* 90 So. 3d 794 (Fla.
2011). (D53). Pittman's motion for rehearing was denied June 7, 2012, and the mandate
issued June 25, 2012. (D55; D56). Pittman did not petition the United States Supreme
Court for a writ of certiorari.

### Federal Habeas Proceedings

On July 19, 2012, Pittman filed a 28 U.S.C. § 2254 Petition for Writ of Habeas
Corpus and a Memorandum of Law in this Court (Docs. 1 and 2), which were amended on
August 31, 2012. (Docs. 14 and 15). Pittman is proceeding on the amended petition
(hereinafter "Petition" or "petition").

### STANDARDS OF REVIEW

In *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011), the United States Supreme
Court reiterated the following standards of review under 28 U.S.C. § 2254:

> As amended by AEDPA, 28 U.S.C. §2254 sets several limits on the
> power of a federal court to grant an application for a writ of habeas corpus on
> behalf of a state prisoner. Section 2254(a) permits a federal court to entertain
> only those applications alleging that a person is in state custody "in violation
> of the Constitution or laws or treaties of the United States." Sections 2254(b)
> and (c) provide that a federal court may not grant such applications unless,
> with certain exceptions, the applicant has exhausted state remedies.
>     If an application includes a claim that has been "adjudicated on the
> merits in State court proceedings," §2254(d), an additional restriction applies.
> Under § 2254(d), that application "shall not be granted with respect to [such
> a] claim... unless the adjudication of the claim":
>
> > "(1) resulted in a decision that was contrary to, or involved an
> > unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States; or
"(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in
the State court proceeding."

This is a "difficult to meet," *Harrington v. Richter*, 562 U.S. ——, ——,
131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011), and "highly deferential standard
for evaluating state-court rulings, which demands that state-court decisions
be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24, 123
S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam)(citation and internal
quotation marks omitted). The petitioner carries the burden of proof. *Id.*, at
25, 123 S.Ct. 357.

*Cullen v. Pinholster*, 131 S. Ct. 1388, 1398.

AEDPA altered the federal court's role in reviewing state prisoner applications in
order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are
given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693, 122 S. Ct.
1843 (2002). In addition to the foregoing, the following principles apply.

## A. Federal Question

A federal court may only entertain an application for a writ of habeas corpus from
a state prisoner who claims his custody violates the "Constitution or the laws or treaties of
the United States." 28 U.S.C. § 2254(a). Questions of state law are generally insufficient
to warrant review or relief by a federal court under § 2254. *Estelle v. McGuire*, 502 U.S. 62,
68, 112 S. Ct. 475 (1991); *Carrizales v. Wainwright*, 699 F.2d 1053, 1055 (11th Cir. 1983);
*Cabberiza v. Moore*, 217 F.3d 1329, 1333 (11th Cir. 2000). A violation of a state rule of
procedure, or of state law itself, is not a violation of the federal constitution. *Branan v.
Booth*, 861 F.2d 1507, 1508 (11th Cir. 1989).

## B. Deference to State Court Decisions

On habeas review, the state court's application of the facts to the law may not be

overturned unless it contradicts a decision of the United States Supreme Court or involves

an unreasonable factual finding. 28 U.S.C. § 2254(d). These provisions bar *de novo* review

in federal court. A decision of a state court is only "contrary to" clearly established Supreme

Court precedent if a state court has applied the wrong legal standard or has applied the

right legal standard but reached a different conclusion than the United States Supreme

Court did on materially indistinguishable set of facts. *Williams v. Taylor*, 529 U.S. 362, 412-

13, 120 S. Ct. 1495, 1522 (2000). In order for the state court's determination of the merits

of the claim to be unreasonable, it must be objectively unreasonable. "The question under

AEDPA is not whether a federal court believes the state court's determination was correct

but whether that determination was unreasonable - a substantially higher threshold."

*Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939 (2007).

The 'clearly established law' requirement of § 2254(d)(1) does not include the law

of the lower federal courts." *Dombrowski v. Mingo*, 543 F.3d 1270, 1274 (11th Cir. 2008).

Therefore, circuit court precedent cannot form the basis for habeas relief under AEDPA.

*Evans v. Sec'y, Fla. Dept. of Corr.,* 2012 WL 5200326 (11th Cir. 2012), citing *Parker v.

Matthews*, ⸺ U.S. ⸺, 132 S. Ct. 2148, 2155 (2012) (citation omitted); *Carey v.

Musladin*, 549 U.S. 70, 77, 127 S. Ct. 649, 654 (2006). Furthermore, the "only Supreme

Court decisions against which a state court decision is to be measured are those on the

books at the time the state court decision was issued." *Evans*, 2012 WL 5200326, citing

*Greene v. Fisher*, ⸺ U.S. ⸺, 132 S. Ct. 38, 45 (2011); *Cullen v. Pinholster*, ⸺ U.S.

⸺, 131 S. Ct. 1388, 1399 (2011).

The state courts' factual findings are subject to a presumption of correctness under

28 U.S.C. §2254(e)(1). The state court's factual conclusions must be accepted by the

federal courts on habeas review, unless the petitioner demonstrates by clear and convincing evidence that they are incorrect. "The question whether a state court errs in determining the facts is a different question from whether it errs in applying the law." *Reese v. Sec'y, Fla. Dept. of Corr.,* 675 F.3d 1277, 1287 (11th Cir. 2012), citing *Rice v. Collins*, 546 U.S. 333, 342, 126 S. Ct. 969, 976 (2006). But the standard of review is again deferential. In a habeas proceeding, the federal court's "review of findings of fact by the state court is even more deferential than under a clearly erroneous standard of review." *Reese*, 675 F.3d at 1287, citing *Stephens v. Hall*, 407 F.3d 1195, 1201 (11th Cir. 2005).

### *Brecht v. Abrahamson*

In *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710 (1993), the Supreme Court set forth the standard for relief where error is determined, on habeas review, to exist. This test is "less onerous" then the harmless error standard enunciated in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967). "The test is whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.' Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" 507 U.S. at 637, 113 S. Ct. at 1722. This standard applies and does so even if the state court did not find error. *Fry v. Pliler*, 551 U.S. 112, 127 S. Ct. 2321 (2007).

### C. Ineffective Assistance of Counsel

For an ineffectiveness of counsel claim, the "clearly established" standard is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). Under *Strickland*, "[a] convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable

15

professional judgment." 466 U.S. at 690, 104 S. Ct. at 2066. Counsel "is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

The "Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Bobby v. Van Hook*, 558 U.S. 4, 130 S. Ct. 13, 17 (2009) (internal quotations and citations omitted). Petitioner bears the heavy burden to "prove, by a preponderance of the evidence, that counsel's performance was unreasonable." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006), *cert. denied sub nom.*, *Jones v. Allen*, 549 U.S. 1030, 127 S. Ct. 619 (2006). And, a court must "judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct," *Roe v. Flores–Ortega*, 528 U.S. 470, 477, 120 S. Ct. 1029 (2000) (quoting *Strickland,* 466 U.S. at 690).

Even if deficient performance is demonstrated, a petitioner must also show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068. It must be "reasonably likely" the result would have been different; "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington*, 131 S. Ct. at 793 (citations omitted). The failure to demonstrate either prong of *Strickland* is dispositive of the claim against the petitioner. 466 U.S. at 697.

This Court does not apply *Strickland de novo*, but rather through the additional layer of AEDPA deference. 28 U.S.C. § 2254(d)(1). As the Supreme Court has noted, "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the

16

two apply in tandem, review is doubly so." *Harrington*, 131 S. Ct. at 788 (internal quotation marks and citations omitted).   When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard. *Harrington*, 131 S. Ct. at 788.

For the following reasons, Pittman has not established that the state court's decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2).

## DISCUSSION

### GROUND I

**MR. PITTMAN WAS DEPRIVED OF HIS RIGHTS TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT, AS WELL AS HIS RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, BECAUSE THE STATE WITHHELD EVIDENCE WHICH WAS MATERIAL AND EXCULPATORY IN NATURE AND/OR PRESENTED FALSE AND MISLEADING EVIDENCE**.

THE BRADY/GIGLIO CLAIMS

Pittman asserts a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963) and *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972). (Petition, Doc. 14 at 6-39; Memorandum, Doc. 15 at 2-21). Pittman raised his *Brady* and *Giglio* claims in his state postconviction motion and they were denied after an evidentiary hearing. Petitioner then

raised the *Brady* and *Giglio* claims on postconviction appeal.[2]   *See*, Initial Brief, Case No. SC08-146, Argument I (D47/57-97). The Florida Supreme Court affirmed the denial of postconviction relief in *Pittman v. State*, 90 So. 3d 794, 804 (Fla. 2011).

This Court's review of the state court's decision is limited by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). See, 28 U.S.C. § 2254; *Williams v. Taylor*, 529 U.S. 362, 402-03, 120 S. Ct. 1495 (2000). Under AEDPA, when the state court has adjudicated the petitioner's claim on the merits, a federal court may not grant habeas relief unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id*. § 2254(d)(2). A state court's factual findings are presumed correct unless rebutted by clear and convincing evidence. *Id*. § 2254(e). "Implicit findings of fact are entitled to deference under § 2254(d) to the same

---

[2]   On postconviction appeal, *Pittman v. State*, 90 So. 3d 794, 804, fn. 8 (Fla. 2011), the Florida Supreme Court noted that Pittman raised nine guilt phase issues and three penalty phase issues on postconviction appeal. The Florida Supreme Court stated, "Pittman raises the following guilt phase claims in his present appeal: (1) whether the postconviction court erred in denying his claim under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963), with respect to inmate Carl Hughes; (2) whether the postconviction court erred in denying his *Brady* claim with respect to inmate David Pounds; (3) whether the postconviction court erred in denying his *Brady* claim with respect to the handwritten notes of other witness interviews; (4) whether the postconviction court erred in denying his *Brady* claim with respect to Dennis Waters' identification of the wrecker; (5) whether the postconviction court erred in denying his *Brady* claim with respect to the letter concerning William Smith; (6) whether the postconviction court erred in denying relief based on the cumulative effect of all the withheld and newly discovered evidence; (7) whether the postconviction court erred in denying his *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L.Ed.2d 104 (1972) claim; (8) whether the postconviction court erred in denying his ineffective assistance of counsel claim; and (9) whether the postconviction court erred in denying his newly discovered evidence claim.

extent as explicit findings of fact." *Blankenship v. Hall*, 542 F.3d 1253, 1272 (11th Cir. 2008).

In *Ponticelli v. Sec'y, Fla. Dept. of Corr.*, 690 F.3d 1271, 1292-1293 (11th Cir. 2012), the Eleventh Circuit recently reiterated:

> To obtain relief on his *Brady* claim, [Petitioner] had to "establish (1) the government possessed evidence favorable to him; (2) the defendant did not possess the evidence and could not have obtained it with reasonable diligence; (3) the government suppressed the favorable evidence; and (4) the evidence was material." *Lamarca v. Sec'y, Dep't of Corr.*, 568 F.3d 929, 941 (11th Cir.2009) (internal quotation marks omitted). "Evidence would be 'material' if it is reasonably probable that a different outcome would have resulted if the government had disclosed the evidence. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ferguson v. Sec'y for the Dep't of Corr.*, 580 F.3d 1183, 1205–06 (11th Cir. 2009)(some internal quotation marks and citation omitted).

The Florida Supreme Court addressed Petitioner's *Brady* claims at length and affirmed the trial court's denial of relief on Pittman's *Brady* claims as follows:

### A. Brady Claim Concerning Carl Hughes

> In this claim, Pittman asserts that the postconviction court erred in denying his *Brady* claim with respect to inmate Carl Hughes. The United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), held that a prosecutor must disclose material information that is favorable to the defense. To establish a *Brady* violation, a defendant must show the following: (1) the State suppressed evidence, either exculpatory or impeaching, that was favorable to the defense; (2) the State did so either willfully or inadvertently; and (3) the defendant was prejudiced. *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). To satisfy the prejudice prong, the defendant must demonstrate a reasonable probability that had the suppressed evidence been disclosed the jury would have reached a different verdict. *Id.* A reasonable probability is a probability sufficient "to undermine confidence in the verdict." *Id.* at 290, 119 S.Ct. 1936 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). A court's decision with respect to a *Brady* claim is a mixed question of law and fact, and a reviewing court will defer to the lower court's factual findings if they are supported by competent, substantial evidence, but will review the court's application of law to facts *de novo, Mordenti v. State*, 894 So.2d 161, 168 (Fla. 2004); *Way v. State*, 760 So.2d

19

903, 913 (Fla. 2000), and the reviewing court will review the cumulative effect of the suppressed evidence *de novo. Mordenti*, 894 So.2d at 168.

In this claim, Pittman asserts that the State failed to disclose certain evidence with respect to inmate Carl Hughes, including the following: (1) certain facts concerning Hughes' ex-wife, Kathleen Anders; (2) Assistant State Attorney (ASA) Pickard's letter dated October 11, 1990, to Detective Cosper; (3) Cosper's handwritten notes of a July 6, 1990, interview with Hughes; and (4) Hughes' presentence investigation report. Pittman asserts that the postconviction court erred in denying relief on this claim. This issue was addressed at length at the evidentiary hearing below, and the postconviction court ruled as follows:

> The Defendant that Carl Hughes, who testified against Mr. Pittman at the trial, was placed with Mr. Pittman so that he could assist the State. The defense argues that Mr. Hughes acted  as a State agent and that the State's action in placing Mr. Hughes with Mr. Pittman violated Mr. Pittman's Sixth Amendment rights. The Defendant alleges that the State withheld favorable evidence concerning Carl Hughes a witness for the State at the Defendant's trial. Mr. Hughes testified at trial that the Defendant had confessed to the murders he was charged with. Mr. Hughes's ex-wife, Kathleen Anders, was called by the defense as a witness at the evidentiary hearing. Ms. Anders testified that Mr. Hughes asked her for money when he was incarcerated at the Polk County Jail and became angry with her when she said she didn't have the money. Ms. Anders testified that Mr. Hughes told her he was trying to keep her from being arrested, and he had been asked by the Florida Department of Law Enforcement to obtain information regarding the Pittman case. Ms. Anders testified that Mr. Hughes told her that she was under surveillance. Ms. Anders testified that she spoke with Assistant State Attorney David Bergdoll and was given a polygraph test. At the evidentiary hearing, Assistant State Attorney Hardy Pickard testified that he did not recall learning of any polygraph being given to Ms. Anders or about any potential criminal charges against her. Ms. Anders said she was in contact with FDLE agent Randy Dey, and she did not recall if Mr. Hughes asked her to tell Dey that he had some information on Pittman. Ms. Anders testified that she did frequently relay messages back and forth between Mr. Hughes and Mr. Dey, but they were not related to Mr. Pittman's case. Norgard, the Defendant's trial counsel testified at the evidentiary hearing that if he had known of a threat of criminal prosecution to Mr. Hughes' wife by the State Attorney's office

or law enforcement it would have been an area of impeachment he would have gone into, and he would have wanted to contact Mr. Hughes' wife to inquire about the threat. At the trial, Mr. Hughes testified that he did not get any rewards or incentives for testifying. Norgard testified that if he had contacted Ms. Anders and learned that Mr. Hughes had said he needed to get information against Mr. Pittman to save her from prosecution, he would have pursued the evidence as indicating that Mr. Hughes was an agent within the meaning of the Fifth and Sixth Amendment.

A review of the direct and cross-examination of Mr. Hughes at trial shows that any purported deal Mr. Pittman thinks Mr. Hughes received was addressed on direct examination and cross-examination at trial. On cross-examination it was brought out that Mr. Hughes had written a letter to the sentencing judge prior to his sentencing letting him know of his cooperation with FBI, and FDLE on HUD cases and in the David Pittman case. It was also brought out that ASA Bergdoll told the court at sentencing that looking at the cooperation and full magnitude of his case they had arrived at a recommendation of 6 years rather than 85 years....Even assuming the undisclosed evidence regarding Ms. Anders had some impeachment value, the Court finds that the Defendant has not shown any reasonable probability that this information weakens the case against the Defendant so as to give rise to a reasonable doubt as to his culpability or might have led to a different jury verdict.

The Defendant alleges that...a letter from Pickard to Detective Cosper addressing the possibility of holding Mr. Hughes in contempt if he refused to testify constituted *Brady* material and should have been disclosed to defense counsel. The Court does not find that this letter constitutes *Brady* material. This matter was specifically addressed at trial, and Mr. Hughes admitted that he knew he could be incarcerated for more time for contempt if he refused to testify.

The Defendant alleges that...some handwritten notes of an interview Detective Cosper had with Mr. Hughes on July 6, 1990, constituted *Brady* material. The defense particularly focused on a handwritten note by Detective Cosper that said "real off on time of occurrence." The defense argues that they were not advised that the interview took place, and information showing more contact between Mr. Hughes and law

enforcement was important because it could be used to show that Mr. Hughes' story improved as he met with law enforcement. At the evidentiary hearing, the defense was not able to elicit any further information from Cosper regarding what he might have meant by, "real off on time of occurrence." Pickard testified that he may not have been aware of all the contacts Detective Cosper had with Mr. Hughes. The court does not find that this note constitutes material information under *Brady*. The Court does not find that the evidence could have any reasonable probability of producing a different outcome at the trial.

The Defendant alleges that...Mr. Hughes' PSI prepared in his State Court case constitutes *Brady* material that should have been disclosed to the defense. Defense Counsel Robert Norgard testified that he could have filed a motion requesting Mr. Hughes' PSI. The defense has not shown that defense counsel could not have obtained the PSI through the exercise of reasonable diligence, and the Court finds no *Brady* violation. Based on this record, we conclude that Pittman has failed to show that the postconviction court erred in denying this claim. Pittman has failed to show that the State suppressed admissible evidence that was favorable to the defense, that the State did so either willfully or inadvertently, and that the defendant was thereby prejudiced. Specifically, Pittman has failed to show that, had the evidence been disclosed, there is a reasonable probability that the jury would have reached a different verdict. Under the above standard of review, Pittman has failed to show that the State committed a *Brady* violation with respect to this claim.

## B. Brady Claim Concerning David Pounds

In this claim, Pittman asserts that the State failed to disclose certain evidence with respect to inmate David Pounds, including the following: (1) Pounds' PSI and jail and prison records, and (2) Detective Cosper's notes concerning a June 18 or 19, 1990, interview with Pounds. Pittman asserts that the postconviction court erred in denying relief on this claim. This issue was addressed at length at the evidentiary hearing below and the postconviction court ruled as follows:

The Defendant alleges that there was undisclosed impeachment evidence regarding witness David Pounds. Mr. Pounds testified at the Defendant's trial for the State. The Defense claims that the State improperly withheld David

22

Pounds' 1990 PSI, which included a detailed psychological history of Mr. Pounds and could have been used to address the mental health of Mr. Pounds. Assistant State Attorney Hardy Pickard testified that he never looked into Mr. Pounds' mental health issues. Mr. Norgard testified at the evidentiary hearing that if he had been aware of information in the PSI regarding Mr. Pounds' mental health he would have explored it through discovery to see how he could use it to impeach Mr. Pounds at the trial. Defense counsel did not ask the Court to provide the PSI to the defense. The defense has not shown that defense counsel could not have obtained the PSI through the exercise of reasonable diligence, and the Court finds no *Brady* violation.

Mr. Pounds listed the names of other people he thought might have been in the jail pod along with him and Mr. Pittman in a transcript of a taped statement taken on June 25, 1990. Mr. Pounds included the name of Carl Hughes as one of the people. The defense tried unsuccessfully to obtain information regarding the jail records and alleges that the State was in possession of a police report concerning jail locations and recreation yard schedules for May 18-21, 1990, that should have been provided to the defense. The exhibit showed that Carl Hughes was not listed as being in the jail at the time. The defense alleges that the jail roster could have been used to locate inmate Reyome and impeach David Pounds by demonstrating that Mr. Hughes was never in the same jail pod with Mr. Pounds. The jail log would not have shown that Pittman and Mr. Hughes were never together, or that Mr. Pounds and Mr. Hughes were never together. Mr. Reyome's testimony at the evidentiary hearing indicated that inmates in Pod 227 could see and talk to inmates in Pod 228.

At the evidentiary hearing, Assistant State Attorney Pickard testified that he was unaware of Detective Cosper's handwritten notes of his interviews with David Pounds on June 4, 1990, June 18, 1990, and June 25, 1990. Police reports and Pound's taped statements to law enforcement on June 4, 1990, and June 25, 1990, were disclosed to the defense at the time of the trial. The defense alleges that the State violated *Brady* by not providing Detective Cosper's handwritten notes, which indicated he may have interviewed Pounds on June 18, 1990. In a 1990 deposition, Detective Cosper acknowledged only two interviews with David Pounds. At the time of trial, David Pounds indicated that Detective Cosper only spoke to him

23

twice. Detective Cosper's handwritten notes of June 18, 1990, are very abbreviated and appear to do nothing more than confirm contact information and coincide with Detective Cosper's arrangement to interview Pounds at the DOC reception center. At the evidentiary hearing, Mr. Norgard discussed as an example of impeachment a reference to Carl Hughes in Pound's June 25 statement, and its relationship to undisclosed evidence demonstrating that Pounds and Mr. Hughes were not in the jail pod together with Pittman. As indicated above, the State Attorney's office was not aware of the handwritten notes of Detective Cosper. At the evidentiary hearing, Detective Cosper was not able to provide any relevant information to further explain the notes he took at the three interviews. The Court does not find...anything in the [handwritten] notes that could reasonably be taken to put the case in such a different light that it undermines confidence in the verdict.

The defense alleges that the newly discovered information regarding David Pounds undermines confidence in the outcome of Pittman's trial. The Court does not find that the evidence could have any reasonable probability of producing a different outcome at the trial.

The Defendant's allegations with regard to ineffective assistance of counsel are addressed more fully in [a different claim]. However, the Court does not find that the evidence supports a conclusion that trial counsel's performance with regard to discovering this information with regard to Mr. Pounds falls below an objective standard of reasonableness, or that but for his errors the outcome might have been different.

Based on this record, we conclude that Pittman has failed to show that the postconviction court erred in denying this claim. Pittman has failed to show that the State suppressed admissible evidence that was favorable to the defense, that the State did so either willfully or inadvertently, and that the defendant was thereby prejudiced. Specifically, Pittman has failed to show that, had the evidence been disclosed, there is a reasonable probability that the jury would have reached a different verdict. Under the above standard of review, Pittman has failed to show that the State committed a *Brady* violation with respect to this claim.

### C. Brady Claim Concerning the Handwritten Notes of Other Witness Interviews

Pittman asserts that the State failed to disclose the notes of witness

interviews, including the following: (1) notes taken by Dectective Cosper and ASA Pickard during a May 31, 1990, interview with Barbara Marie Pittman in which she indicated that her sister, the victim Bonnie, was known for "making up physical ailments," and in which she indicated that Pittman "and my parents had [a] pretty good relationship"; and (2) notes showing the correct address of Aaron Gibbons, a witness concerning the George Hodges letter. Pittman asserts that the postconviction court erred in denying relief on this claim. This issue was addressed at the evidentiary hearing below and the postconviction court ruled as follows:

> Defendant alleges that notes taken by Detective Cosper of an interview of Marie Pittman, Defense exhibit 13, indicated that Marie Pittman told him that Bonnie made up physical ailments. The defense alleges this statement by Marie was never disclosed to them. The defense alleges that had this information been provided to the defense they could have argued to the jury that the rape allegation was another example of Bonnie's fabrications or was being used to strengthen Marie's position in a pending divorce and custody battle.

> At the evidentiary hearing Detective Cosper was not able to add to the information contained in his abbreviated notes, and the State Attorney's office was not aware that these notes existed. The Court [finds that]...[a]lthough the notes might contain some information that might be considered favorable to the defense, there is no reasonable probability that the jury verdict would have been different had the suppressed information been used at trial.

> Mr. Pittman also alleges that the State withheld information from Cosper's notes that Pittman had a good relationship with Marie Pittman's parents....[However,] the statement regarding Mr. Pittman's relationship with his wife's parents does not indicate what period of time is being discussed.  At the evidentiary hearing Detective Cosper was not able to add to the information contained in his abbreviated notes, and the State Attorney's office was not aware that these notes existed. The Court [finds that] ...[a]lthough the notes might contain some information that might be considered favorable to the defense, there is no reasonable probability that the jury verdict would have been different had the suppressed information been used at trial.

....

25

The Defendant also alleges that the State withheld information from the defense concerning its investigation of the George Hodges letter. The Defendant alleges that the State withheld evidence contained in a note from Dee Dee Wright to Mr. Pickard advising him that Gibbons had not taken off, and he had moved to a specific address. The Defendant alleges this information was intentionally withheld from the defense in order to keep them from having further access to Gibbons....

The Defendant alleges the information that was withheld clearly contributed to the trial court's decision to exclude the evidence. The Defendant argues that had everything been revealed to the defense, the defense would have been permitted to present Mr. Watson's confession to the murder. At the evidentiary hearing Assistant State Attorney Pickard testified that he had no knowledge of Mr. Gibbons supposedly taking off, and he said that both Gibbons and Watson showed up in court for a hearing that was held with regard to the George Hodges letter. The Court finds that the defense has not supported any reason to believe the trial court's decision to exclude the evidence would have been affected by disclosure of this information.

Based on this record, we conclude that Pittman has failed to show that the postconviction court erred in denying this claim. The court's factual findings are supported by competent, substantial evidence and the court properly applied the law. Pittman has failed to show that the State suppressed admissible evidence that was favorable to the defense, that the State did so either willfully or inadvertently, and that the defendant was thereby prejudiced. Specifically, Pittman has failed to show that, had the evidence been disclosed, there is a reasonable probability that the jury would have reached a different verdict. Under the above standard of review, Pittman has failed to show that the State committed a *Brady* violation with respect to this claim.

### D. Brady Claim Concerning Dennis Waters' Identification of the Wrecker

In this claim, Pittman asserts that the State failed to disclose the fact that Dennis Waters had advised law enforcement officers that his identification of the wrecker as belonging to Pittman was uncertain. Pittman asserts that the postconviction court erred in denying relief on this claim. This issue was addressed at the evidentiary hearing below and the postconviction court ruled as follows:

The defense alleges that there is new information that

26

could be used to impeach the testimony of witness Dennis Waters. At the evidentiary hearing, Dennis Waters testified that he was concerned that his testimony at the trial did not convey the doubt he had regarding the wrecker he saw on the morning after the murders. Mr. Waters testified that he had advised law enforcement officers of his doubts that the wrecker was in fact Mr. Pittman's wrecker. In pre-trial deposition on December 27, 1990, Waters identified the wrecker he saw at Mr. Barker's place as being similar to the wrecker he saw on Prairie Mine Road. At trial, Waters identified the wrecker as being the same wrecker after noting some distinctive Bondo on the hood. The defense claims that information that Waters' identification was equivocal could have been used as valuable impeachment. Although Norgard testified at the evidentiary hearing that he was unaware of any information that Mr. Waters' identification of the wrecker was equivocal, the equivocal nature of Waters' deposition had already put the defense on notice that he had vacillating levels of certainty on the matter. The Court finds the defense's allegation of a *Brady* violation in this matter to be without merit.

Based on this record, we conclude that Pittman has failed to show that the postconviction court erred in denying this claim. The court's factual findings are supported by competent, substantial evidence and the court properly applied the law. Pittman has failed to show that the State suppressed admissible evidence that was favorable to the defense, that the State did so either willfully or inadvertently, and that the defendant was thereby prejudiced. Specifically, Pittman has failed to show that, had the evidence been disclosed, there is a reasonable probability that the jury would have reached a different verdict. Under the above standard of review, Pittman has failed to show that the State committed a *Brady* violation with respect to this claim.

*E. Brady Claim with Respect to Evidence Concerning William Smith*

In this claim, Pittman asserts that the State failed to disclose William Smith's statement that the man who had been arrested for the murders looked like the same person he had seen behind a car dealership two or three weeks prior to the crimes. Pittman claims that the postconviction court erred in denying relief on this claim. This issue was addressed at the evidentiary hearing below and the postconviction court acknowledged it in its order and then summarily denied relief:

The Defendant alleges that Mr. Smith was interviewed in July of 1990 by the State, and he told them that the individual he

had seen behind the convenience store looked like an individual he had seen at a car dealership 2 or 3 weeks before that time. The Defendant alleges that the defense was never provided with this information despite the fact that statements of witnesses are required to be disclosed pursuant to rule 3.220, Fla. R. Crim. P. The defendant alleges that had defense counsel known about this statement, the statement could have been used to cast doubt on Mr. Smith's identification of the Defendant.

Based on this record, we conclude that Pittman has failed to show that the postconviction court erred in denying this claim. Pittman has failed to show that the State suppressed admissible evidence that was favorable to the defense, that the State did so either willfully or inadvertently, and that the defendant was thereby prejudiced. Specifically, Pittman has failed to show that, had the evidence been disclosed, there is a reasonable probability that the jury would have reached a different verdict. Under the above standard of review, Pittman has failed to show that the State committed a *Brady* violation with respect to this claim.

*F. Cumulative Effect of All the Withheld and Newly Discovered Evidence and Evidence of Ineffective Assistance of Counsel*

In this claim, Pittman asserts that the postconviction court erred in denying relief based on the cumulative effect of all the withheld evidence and newly discovered evidence and evidence of ineffective assistance of trial counsel (IAC), as discussed below. The various individual allegations made by Pittman were addressed at length at the evidentiary hearing below and in the postconviction court's order denying relief, and the court concluded as follows with respect to this claim:

> The Defendant alleges that the new Jones evidence must be evaluated cumulatively with the Brady evidence and the evidence of ineffective assistance of counsel and when this is done confidence has been undermined in the reliability of Mr. Pittman's trial. The Court does not find any reasonable probability that the new evidence argued by the Defendant in this Claim when considered cumulatively along with his other claims of *Brady* violations and claims of ineffective assistance of counsel would have made a difference in the outcome of the verdict. [This claim] of the Defendant's Motion is denied.

Based on this record, we conclude that Pittman has failed to show that the postconviction court erred in denying this claim. Specifically, as noted herein, Pittman has failed to show (1) that the State committed any Brady

violations; (2) that the asserted newly discovered evidence qualifies as such under *Jones v. State*, 709 So. 2d 512 (Fla. 1998); and (3) that trial counsel was ineffective. Whether Pittman's claims are evaluated individually or cumulatively, Pittman has failed to show that he is entitled to relief under the applicable standards of review.

*Pittman*, *90 So. 3d at 804-11*.

Here, as in *Ponticelli*, Pittman's reliance on *Porter* and *Sears* are of no benefit to him and Pittman has failed to show that the state courts unreasonably applied federal law in affirming the trial court's rejection of Pittman's constitutional claims under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963) or *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972). The Florida Supreme Court did not contravene clearly established federal law, unreasonably apply clearly established federal law, or reach an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

*The Carl Hughes Claim*

Pittman's first *Brady* claim focuses on Carl Hughes, the disgraced director of operations for the Lakeland Housing Authority who was convicted in federal court and in state court on multiple criminal charges, including bribery and grand theft. Hughes did not testify in postconviction; his trial testimony was neither changed nor recanted. In state court, and here, Pittman has argued that the State violated *Brady* in allegedly failing to disclose the following witnesses/information regarding Carl Hughes: (1) Hughes' ex-wife, Kathleen [Kathie] Anders; (2) the prosecutor's letter of 10/11/90 to Detective Cosper; (3) Cosper's handwritten notes regarding an interview with Hughes on 7/6/90; and (4) Hughes' confidential PSI.

On direct examination at trial, Hughes testified that he was incarcerated in a federal penitentiary in New York for falsifying a firearms application and bribery. Hughes had been

29

charged in Polk County with 17 counts of bribery and grand theft. (DA-R/2246). Hughes

had an 18-month federal sentence and 4.5 years state sentence, concurrent. (DA-R/2247).

Hughes met Pittman in the Polk County Jail and their conversations occurred about June

20-27, from midnight to 5 a.m. (DA-R/2248; 2250). On cross-examination of Hughes at trial,

defense counsel emphasized that:

> Prior to his current convictions, Hughes had been convicted of 6 prior
> felonies. (DA-R/2272).
>
> Hughes was going to be prosecuted as a career criminal. (DA-R/2274).
>
> Hughes faced the possibility of 85 years in prison. ASA Bergdoll repeatedly
> made it clear that he was seeking an enhanced penalty. (DA-R/2278; 2283).
>
> Hughes had his attorney seek a plea agreement on Hughes' behalf, but the
> prosecutor said "no deals." (DA-R/2284).
>
> Hughes wrote two or three letters to ASA David Bergdoll, head of the career
> criminal division, offering to help out the State in exchange for a deal. During
> his 16 months in jail, Hughes saw plea bargains, but the State refused to plea
> bargain in his case. (DA-R/2285-86).
>
> Hughes never believed that there really would be an 85-year sentence. On
> March 6, 1990, Hughes wrote to the judge complaining that the State
> wouldn't give him a deal and the State was being excessive. (DA-R/2284-85).
> In his letter to the judge, Hughes also offered to turn State's evidence on
> about 20 people related to HUD cases. (DA-R/2286).
>
> According to Hughes, his attorney, Roger Alcott, thought he could get a 10-
> year cap with a guilty plea. (DA-R/2287).
>
> No one ever promised Hughes anything whatsoever. ASA Bergdoll stood
> very firm on the fact that the statute prohibited him from making any kind of
> deals whatsoever. (DA-R/2299).
>
> Hughes wrote several letters, against his counsel's wishes, to ASA David
> Bergdoll and to the sentencing judge. (DA-R/2299).
>
> On April 25, 1990, Hughes pled "straight up" to the charges, with the
> maximum penalty of 85 years. According to Hughes, his attorney assured
> Hughes that if he acted in good faith, he could get a 10-year cap for Hughes;

if not, it wouldn't exceed 20 years. (DA-R/2295-96).

Hughes thought the guidelines called for 7-9 years; Hughes was unaware of ASA Bergdoll's continuing recommendation in Hughes' PSI for 85 years. Three days after his plea, Hughes wrote to the trial judge offering to be debriefed by the State on the HUD charges and to do anything to correct his mistakes. (DA-R/2297).

Both before and after his plea, Hughes made offers to testify against other people. Hughes stated he "had been asked to do that all through the course of [his] confinement." Hughes wanted a specific plea agreement, stating a specific amount of time. (DA-R/2298).

Between the time of Hughes' plea and sentencing, Hughes had conversations with FDLE case agent Randy Dey and negotiated giving information about the HUD charges. (DA-R/2300).

The only thing FDLE agent Randy Dey and FBI agent Brad Brekke promised Hughes was that they would come forward and make the judge aware of Hughes' cooperation. Randy Dey never indicated that he could persuade the trial judge and ASA Bergdoll was firm in wanting to ask for the maximum penalty; therefore, the whole question at the time was what the sentencing judge would do. (DA-R/2301; 2306).

Hughes wrote several letters to the trial judge. Hughes' letter of May 16th complained about being in isolation for almost five months; Hughes wanted to get past the county jail stage and start doing his time. Hughes' attorney told Hughes that FDLE was upset with Hughes; Hughes' probation report wasn't going well and the PSI investigator felt Hughes had lied to him. (DA-R/2302-03).

Hughes had a plea agreement with the federal government and the federal prosecutor agreed to dismiss some of the charges. (DA-R/2305). Also, HUD did not want any more disclosures to the state and Hughes felt that he was caught in the cross-fire between the state and the federal government. (DA-R/2303-04). Hughes entered his plea in federal court on May 23, 1990. (DA-R/2305-06).

On June 26, 1990, Hughes gave information about David Pittman to law enforcement. That meeting [with Detective Cosper and FDLE Agent Dey] lasted about an hour. (DA-R/2306).

Hughes asked to take a polygraph to confirm his credibility. Hughes initially refused to give a taped statement since law enforcement would not give him a polygraph. When Hughes asked if they would make his cooperation known

to the sentencing judge, Detective Cosper informed Hughes, "Carl, I can't promise you anything as much as a phone call." (DA-R/2307-08).

Hughes later gave a taped statement. Page two of Hughes taped statement to Detective Cosper included: "QUESTION: You understand that I can't promise you anything. However, you have been made aware that the court would be advised of your cooperation in this matter, and that's the only thing I could do for you? ANSWER: I understand that." (DA-R/2308).

Hughes felt that he still had a lot to lose, including his life and "ten years probation following this." (DA-R/2310).

On June 27, 1990, Hughes was on his bunk when he was attacked by Pittman and Schneider. (DA-R/2311).

Hughes was not a very popular inmate with the jail administration and Hughes thought that was why he spent 5 months in isolation. (DA-R/2315-16).

After being attacked in his jail cell, Hughes wrote Schneider a threatening letter. (DA-R/2317).

At Hughes' federal sentencing hearing (August 3, 1990), both FDLE agent Randy Dey and FBI agent Brad Brekke informed the federal judge that Hughes had been cooperating. (DA-R/2321).

On September 7, 1990, Hughes wrote a letter to the state judge regarding cooperation that Hughes gave, or attempted to give, to the FBI, to FDLE in the HUD cases, and to the state in the Pittman case. (DA-R/2322).

Hughes gave a taped statement to Detective Cosper, but he was unsure of the date [September 11, 1990]. (DA-R/2323).

Hughes was sentenced in state court September 26, 1990. (DA-R/2323).

At Hughes' sentencing hearing in state court, ASA Bergdoll advised the court of Hughes' cooperation with the HUD investigation and the homicide case. ASA Bergdoll re-evaluated the State's original intent to pursue career criminal status/sentencing, relied on the statute's exception for cooperation, and "looking at the cooperation" and "full magnitude of the case," ASA Bergdoll recommended a total of 6 years." (DA-R/2324; 2325-26).

On October 6, 1990, Hughes wrote a letter to ASA Bergdoll, thanking him "for giving [Hughes] another chance in life." (DA-R/2324; 2327-29). Hughes' letter to ASA Bergdoll also stated, "I respect you for standing firmly on your

decision not to plea bargain with me. Because of your persistence I was forced to offer assistance." (DA-R/2331).

The guidelines called for probation, and the PSI recommended 7-9 years, but that included charges that were not allowed. Another PSI was never done, but another score sheet was. (DA-R/2332-33).

Hughes spent 16 months in the county jail before sentencing. By the time of Hughes' anticipated release date (March 13, 1992), Hughes would have served 33 months on a 4-1/2 half year sentence; about three times as much as anybody else. Hughes would serve 17 months of his 18-month federal sentence. (DA-R/2334).

Hughes did not know if Pittman's statements were true. Therefore, Hughes had his ex-wife [Kathie] contact law enforcement to confirm whether the information from Pittman was true or not. Kathie contacted FDLE agent Randy Dey, who confirmed, "Yes, in fact that murder did occur. We will be very interested in talking to Carl about it." (DA-R/2338-39).

On November 1, 1990, Hughes wrote another letter to ASA Bergdoll, and thanked him for dropping some other charges (because Hughes faced 85 years on a straight-up plea and it served no prosecutorial purpose to continue with the prosecution). According to Hughes, those charges included the "absurdity" of a wiretapping charge for openly tape recording the public housing staff meetings and an alleged aggravated assault involving plastic toy laser guns. (DA-R/2341; 2343).

Hughes wrote quite a few letters to ASA Bergdoll and to the trial judge, clearly asking for help, especially after articles appeared in the local newspaper. In January of 1990, Hughes wrote to ASA Bergdoll to "try to get four or five months off" his sentence because there was a discrepancy for the time credited to him. (DA-R/2346).

Hughes also wrote letters to ASA Pickard. In one letter, Hughes complained that he was sitting in state prison in violation of the trial court's order, that he should be in federal custody, and that "everybody is aware of my involvement in the Pittman case. Get me out of her before I get killed." (DA-R/2349).

Hughes did not want to come back to Polk County to testify, but knew that he would be returned anyway. ASA Pickard gave Hughes the options to either testify or face contempt, and six months. Hughes did not want to finish his federal prison sentence and be stuck for six months in Polk County jail again. (DA-R/2358-59).

Hughes thought he gave three different statements: one written, one off tape,

and one taped. (DA-R/2374).

Hughes' written statement to Detective Cosper detailed Pittman's statements to Hughes, but Hughes did not know if Pittman said that he set the car on fire right before Pittman went to his father's house. (DA-R/2380-82).

Hughes was subjected to extensive cross-examination. Hughes' criminal history, unsuccessful efforts to obtain a "plea bargain," repeated offers of assistance, initiation of contact with law enforcement *via* his ex-wife, Kathie [Anders], and description of Pittman's various admissions to Hughes were explored in detail. Again, in denying Pittman's *Brady* claim regarding Carl Hughes, the trial court emphasized that any purported "deal" was thoroughly addressed at trial, that Pittman failed to show that the privileged, hearsay statements to Hughes' then-wife, Kathleen Anders, would have been admissible at trial, and even if her hearsay testimony was arguably admissible as alleged impeachment, Pittman failed to show any reasonable probability that this information weakened the case against Pittman "so as to give rise to a reasonable doubt as to his culpability or might have led to a different jury verdict." (PCR V34/5386). As the trial court concluded:

> A review of the direct and cross-examination of Mr. Hughes at trial shows that any purported deal Mr. Pittman thinks Mr. Hughes received was addressed on direct examination and cross-examination at trial. On cross-examination it was brought out that Mr. Hughes had written a letter to the sentencing judge prior to his sentencing letting him know of his cooperation with FBI, and FDLE on HUD cases and in the David Pittman case. It was also brought out that Assistant State Attorney Bergdoll told the Court at sentencing that looking at the cooperation and full magnitude of his case they had arrived at a recommendation of 6 years rather than 85 years. Additionally, the defendant has not shown that Mr. Hughes's hearsay statements to Ms. Anders were admissible at trial. Even assuming the undisclosed evidence regarding Ms. Anders had some impeachment value, the Court finds that the Defendant has not shown any reasonable probability that this information weakens the case against the Defendant so as to give rise to a reasonable doubt as to his culpability or might have led to a different jury verdict.

34

(PCR V34/5386).

The state courts did not contravene clearly established federal law, unreasonably apply clearly established federal law, or reach an unreasonable determination of the facts. Pittman cites to the postconviction testimony of Hughes' former wife, Kathleen Anders. (Doc. 14 at 11). First of all, at the time of trial, the defense knew that Hughes had initiated contact with FDLE Agent Randy Dey *via* Hughes' [then] wife, Kathie. At trial, both Randy Dey and Hughes addressed the initial contact by Hughes' wife. (DA-R/2338-39; 2408). A *Brady* claim cannot stand if the defense knew of the witness at the time of trial. Second, Pittman did not establish that the State was ever aware of the arguments or conversations between Hughes and his [then] wife. The *Brady* rule only applies to the discovery, after trial, of information which had been *known to the prosecution* but unknown to the defense. See, *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392 (1976). Third, the trial record confirms that any purported "deal" to Hughes was addressed, at length, on direct and cross-examination at trial. Fourth, Pittman failed to show that any confidential hearsay statements Hughes allegedly made to his wife were not privileged and would have been admissible at trial. See, Section 90.504, Florida Statutes. Fifth, according to Ms. Anders in postconviction, approximately 16 years earlier, Hughes called her and asked her to give some money to a friend, Hughes became very angry when she said that she didn't have it; Hughes then claimed that he was trying to keep her from being arrested along with him and had been asked by FDLE to obtain information regarding the case that had been in the newspapers [Pittman]. Ms. Anders simultaneously denied any wrongdoing and admitted that she was administered a polygraph. See, *Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (reversing federal appellate court's speculation and misapplication of *Brady* principles and

35

concluding that it was not "reasonably likely" that disclosure of inadmissible information – witness' polygraph results - would have resulted in a different outcome). At most, Hughes' attempt to make his wife feel indebted to him, assuming it occurred, is scarcely more than Hughes' self-serving bluster when juxtaposed against her steadfast denial of any wrongdoing. To satisfy *Brady*'s prejudice prong, a defendant must show that the suppressed evidence was material. *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S. Ct. 1555 (1995). A new trial is only warranted when the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *Strickler*, 527 U.S. at 290. Given the significant amount of evidence impeaching Hughes at trial, even assuming the admissibility of Anders' hearsay and alleged additional impeachment value from Hughes' self-serving tirade to her, there was no reasonable probability that it would have led the jury to doubt the incriminating portions of Hughes' testimony.

Next, Pittman cites to the prosecutor's letter to Detective Cosper on October 11, 1990. (Doc. 14 at 12). This letter instructed Detective Cosper to locate Hughes in the prison system, tell Hughes that if he refuses to testify "we will ask that he be held in contempt" and "[i]f that prospect, which would be added to his present sentence and delay his release, does not concern him and he still refuses to testify, we will simply try the case without him." (PCR-E V5/839). The trial court found that the prosecutor's letter did not constitute *Brady* material and this matter was specifically addressed at trial - Hughes admitted that he knew he could be incarcerated for more time for contempt if he refused to testify. At trial, Hughes acknowledged that he could receive six months for contempt and Hughes agreed that he did not want to "finish this federal prison sentence [and] be stuck for six months in Polk

County Jail again." (DA-R/2358-59). There is no *Brady* claim where the same information (contempt and six months) was known to the defense and addressed at trial.

Next, Pittman cites to defense postconviction exhibit 15, Detective Cosper's 1-1/2 pages of handwritten notes from an interview with Hughes on July 6, 1990. (Doc. 14 at 14-15). The state court found that Detective Cosper's handwritten notes did not constitute material information under *Brady* and did "not find that the evidence could have any reasonable probability of producing a different outcome at the trial." (PCR V34/5387). On October 3, 1990, Detective Cosper was deposed by the defense prior to trial. During his deposition, Detective Cosper addressed, at length, his police reports, witness interviews, including taped interviews, his interview with Hughes on June 26, 1990, and Hughes' taped statement on 9/11/90, all of which were provided to the defense at the time of trial. During Detective Cosper's pre-trial deposition, defense counsel confirmed his understanding that taped interviews were normally conducted after oral interviews. Detective Cosper noted that, absent oversight, his written reports would address any significant off-tape statements. Detective Cosper also met with Hughes on July 6, 1990, and Cosper's handwritten notes included cryptic remarks such as "*F/S across ST*," "*burned in bucket*" and "*real off on time of occurrence.*" The transcript of Hughes' taped statement, which the defense had at the time of trial, also included Hughes' remark that Pittman "said several times that one thing that was going for him was that you all were totally wrong about the time. . ." (PCR-E V6/917). On cross-examination at trial, defense counsel repeatedly questioned Hughes on whether Pittman allegedly told Hughes that Pittman had set the car on fire right before Pittman went to his father's house [three hours before the burning car was discovered, i.e., "real off on time of occurrence"]. (DA-R/2381-82). Pittman failed to show that Detective

37

Cosper's handwritten notes of a contact with Hughes on 7/6/90 constituted any material information under *Brady*; and the cryptic remark "real off on time of occurrence" arguably refers to the same subject - the timing of the car fire - addressed in the taped statement and on cross-examination at trial. (DA-R/2381-82).

Pittman next asserts a perfunctory claim based on Hughes' PSI. (Doc. 14 at 17-18). Trial counsel, Robert Norgard, admitted that he could have filed a motion requesting Hughes' PSI, and the postconviction court found "the defense has not shown that defense counsel could not have obtained the PSI through the exercise of reasonable diligence," and found no *Brady* violation. (PCR V34/5387). As to Pittman's corollary IAC claim, the trial court found no deficiency of counsel and no resulting prejudice. (PCR V34/5388). Notably, during the cross-examination of Hughes at trial, both defense counsel Norgard and witness Hughes referred to information contained in Hughes' PSI. (DA-R/2297; 2332-33). Thus, defense counsel apparently was familiar with the contents of Hughes' PSI at the time of Pittman's trial. (DA-R/2297). Because the information was not only equally accessible to the defense, but apparently was available or known to the defense at the time of trial, any *Brady* claim was unfounded.

The David Pounds Claim

Next, Pittman argues that the prosecutor allegedly violated *Brady* by failing to obtain David Pounds' confidential PSI, which included Pounds' psychological history, and by failing to obtain the DOC's confidential medical file on Pounds, and then furnish the sealed PSI and DOC's confidential medical file to Pittman. (Doc. 14 at 18-20). In denying this claim, the state court did not contravene clearly established federal law, unreasonably apply clearly established federal law, or reach an unreasonable determination of the facts.

At trial, David Pounds testified that he was incarcerated at Union Correctional Institution, serving a life sentence for armed robbery. Pounds had been convicted of six felonies. (DA-R/1892). Pounds previously was convicted of eleven misdemeanors that involved either dishonesty or making false statements. (DA-R/1893). On several occasions when Pounds and Pittman were in the cell together, Pittman said "the people that I killed" and then he changed it to "the people they say I killed". (DA-R/1895). One time, Pittman made the statement to Pounds that he had done it. (DA-R/1897). They were watching the news on the Mulberry homicides and Pounds ribbed Pittman and said "Come on, man, you know you did it" and Pittman replied, "Yeah, I did it, but there's no way they can pin it on me. My alibi is too good because of the time frames involved." Pittman's alibi was that he was home in bed approximately 10 minutes after the murders were supposedly committed and Pittman's father would give him an alibi. (DA-R/1898). Pittman told Pounds that there was no way they could lift fingerprints off the car because it had been burned and the fire department used water to put out the fire and that would have washed away the fingerprints. Pittman said his in-laws' attitude toward him was not good because they were supportive of their daughter in the divorce. Pittman said he had a wrecker that had the boom removed and a circle on the hood that hadn't been painted. Pittman also said that someone had seen a black wrecker in the area, but his wrecker was blue and there was only one spot on the hood where he had run out of paint. (DA-R/1899). Pounds and Pittman had only this one discussion at any great length and it was about the time of the 11:00 news. There were six other inmates in the cell, but they were not participating in the conversation. (DA-R/1900). There was a lapse of a few days from the time Pittman told Pounds these things until Pounds contacted the State Attorney's Office. Pounds had

already been convicted and sentenced in his case. (DA-R/1901). At first, Pounds thought he might help the State and that might help in mitigation of his sentence. Detective Cosper took a statement from Pounds, but Pounds did not divulge all the information he had. (DA-R/1902). Pounds did not tell Detective Cosper that Pittman had given him a direct confession. Pounds wanted to contact his parents first, to get their opinion on whether he should become involved with the case. (DA-R/1903). After Pounds spoke with his mother, Detective Cosper went to Central Florida Reception Center and took a second statement from Pounds. This time, Pounds told Detective Cosper that Pittman actually had committed the murders. (DA-R/1904). At that point, Detective Cosper made it perfectly clear to Pounds that if Pounds became a witness, there was nothing they could do to help him with his sentence, as did the State Attorney's office. No one told Pounds that he would get his sentence reduced if he testified. Pounds wanted to testify because he was thinking about the victims' families. (DA-R/1905). On cross-examination, defense counsel stressed:

> Pounds was sentenced on May 9, 1990 and Pittman was placed in Pounds' cell on May 15, 1990. (DA-R/1905).

> Pounds was not aware that there were still 60 days from the conclusion of Pittman's trial for Pounds' attorney to file a 3.800 motion. (DA-R/1909).

> Pounds also did not tell Detective Cosper everything in the first statement because, according to Pittman's defense counsel, Pounds wanted to get paid for it. The only person Pounds could recall being around when Pittman made his statements was Raymond Kayoni (phonetic) [Reyome]. (DA-R/1914).

> Pounds didn't know if the others who were watching TV heard Pittman's comments or not. It was pretty loud. Besides having committed the crime himself, Pittman may have learned the information from his attorney. (DA-R/1915).

> Pounds was not sure how badly his memory had been affected by his extensive alcohol use. During 1979-1986, Pounds was severely alcoholic and having blackouts. While Pounds was on psychotropic medications, he was

maintaining a 3.5 GPA in college. During his deposition of December 28, 1990, Pounds informed defense counsel that he was currently on psychotropic medication for mental disorders, which also affected his memory. (DA-R/1920-22).

According to defense counsel, Pounds basically lied to Detective Cosper the first time he talked to him when he said that he did not have any additional information. (DA-R/1924).

Pounds did not consider it lying. Pounds did not consider withholding information that he was not obligated to tell anybody to be a lie. (DA-R/1925).

Pounds admitted that he initially withheld information from Detective Cosper, which defense counsel emphasized as lying. (DA-R/1931-33).

On redirect examination at trial, Pounds read the letter he wrote to his mother. (DA-R/1936-37). Pounds' letter to his mother stated, in pertinent part:

> The problem is that I know David Pittman did it. He told me he did. I didn't tell the detective that he actually told me he did it but he did. He said there was no way that he could get convicted of it though.
>
> Now, if I help the State Attorney prosecute David Pittman I can get this life sentence off of me. But, you know, I have to snitch, and that's what I would be doing. I would never tell on a friend if they told me something like that, but I don't even know David Pittman. Killing three people is a serious crime.
>
> The detective gave me his name and number and he wants me to give a statement under oath and take a polygraph test. Then I would have to testify in court against him. Would you do it or not? I don't know what I should do. It is awful tempting to get this life sentence off of me. Give me some advice on this.

(DA-R/1936-37).

SAO Investigator Martin Hodges interviewed Pounds the week before the post-conviction hearing. Pounds was going to change his testimony to help Pittman, but Pounds decided against lying and confirmed that his trial testimony was true.  ASA Pickard never looked into Pounds' mental health issues and did not know any more than the defense

knew. Attorney Norgard did not ask the trial court to provide the sealed PSI to the defense. Although the prosecutor arguably may have had "access" to Pounds' PSI, this access, alone, did not authorize the State to release otherwise confidential records. Furthermore, *Brady* does not require the prosecutor to obtain and disclose evidence which is available to the defense from other sources. Pittman did not show that defense counsel could not have obtained the otherwise confidential records through the exercise of reasonable diligence; therefore, the trial court found no *Brady* violation. (PCR V34/5388). There is no *Brady* violation where the defense either had the information or could have obtained it through the exercise of reasonable diligence. Moreover, Pounds' dubious mental health was addressed both at Pounds' deposition and again at trial. (DA-R/1920-22).

Pittman next argues that the jail records would have been *useful* in impeaching Pounds by allegedly demonstrating that Hughes was *never* in the pod with Pounds. The trial court found that "the jail log would not have shown that Pittman and Hughes were never together, or that Pounds and Hughes were never together. Reyome's testimony at the evidentiary hearing indicated that inmates in Pod 227 could see and talk to inmates in Pod 228." (PCR V34/5388-89). The trial court's fact-specific determination is unassailable. Furthermore, the "mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." See, *United States v. Agurs*, 427 U.S. 97, 109-10, 96 S. Ct. 2392 (1976).

Addressing Detective Cosper's purported "interview" with Pounds on June 18, 1990, the trial court found that Detective Cosper's handwritten notes of June 18, 1990 (PCR-Evid. V5/729) "are very abbreviated and appear to do nothing more that confirm contact

42

information and coincide with Detective Cosper's arrangement to interview Pounds at the

DOC reception Center." (PCR V34/5389). Pittman does not dispute this dispositive factual

determination supporting the state court's conclusion that the handwritten notes were not

*Brady* material. The trial court did not find anything "that could reasonably be taken to put

the case in such a different light that it undermines confidence in the verdict." (PCR

V34/5390). Pittman failed to show any materiality from Detective Cosper's travel directions

and arrangement to interview Pounds at the DOC reception center.

The ASA's handwritten notes & Detective's handwritten notes

Next, Pittman alleges that the State allegedly violated *Brady* by not disclosing the

prosecutor's handwritten notes and Detective Cosper's handwritten notes of an interview

with Pittman's ex-wife, Marie, on May 31, 1990. These notes were not subject to disclosure

under *Brady*,[3] and, in fact, "non-verbatim, non-adopted witness statements are not

admissible at trial as impeachment evidence." See, *Williamson v. Moore*, 221 F.3d 1177,

1183 (11th Cir. 2000).

Pittman next cites to remarks that Pittman and Marie's parents "had [a] pretty good

relationship" [at some unspecified time] and Bonnie would "make up physical ailments."

(Doc. 14 at 27-28). And, as to Pittman's "crank" use and remark that Pittman (at some

---

[3]  Pittman's reliance on *Banks v. Dretke*, 540 U.S. 668, 124 S. Ct. 1256 (2004) is misplaced. As the Eleventh Circuit noted in *Jennings v. McDonough*, 490 F.3d 1230, 1239, n.8 (11th Cir. 2007), "[a]lthough the Court in *Banks* did warn that a rule "declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process," *id.* at 696, 124 S. Ct. at 1275, that statement was made in response to the State's contention that the "prosecution can lie and conceal and the prisoner still has the burden to . . . discover the evidence." *Id.*; see also, *id.* at 694, 124 S. Ct. at 1274 (noting that the prosecution continually allowed "untruthful testimony to stand uncorrected" on the matter underlying the *Brady* claim)."

undisclosed time) had a good relationship with Marie's parents, the trial court found that the "defense was well aware of the Defendant's difficulties with drugs, and the statement regarding Pittman's relationship with his wife's parents does not indicate what period of time is being discussed." (PCR V34/5398). The trial court did "not find that the notes qualify as a statement that should have been disclosed to the defense, pursuant to Rule 3.220, Fla. R. Crim. P., and they are not *Brady* material. Although the notes might contain some information that might be considered favorable to the defense, there is no reasonable probability that the jury verdict would have been different had the suppressed information been used at trial." (PCR V34/5398).

The handwritten notes did not contain any information that was material under *Brady*. The unremarkable disclosure that Pittman had - at some unspecified point in time - a "pretty good relationship" with Marie's parents would not diminish the strength of the State's case, nor bolster Pittman's "someone else did it" defense. Marie was not the only witness who testified to Pittman's fractured relationship with her parents, and Marie was not the only witness to testify about the threats Pittman made against Marie and her family. Witness Johnny Taylor testified that he met Pittman at the Bartow Correctional Center and Pittman's attitude toward the wife's parents was one of hatred. Pittman said he would kill them but did not give any reasons. Pittman said he was going to kill them. (DA-R/2454). Deborah Caves, an acquaintance, recalled Pittman making a statement to his wife, Marie, that he would kill her and her family if she got a divorce from him. (DA-R/2497). Correctional Officer William Hunter testified that in late 1989 and early 1990, Pittman told him of the family problems he had. Pittman felt that his in-laws were responsible and instrumental in keeping Pittman and his wife apart and Pittman was adamant that he would

resort to violence if necessary to resolve the problem. (DA-R/2792). Pittman stated that if necessary he would kill them; Pittman could do it in a heartbeat. (DA-R/2793). Pittman had a lot of knowledge about stealing cars and said he would burn them if he was in a rush and that torching took care of any evidence. (DA-R/2794-95). Furthermore, any suggestion by Marie that Bonnie made up physical ailments does not materially undermine the State's prosecution, nor credibly bolster Pittman's defense. The issue was not whether Bonnie's belated rape allegation was true; rather, it was that the allegation had been made against Pittman. Moreover, at the conclusion of Marie's deposition, the prosecutor specifically alerted defense counsel to additional areas of inquiry and Pittman was fully aware of the nature of his own relationship with the parties.

The state courts did not unreasonably apply *Brady* in concluding that even if the State arguably withheld any of the foregoing, Pittman could not demonstrate that he was prejudiced by the alleged nondisclosure. The undisclosed favorable evidence must place "the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290. The evidence cited by Pittman would have been merely cumulative impeachment. Marie testified at length and was subjected to extensive cross-examination. (DA-R/2524-2631; 2893-2912). Marie was Pittman's alternate suspect, Marie testified that her mother physically abused her as a child, the older she became, the worse the abuse. Her father refused to believe Marie, and Marie ran away from home when she was 16 or 17 years old. (DA-R/2894-98). Marie's alleged motive and capacity for truthfulness was already significantly impeached and any additional impeachment would have merely been cumulative.

Next, Pittman summarily concludes that Detective Cosper's handwritten notes of the

May 30, 1990, interview with the defendant's father, Eugene Pittman, might have been useful to "refresh Eugene Pittman's recall" or "impeach Eugene to the extent that he deviated" from an earlier statement. (Doc. 14 at 29-30). Again, "non-verbatim, non-adopted witness statements are not admissible at trial as impeachment evidence." See, *Williamson*. Pittman had Detective Cosper's handwritten notes in postconviction and he failed to specifically identify anything at all, that remotely supports a legitimate *Brady* claim. Moreover, Eugene Pittman also testified as a defense witness and Pittman was not denied access to Eugene, Pittman's father. A *Brady* claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it.

Pittman argues that the whereabouts of Aaron Gibbons was undisclosed. (Doc. 14 at 30). In denying this claim, the trial court reiterated that ASA Pickard testified that both Gibbons and Watson showed up in Court for a hearing that was held mid-trial with regard to the George Hodges' letter. (PCR V34/5400). Pittman does not dispute this conclusive adverse determination.

<u>The Dennis Waters Claim</u>

Next, Pittman repeats that Dennis Waters' alleged uncertainty over the wrecker constituted a *Brady* violation. (Doc. 14 at 31). During Dennis Waters' pre-trial deposition, taken by defense counsel Norgard on 12/27/90, Waters thought the wrecker was similar; and, at trial, Waters identified it as the same wrecker (noting the distinctive "Bondo" on the hood). (DA-R/1650). In postconviction, Waters again thought that the wrecker was similar, which was the same thing that he said in his pre-trial deposition. In denying Pittman's claim regarding Waters' vacillating levels of certainty, the trial court found that the "equivocal nature of Water's deposition had already put the defense on notice that he had vacillating

46

levels of certainty on the matter." (PCR V34/5391). Again, Pittman did not dispute this dispositive finding; and, once again, his alleged *Brady* claim was without merit. (PCR V34/5391).

The William Smith Sub-Claim

William Smith, who lived near the Majik Market on Highway 60, testified that between 6:30 and 6:45 a.m. on May 15th, he saw a homemade wrecker come to a stop behind the store. (DA-R/1793). It was dark blue or black with booms, and orange primer coat on the right front fender of the hood. A white male got out of the vehicle and picked up a five gallon gas can, shook it on the ground and set it back in the truck. (DA-R/1795). Later on the 6:00 television news, Smith saw the guy who had been arrested and he told his wife that it was the same person he had seen earlier that day. (DA-R/1801).

On July 2, 1990, ASA Pickard sent Detective Cosper a letter that included the following instruction, with a handwritten notation "*not necessary*" in the margin next to this paragraph:

> (2) Smith said he thought he recognized the defendant as the same person he saw 2 to 3 weeks prior at Charles Layton's Used Car Lot on Hwy. 60 and 37 in Mulberry trying to sell a Pontiac to Layton. Please contact Layton and see if he knows defendant and can verify that incident.

(PCR-E V6/843).

The failure to disclose the prosecutor's request to Detective Cosper, which is marked with the notation "not necessary" at the same paragraph, does not constitute a *Brady* violation. There is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." United *States v. Agurs*, 427 U.S. 97, 109, 96 S. Ct. 2392 (1976).

47

Pittman also repeats that the State's case was circumstantial, except for Hughes and Pounds. (Doc. 14 at 33). In other words, the State presented direct evidence at trial. The State also presented three additional witnesses (Caves, Taylor, and Hunter) who testified regarding Pittman's threats of harm to his in-laws. In short, there was more than one witness to testify about Pittman's incriminating admissions and confessions.

Pittman also contends that the state court allegedly failed to conduct the requisite cumulative analysis. This claim is belied by the record. Both the trial court (PCR V34/5394; 5400) and Florida Supreme Court, *Pittman*, 90 So. 3d at 810-811, evaluated Pittman's claims cumulatively. Furthermore, in *Ponticelli*, the Eleventh Circuit rejected a similar claim, noting:

> Ponticelli argues that the Supreme Court of Florida reviewed his *Brady* claim too "narrowly" and "ignored much of the evidence presented at the postconviction hearing," but "to merit AEDPA deference the state court need not...provide a detailed opinion covering each aspect of the petitioner's argument." *Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 748 (11th Cir. 2010). That the Supreme Court of Florida did not explicitly discuss every piece of evidence is of no moment because we must presume "that state courts know and follow the law," and "state court decisions [must] be given the benefit of the doubt." *Visciotti*, 537 U.S. at 24, 123 S.Ct. at 360. "[F]ederal habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a license to penalize a state court for its opinion-writing technique." *Lafler v. Cooper*, ―― U.S. ――, 132 S.Ct. 1376, 1396, 182 L.Ed.2d 398 (2012) (Scalia, J., dissenting)(quoting *Harrington*, 131 S.Ct. at 786). And *Allen v. Secretary, Florida Department of Corrections* forecloses Ponticelli's argument that the "piecemeal" analysis of the court suggests that it did not follow the correct standard for materiality. *See* 611 F.3d at 749. In *Allen*, we reasoned that the "existence of item-by-item analysis...is not inconsistent with a cumulative analysis. Indeed, the only way to evaluate the cumulative effect is to first examine each piece standing alone." *Id.* at 749 (internal quotation marks omitted); *see also Kyles v. Whitley*, 514 U.S. 419, 436 n. 10, 115 S.Ct. 1555, 1567 n. 10, 131 L.Ed.2d 490 (1995) ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect...separately."). Ponticelli cannot overcome the presumption that the Florida state court assessed prejudice cumulatively. *See Visciotti*, 537 U.S. at 24, 123 S.Ct. at 360; *see also Greene*

48

*v. Upton*, 644 F.3d 1145, 1159–60 (11th Cir. 2011)("Greene raised a claim on direct appeal about the cumulative effect of the prosecutor's allegedly prejudicial statements, and the Supreme Court of Georgia rejected it....Although Greene contends that the Supreme Court of Georgia failed even to consider his claim of cumulative prejudicial effect, we must presume otherwise.").

Pittman failed to show that the state court's determination was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

The Misleading Conduct Claim

Pittman repeats his purported *Giglio* claim based on shotgun allegations of allegedly false or misleading testimony. (Doc. 14 at 37). *Giglio* involves a prosecutor's knowing presentation, at trial, of false testimony against the defendant. *Giglio*, 405 U.S. at 154-55. To obtain relief on his *Giglio* claim, [Petitioner] had to "prove: (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, i.e., that there is any reasonable likelihood that the false testimony could have affected the judgment." *Trepal v. Sec'y, Fla. Dept. of Corr.*, 684 F.3d 1088, 1107-08 (11th Cir. 2012) (internal quotation marks omitted).

Pittman summarily asserts that the following was allegedly false or misleading: Hughes' trial testimony that he "was given no favors" (DA-R/2337); that Hughes allegedly gave no interviews between June 26 and September 11(although Hughes stated at trial that "I gave, I think, three different statements: one written, one off tape, and one taped." (DA-R/2374))]; FDLE Agent Randy Dey's deposition and Detective Cosper's deposition - that

Hughes' taped statement on September 11th was Hughes' second one; testimony that Pounds was only interviewed by Cosper twice; the State's argument that Pittman and his ex-wife's parents had "bad blood" between them; Dennis Waters' positive identification of the homemade wrecker he saw on the morning of May 15th; and information the State provided to the defense as to Aaron Gibbons' address and availability. Pittman's reliance on depositions and pre-trial information is of no benefit to him. *Giglio* involves a prosecutor's knowing presentation, at trial, of false testimony against the defendant. *Giglio*, 405 U.S. at 154-55.

Pittman's conclusory allegations of alleged falsity were insufficient to fairly preserve any claim for review in state court and Pittman's mischaracterizations of the foregoing as allegedly false testimony are rejected by this Court. Pittman was afforded more than a week of evidentiary hearings and he failed to prove any of his alleged *Giglio* violations. The state court found that Pittman failed to show that the prosecutor presented false testimony and that the prosecutor knew the testimony was false. The Florida Supreme Court rejected Pittman's *Giglio* claim as follows:

### G. Giglio Claim

In this claim, Pittman asserts that the postconviction court erred in denying his *Giglio* claim with respect to Carl Hughes and other matters. The United States Supreme Court in *Giglio v. United States*, 405 U.S. 150, 153––54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), held that a prosecutor cannot knowingly present false testimony against a defendant. To establish a *Giglio* violation, it must be shown that (1) the prosecutor presented false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. *Guzman v. State*, 941 So.2d 1045, 1050 (Fla. 2006). Once the defendant establishes the first two prongs, the State bears the burden of showing that the false evidence was immaterial by showing that its use was harmless beyond a reasonable doubt. *Id.* To do this, the State must show that "there is no reasonable possibility that the error contributed to the conviction." *Id.* (quoting *State v. DiGuilio*, 491 So.2d 1129, 1138 (Fla. 1986)).

A court's decision with respect to a *Giglio* claim is a mixed question of law and fact, and a reviewing court will defer to the lower court's factual findings if they are supported by competent, substantial evidence, but will review the court's application of law to facts *de novo. Sochor v. State*, 883 So.2d 766, 785 (Fla. 2004).

Pittman asserts that the State knowingly presented false or misleading evidence with respect to Carl Hughes' testimony that he received no benefit in exchange for his testimony ("I was given no favors") and that he gave no interviews between June 26, 1990, and September 11, 1990. Pittman asserts that the postconviction court erred in denying relief on this claim. This issue was addressed at the evidentiary hearing below and the postconviction court ruled as follows:

> In his Motion, the defense alleges that State witness, Carl Hughes's testimony was less than truthful regarding his relationship with the State. The Defendant alleges that Mr. Hughes made statements that he was going to attempt to get statements from Mr. Pittman and that doing so was part of the deal with the State that existed prior to his placement with Mr. Pittman. The Defendant alleges that Mr. Hughes decided not to go through with his testimony but was coerced into doing so when the State threatened to prosecute him and a family member unless he went through with the deal. The defense alleges that an interview Hughes had with Detective Cosper on July 6, 1990 was never disclosed to the defense. This matter is fully discussed by the Court under Claim I. The Defendant also alleges that the State violated Mr. Pittman's due process rights by allowing Hughes to testify that he had been advised by other inmates that Mr. Pittman talked about this case nonstop and indicated to some inmates that he may have done it. The Defendant claims that the State knew that this wasn't the case; and they failed to disclose that they knew that another inmate, Elton Ard, had indicated that Mr. Pittman had never given an indication that he had killed anyone. The Court does not find that this allegation has any merit, and it was not supported by the defense at the evidentiary hearing.

> Based on this record, we conclude that Pittman has failed to show that the postconviction court erred in denying this claim. The court's factual findings are supported by competent, substantial evidence and the court properly applied the law. Pittman has failed to show that the prosecutor presented false testimony and that the prosecutor knew the testimony was false. Under the above standard of review,

> Pittman has failed to show that the State committed a *Giglio* violation with respect to this claim.

*Pittman*, 90 So. 3d at 811-812.

Again, AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, —— U.S. ——, 130 S. Ct. 1855, 1862 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, —— U.S. ——, 131 S. Ct. 770, 786 (2011) (internal quotation marks omitted). See also, *Ponticelli v. Sec'y, Fla. Dept. of Corr.,* 690 F.3d 1271, 1292-1294 (11th Cir. 2012) (The trial court found and the state supreme court affirmed that the prosecution did not knowingly present false testimony and [Petitioner] failed to satisfy his burden of rebutting, by clear and convincing evidence, these factual determinations. See, 28 U.S.C. § 2254(e)(1).

Pittman failed to show that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). Furthermore, *Giglio* error is trial error, not a structural defect. *Ventura*, 419 F.3d at 1278 n. 3. Therefore, this court can grant relief on that claim only if (1) the petitioner establishes that a *Giglio* error occurred and (2) that error had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637, 113 S. Ct. at 1722. The shotgun barrage of complaints listed by Pittman, even if any *Giglio*

error, did not have "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623, 113 S. Ct. at 1714. Thus, even if Pittman arguably could establish a *Giglio* violation, which he failed to do, error, if any, would be harmless. See, *Trepal v. Sec'y, Fla. Dept. of Corr.,* 684 F.3d 1088, 1111-17 (11th Cir. 2012).

Ground one does not warrant habeas corpus relief.

## GROUND II

**MR. PITTMAN WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF HIS TRIAL IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Pittman renews his allegation that he was denied the effective assistance of counsel during the guilt phase. (Petition, Doc. 14 at 39-44; Memorandum, Doc. 15 at 21-24). Pittman alleges that his experienced trial attorneys, Robert Norgard and Robert Trogolo, were ineffective at the guilt phase[4] in failing to: (1) elicit from James Troup the fact that even though there was smoke inside the Toyota when he came upon it on the side of the road, the smoke was not yet coming out of the car, (2) contact inmate John Schneider in person, and (3) obtain inmate Pounds' PSI.

Again, this case is governed by AEDPA, which means that Pittman may be granted habeas relief only if the Florida courts' decisions were "contrary to, or an unreasonable application of, clearly established federal law." 28 U.S.C. § 2254(d)(1). This Court is "not

---

[4] In state court, Pittman also asserted that trial counsel was ineffective at the guilt phase in failing to dispute Dennis Waters' level of certainty in identifying the homemade wrecker. (See D47/92). Petitioner does not present any IAC/guilt phase claim based on Dennis Waters. See Doc. 14 at 40-44. Therefore, any IAC/guilt phase claim based on Waters' identification of the wrecker is abandoned.

applying *Strickland de novo*, but rather through the additional prism of AEDPA deference. Thus, under this doubly deferential standard, '[t]he pivotal question is whether the state court[s'] application of the *Strickland* standard was unreasonable. And if, at a minimum, fair minded jurists could disagree about the correctness of the state court[s'] decision, the state court [s'] application of *Strickland* was reasonable and AEDPA precludes the grant of habeas relief." *Morris v. Sec'y, Dept. of Corr.*, 677 F. 3d 1117 (11th Cir. 2012).

Pittman's IAC/guilt phase claim was raised in his Rule 3.851 motion to vacate and denied after an evidentiary hearing. Pittman included an IAC/guilt phase claim on his post-conviction appeal. See, Initial Brief, Case No. SC08-146 (Argument I, D47/91-94). In affirming the trial court's denial of the IAC/guilt phase claim, the Florida Supreme Court stated, in pertinent part:

H. Ineffectiveness Claim

In this claim, Pittman asserts that the postconviction court erred in denying his claim of ineffective assistance of trial counsel with respect to the guilt phase of the trial. Following the United States Supreme Court decision in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)(holding that the Sixth Amendment right to counsel embodies the right to effective assistance of counsel), this Court held that two requirements must be met to satisfy the deficient performance and prejudice prongs of *Strickland*:

First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.

*Maxwell v. Wainwright*, 490 So. 2d 927, 932 (Fla. 1986)(citations omitted).

Several additional criteria apply to such claims. First, there is a strong presumption that counsel's performance was not ineffective. *See Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 ("Judicial scrutiny of counsel's performance must be highly deferential."). Second, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Third, the defendant must "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83(1955)). Specifically, "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." *Occhicone v. State*, 768 So.2d 1037, 1048 (Fla. 2000).

Because both prongs of the ineffectiveness test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), present mixed questions of law and fact, this Court employs a mixed standard of review. *Sochor v. State*, 883 So.2d 766, 771 (Fla. 2004). The Court will defer to the postconviction court's factual findings as long as they are supported by competent, substantial evidence in the record, and the Court will review the lower court's legal conclusions de novo. *Id.* at 772.

In this claim, Pittman argues that his trial attorneys, Norgard and Trogolo, were ineffective in failing to do the following: in failing to elicit from James Troup the fact that even though there was smoke inside the Toyota when he came upon it on the side of the road, the smoke was not yet coming out of the car; in failing to contact inmate John Schneider in person; in failing to obtain inmate Pounds' PSI; and in failing to dispute Waters' level of certainty in identifying the homemade wrecker. This issue was addressed at the evidentiary hearing below, and the court addressed it at length its order denying relief. Specifically, with respect to Troup, the court ruled as follows: "The Court does not find that counsel's performance fell below a reasonable standard with respect to this allegation. To the extent counsel's failure to elicit the information from Troup might be considered deficient performance, the Court finds the second prong of the *Strickland* standard has not been met. There is no reasonable basis to assume that but for such deficient performance, the result of the proceeding would have been different." With respect to Schneider, the court ruled as follows: "To the extent counsel's failure to interview Schneider might be considered deficient performance, the Court finds the second prong of the *Strickland* standard has not been met. There is no reasonable basis to assume that but for such deficient performance, the result of the proceeding would have been different." And with respect to this claim overall, the court concluded as follows:

The Defendant has not shown that counsel's performance fell below an objective standard of reasonableness with respect to the allegations he makes in [this claim] of his Motion. In addition, to the extent it might be argued that there was deficient performance, the Court does not find there is any reasonable probability that the result of the proceedings would have been different but for such deficiencies. [This claim] of Defendant's motion is denied.

Based on this record, we conclude that Pittman has failed to show that the postconviction court erred in denying this claim. The court's factual findings are supported by competent, substantial evidence and the court properly applied the law. **Pittman has failed to show that counsel rendered deficient performance in the guilt phase and that the defendant was thereby prejudiced.** Under the above standard of review, Pittman has failed to show that trial counsel was ineffective in this respect.

*Pittman*, 90 So. 3d at 812-13 (e.s.).

The "unreasonable application" standard is a difficult one for a habeas petitioner to meet and is more than merely an "incorrect application" of federal law. *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010). Furthermore, under the AEDPA, the "determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Rutherford v. Crosby*, 385 F.3d 1300, 1306-07 (11th Cir. 2004) (citing § 2254(e)). Thus, under the AEDPA, a habeas petitioner "must do more than satisfy the *Strickland v. Washington*, 466 U.S. 668 (1984) standard. He must also show that in rejecting his ineffective assistance of counsel claim the state court 'applied *Strickland* to the facts of his case in an objectively unreasonable manner.'" *Rutherford*, 385 F.3d at 1309 (quoting *Bell v. Cone*, 535 U.S. 685, 699 (2002)).

Again, Pittman was represented at trial by very experienced trial counsel, attorneys Robert Norgard and Robert Trogolo. "When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even

stronger." *Chandler v. United States*, 218 F.3d 1305, 1316 (11th Cir.2000) (en banc). The state courts reasonably applied the facts and proper precedent, *Strickland*, to reject Petitioner's IAC/guilt phase claim. The state court's decision does not conflict with any clearly established Supreme Court precedent nor does it constitute an unreasonable application of any such precedent under the facts of this case.

At trial, James Troup testified that he saw a car on fire on Prairie Mine Road at around 6:30 a.m. (DA-R/1283). In denying the IAC sub-claim (based on the failure to elicit testimony from Troup that he did not see smoke coming from the vehicle to allegedly impeach the observations of Barbara Davis[5]), the trial court found no deficiency; and, even assuming any deficiency, there was "no reasonable basis to assume that but for such deficient performance, the result of the proceeding would have been different." (PCR V34/5403). In short, the jury already knew that Troup did not see anyone around the burning car. (DA-R/1290-91).

With regard to the failure to contact inmate John Schneider in person, trial counsel,

---

[5]   Barbara Davis identified Pittman as the man next to the passenger side of the burning car and who came up the embankment at a "jog-like" pace. Ms. Davis lived in an apartment on Prairie Mine Road next to where the Toyota was abandoned and burned. (DA-R/1699—1700). At approximately 6:40 a.m. on the morning of the fire, Ms. Davis was outside picking roses when she saw a ball of smoke. (DA-R/1702-03). When Ms. Davis subsequently approached the location of the fire, she saw a man coming up the embankment from beside the car. (DA-R/1704-05). The man was right next to the passenger side of the car - an inch or two away from it. (DA-R/1704) The man went across the parking lot, taking "big steps at record speed." (DA-R/1705) Ms. Davis saw the right side of the man's face; she described him as a white male with acne or indents in his face, a long and pointed nose, and dirty blonde hair hanging down on his head. (DA-R/1705; 1711-1712; 1714). Later that day, the police took her to Bartow where she identified Pittman's photo from two separate photo-packs; the first group of photos were front view only and the second group were right side profile photographs. (DA-R/1714-16; 1720). Ms. Davis also identified Pittman in court. (DA-R/1719).

Robert Norgard testified in postconviction that Schneider[6] was not contacted (in person) at the time of trial because Schneider's attorney informed the Public Defender's investigator that Schneider was afraid and Schneider didn't want to talk to them. *Strickland* mandates an evaluation of the conduct from counsel's perspective at the time. 466 U.S. at 689. Further, as the state court found, "[t]here is no reasonable basis to assume that but for such deficient performance, the result of the proceeding would have been different." (PCR V34/5403). Pittman was represented by experienced capital defense attorneys who were zealous advocates on Pittman's behalf. The state court did not unreasonably apply *Strickland* in finding that Pittman failed to establish any deficiency of counsel; and, even assuming deficient performance, there was no reasonable probability that the result of the proceedings would have been different. (PCR V34/5405).

On cross-examination of David Pounds at trial, defense counsel elicited the following:

DA-R/1905   Pounds was sentenced on May 9, 1990 and the defendant was placed in Pounds' cell on May 15, 1990.

DA-R/1909   Pounds was not aware that there were still 60 days from the conclusion of Pittman's trial for Pounds' attorney (Robert Doyle) to file a 3.800 motion.

DA-R/1914   Pounds also did not tell Det. Cosper everything in the first statement because, according to Pittman's defense counsel, Pounds wanted to get paid for it. The only person Pounds could recall being around when the defendant made

_____

[6]   At the postconviction hearing, Schneider testified that he saw Hughes going through Pittman's papers on two occasions, and that inmates in the jail had access to newspapers.

his statements was Raymond Kayoni (phonetic).

DA-R/1915   Pounds didn't know if the others who were watching TV heard the defendant's comments or not. It was pretty loud in there. Besides having committed the crime himself, the defendant may have gotten the information from his own attorney.

DA-R/1920   Pounds was not sure how badly his memory had been affected by his extensive alcohol use. During 1979 – 1986, Pounds was severely alcoholic and having blackouts. While Pounds was on psychotropic medications, he was maintaining a 3.5 GPA in college. During his deposition of December 28, 1990, Pounds informed defense counsel that he was currently on psychotropic medication for mental disorders, which also affect his memory.

DA-R/1924   According to defense counsel, basically, Pounds lied to Detective Cosper the first time he talked to him when he said that he didn't have any additional information.

DA-R/1925   Pounds didn't consider it lying. He didn't consider withholding information that he wasn't obligated to tell anybody to be a lie.

DA-R/1929   Pounds' appeal was denied by the 2DCA on January 24, 1991 when they affirmed his judgment and sentence.

DA-R/1930   Pounds thought he had 60 days from that date to file a 3.800 but that time had expired. He told his lawyer to begin work on a 3.850.

DA-R/1931   Pounds admitted that he initially withheld information from Detective Cosper, which defense counsel emphasized as lying.

On redirect examination, Pounds read the letter he wrote to his mother. (DA-R/1936-

37). Pounds' letter to his mother stated, in pertinent part:

The problem is that I know David Pittman did it. He told me he did. I didn't tell the detective that he actually told me he did it but he did. He said there was no way that he could get convicted of it though.

Now, if I help the State Attorney prosecute David Pittman I can get this life sentence off of me. But, you know, I have to snitch, and that's what I would be doing. I would never tell on a friend if they told me something like that, but I don't even know David Pittman. Killing three people is a serious crime.

The detective gave me his name and number and he wants me to give a statement under oath and take a polygraph test. Then I would have to testify in court against him. Would you do it or not? I don't know what I should do. It is awful tempting to get this life sentence off of me. Give me some advice on this.

(DA-R/1936-37).

In postconviction, State Attorney Investigator Martin Hodges interviewed Pounds the week before the evidentiary hearing. Pounds was going to change his testimony to help Pittman, but he decided against lying and confirmed that his trial testimony was true.

The question is not how the district court or this Court would rule if presented with the issue for the first time and not whether we think the state court decision is correct, but whether its decision is contrary to, or an unreasonable application of, clearly established federal law.

Pittman's claim of an entitlement to cumulative prejudice analysis also must fail. As the Eleventh Circuit explained in *Evans*,

While the prejudice inquiry should be a cumulative one as to the effect of all of the failures of counsel that meet the performance deficiency requirement, only the effect of counsel's actions or inactions that do meet that deficiency requirement are considered in determining prejudice. *Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067 ("[A]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution"); *id.* at 694, 104 S.Ct. at 2068 ("The defendant must show that there is a reasonable probability

60

that, but for counsel's unprofessional errors, the result of the proceeding would have been different.") (emphasis added). Because Evans has failed to show any deficiency in counsel's performance based on not calling any of the other six witnesses, there is no deficiency to accumulate in order to establish prejudice. *Cf. Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir.2012)("[N]one of Morris's individual claims of error or prejudice have any merit, and therefore we have nothing to accumulate."). We reject Evans' cumulative prejudice argument.

*Evans v. Sec'y, Fla. Dept. of Corr.,* 2012 WL 5200326, *17 (11th Cir. 2012).

Viewing the state court record as a whole, and examining it through the lens of double deference, the new testimony adduced at the postconviction evidentiary hearing is insufficient to establish that the Florida Supreme Court's determination was an unreasonable application of *Strickland*, or, in other words, that no fair minded jurist could reach the conclusion that the Florida Supreme Court reached in this case.

Ground two does not warrant habeas corpus relief.

### GROUND III

### MR. PITTMAN RECEIVED A CONSTITUTIONALLY DEFICIENT ADVERSARIAL TESTING DURING THE PENALTY PHASE DUE TO THE INEFFECTIVE ASSISTANCE OF COUNSEL

Pittman repeats his claim of ineffective assistance of counsel at the penalty phase. (Petition, Doc. 14 at 45-53; Memorandum, Doc. 15 at 24-28). In state court, and here, Pittman alleged that defense counsel was ineffective in failing to (1) present four additional witnesses — Robert Barker, Michael Pittman, Jean Wesley and Tillie Woody — to attest to his substance abuse and life-long afflictions, and (2) elicit additional information from three witnesses — Tammie Davis, William Pittman, and Dr. Dee — who previously testified during the penalty phase.

Pittman's IAC/penalty phase counsel claim was raised in his state postconviction

motion to vacate and denied after an evidentiary hearing. The trial court summarized the testimony presented by the postconviction witnesses on his IAC/penalty phase claim -- Robert Barker, Michael Pittman, Jean Wesley, Tillie Woody, Tammie Davis, William Pittman, and Dr. Dee. (D34/5332-33; 5336-41). In addition, the trial court addressed the testimony presented by these witnesses in denying this IAC/penalty phase claim (D34/5410-5412) and concluded that Pittman failed to establish that trial counsel's performance with regard to presenting mental health and other mitigation evidence fell below an objective standard of reasonableness. (D34/5412). In addition, Dr. Dee previously testified during the penalty phase regarding Pittman's mental health issues, drug problems, and sexual abuse.[7] (D34/5412).

After conducting the multi-day evidentiary hearing, the trial court denied Pittman's IAC/penalty phase claim as follows:

> The defense argues that defense counsel was ineffective in failing to present witnesses Robert Barker, Michael Pittman, Jean Wesley and Tilly Woody during the penalty phase, and to elicit additional testimony from Tammy Davis, William Pittman, and Dr. Dee, who did testify at the penalty phase.

---

[7] During the postconviction hearing, Dr. Dee agreed on cross-examination, that he had quite a bit of experience in testifying in penalty phases of a death penalty case, and he had quite a bit of experience before testifying in Pittman's case. Dr. Dee testified that there was nothing he would now change about the opinions he gave during the course of the trial, but there was now a little additional information in terms of corroboration. (D24/3790-92). Dr. Dee talked with Pittman and members of his family (Pittman's aunt, an uncle, his mother and his younger sister) and Dr. Dee testified at the penalty phase about Pittman's addiction. Dr. Dee recalled that the addiction was either alcohol and/or drugs, but Pittman denied being addicted when Dr. Dee talked to him. (D25/3793-95). When Dr. Dee asked Pittman if he had a drug addiction or used methamphetamines or drugs, Pittman told him no. (D25/3795). Dr. Dee previously testified at the penalty phase about Pittman's having been sexually molested three or four times at the age of nine or ten; Dr. Dee recalled that information came from Pittman. (D25/3797).

Pittman worked for Mr. Barker at his junkyard and Mr. Barker testified at the evidentiary hearing to incidents of drug abuse by Pittman. Mr. Barker testified that he saw Mr. Pittman using some crack cocaine in the months proceeding the murders. Ms. Woody testified that she taught Mr. Pittman as a student for sixth, seventh, and eighth grade at the Mulberry Middle School. She testified that he was not a critical thinker and his behavior in the classroom was average. She testified that he was not impulsive, and he did not pick on other kids. She said he did not really cause problems for her. Ms. Jean Wesley worked as a teacher's aid with a class of six students including David Pittman in 1974. She testified that it was a mixed class of emotionally handicapped students and autistic students. She testified that she thought David Pittman was eleven or twelve years of age when he was one of her students, and he was not working on grade level for his age. She testified that she did not remember him ever being aggressive to anybody when he was upset.

Michael Eugene Pittman, David Pittman's half brother testified to the physical abuse David received as a child from his mother. He testified to incidents of the Defendant being sexually abused and to Mr. Pittman's use of drugs. Tammy Davis testified at the evidentiary hearing that Mr. Pittman's mother had practically raised her. She testified to the physical abuse David received as a child from his mother. She testified at trial, but she said at the evidentiary hearing that she did not remember if David Pittman's trial lawyers ever asked her about her knowledge of David Pittman while he was growing up.

William Pittman, David Pittman's half brother testified at the evidentiary hearing regarding sexual abuse suffered by Mr. Pittman and incidents of drug abuse. He testified that he was not asked about his knowledge about sexual abuse that might have happened or drug use his brother was involved in. He testified that had be been asked these questions he would have testified about them for his brother. On cross-examination, Mr. Pittman testified that he did not tell David Pittman's lawyers about his brother's methamphetamine problem because they did not ask. He testified that he did not tell them information he was not asked about; and he did not tell them about the sexual molestation because they did not ask him about it.

Dr. Henry L. Dee, a clinical psychologist and clinical neuropsychologist testified at the evidentiary hearing. He testified that he evaluated David Pittman at the request of the defense in his murder trial in 1990, and he testified at his trial on behalf of the defense. Dr. Dee testified that he talked to some family members and relatives prior to testifying in the trial. Dr. Dee agreed that he testified at trial about Mr. Pittman's addiction. He testified that Pittman's addiction was alcohol and/or drugs, but Pittman denied being

addicted to him. He testified he was convinced of the addiction at the time of the trial, but he didn't have corroboration of it. He testified at the evidentiary hearing that he did not have any independent recollection of talking to Pittman's family members about Pittman's drug use. Dr. Dee also testified that the family members he talked to, an aunt, an uncle, his mother, and a younger sister might not have been in a position to give him that kind of information. Dr. Dee agreed that it normally would be the kind of question he would have asked them, but his notes revealed no information about it. Dr. Dee agreed that he may not have talked to the people that were aware of Pittman's drug addiction. Dr. Dee also testified that the people he talked to might not have known the significance of the drug addiction or didn't tell him about it. Dr. Dee agreed that he remembered testifying at trial that Pittman had been sexually molested three or four times at age eight or nine.

Although the testimony of these witnesses presents a harsh and depressing picture with respect to Mr. Pittman's childhood, drug use and sexual abuse; the Court does not find that the defense has shown that trial counsel's performance with regard to presenting mental health and other mitigation evidence fell below an objective standard of reasonableness. Dr. Dee testified at trial regarding Mr. Pittman's mental health issues, drug problems, and sexual abuse. Claim VII of Defendant's Motion is denied.

(D34/5409-12).

Pittman's initial brief on his postconviction appeal devoted three pages to his

IAC/penalty phase claim. *See*, Initial Brief, Case No. SC08-146, Argument II (D47/97-100).

The Florida Supreme Court affirmed the denial of relief as follows:

K. Ineffectiveness Claim Concerning the Penalty Phase

In this claim, Pittman asserts that trial counsel was ineffective in the penalty phase in failing to present additional evidence of mental health issues and other mitigation. He asserts that the postconviction court erred in denying relief on this claim. He claims that defense counsel was ineffective in the following ways: (1) in failing to present four additional witnesses — Robert Barker, Michael Pittman, Jean Wesley and Tillie Woody—to attest to his substance abuse and life-long afflictions, and (2) in failing to elicit additional information from three witnesses—Tammie Davis, William Pittman, and Dr. Dee--who testified during the penalty phase. This issue was addressed at the evidentiary hearing below and the postconviction court addressed it at length in its order denying relief, concluding as follows:

Although the testimony of these witnesses presents a

harsh and depressing picture with respect to Pittman's childhood, drug use and sexual abuse, the court does not find that the defense has shown that trial counsel's performance with regard to presenting mental health and other mitigation evidence fell below an objective standard of reasonableness. Dr. Dee testified at trial regarding Pittman's mental health issues, drug problems, and sexual abuse. Claim VII of Defendant's Motion is denied.

Based on this record, we conclude that Pittman has failed to show that the postconviction court erred in denying this claim. The court's factual findings are supported by competent, substantial evidence and the court properly applied the law. **Pittman has failed to show that counsel rendered deficient performance in the penalty phase and that the defendant was thereby prejudiced.** Under the above standard of review, Pittman has failed to show that trial counsel was ineffective in this respect.

*Pittman*, 90 So. 3d at 815-16 (e.s.).

Petitioner has not established that the state court's adjudication of this claim either (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

As Pittman recognizes, the postconviction court found that "Dr. Dee testified at trial regarding Pittman's mental health issues, drug problems, and sexual abuse." (Doc. 15 at 25, citing PCR 5412). Trial counsel's reasonable investigation into a defendant's mental health or presentation of mental health testimony is not rendered deficient simply because collateral counsel presents more mental health testimony in postconviction. Nor is counsel deemed ineffective because postconviction counsel secures the testimony of a more favorable mental health expert. See, *McClain v. Hall*, 552 F.3d 1245, 1253 (11th Cir. 2008). AEDPA "demands that state-court decisions be given the benefit of the doubt." *Renico v.*

*Lett*, —— U.S. ——, 130 S. Ct. 1855, 1862, (2010) (quotation marks omitted); *accord Morton v. Sec'y, Fla. Dept. of Corr*, 684 F.3d 1157 (11th Cir. 2012). To be unreasonable, the alleged error in the state court's finding must be so clear that there is no possibility for "fairminded disagreement." *Harrington*, 131 S. Ct. at 786–87.

Pittman's burden of establishing ineffective assistance in this case was especially difficult as he was represented by very experienced defense counsel. See, *Chandler v. United States*, 218 F.3d 1305, 1316 (11th Cir. 2000) (en banc). Pittman's experienced defense counsel prepared for the penalty phase and presented mitigation about Pittman to the penalty phase jury and the trial court. This not a bare bones penalty phase presentation. "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision" that seldom, if ever, serves as grounds to find counsel's assistance ineffective. *Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004).

The trial court's sentencing order discussed the aggravating factors and mitigating factors presented:

I. AGGRAVATING CIRCUMSTANCES

1. As an aggravating circumstance, the Defendant, David Joseph Pittman, was proven beyond and to the exclusion of every reasonable doubt to have a previous conviction of a felony involving the use or threat of violence; to wit: Aggravated Assault. (Case No. CF85-3584A1-Sentenced on March 12, 1986.)

2. As an aggravating circumstance, the Defendant, David Joseph Pittman, was proven beyond and to the exclusion of every reasonable doubt to have committed two previous capital felonies as to each of the three murders for which he has been found guilty; to wit: the murders of Bonnie Knowles and Barbara Knowles as to the murder of Clarence Knowles; the murders of Barbara Knowles and Clarence Knowles as to the murder of Bonnie Knowles; the murders of Clarence Knowles and Bonnie Knowles as to the murder of Barbara Knowles.

3. As an aggravating circumstance, the commission of the First Degree Murder of Bonnie Knowles was especially heinous, atrocious or cruel. By testimony and evidence in the record the court finds that the State proved beyond and to the exclusion of all reasonable doubt that Bonnie Knowles experienced conscious pain and suffering before death as a result of the Defendant cutting and stabbing Bonnie Knowles numerous times with a knife or similar object.

4. As an aggravating circumstance, the commission of the First Degree Murder of Barbara Knowles was especially heinous, atrocious or cruel.

By the testimony and evidence in the record the Court finds that the State proved beyond and to the exclusion of every reasonable doubt that Barbara Knowles [a] experienced pre-death apprehension of physical pain; [b] experienced conscious pain and suffering before death as a result of the Defendant stabbing Barbara Knowles numerous times with a knife or similar object; and [c] that she experienced apprehension of impending death even absent physical pain.

5. As an aggravating circumstance, the commission of First Degree Murder of Clarence Knowles was especially heinous, atrocious or cruel.

By testimony and evidence in the record the Court finds that the State proved beyond and to the exclusion of every reasonable doubt that Clarence Knowles [a] experienced pre-death apprehension of physical pain; [b] experienced apprehension of death even absent physical pain; and [c] experienced conscious pain and suffering before death as a result of the Defendant stabbing Clarence Knowles numerous times with a knife or similar object.

THE COURT concludes from these facts that David Joseph Pittman's actions in murdering each of the three individuals was especially heinous, meaning extremely wicked or shockingly evil; was especially atrocious, meaning outrageously wicked or vile; and was especially cruel, meaning designed to inflict a high degree of pain with utter indifference to, or even with enjoyment of, the suffering of others.

## II. MITIGATING CIRCUMSTANCES

As to mitigating circumstances, the Court finds the following:

1. That the three First Degree Murders for which the Defendant is to be sentenced were not committed while the Defendant was under the influence of extreme mental or emotional disturbances, nor were they mitigated by the use of alcohol as suggested. To the contrary, the Court finds the Defendant

[a] arranged the visit to his father's house on the eve of the murders, the first time in months that he had been to his father's house; [b] that he left the house by an outside door from a locked room; [c] walked the short distance in the early morning hours to the victim's home; and [d] there cut the telephone lines to the outside of the house.

The Defendant upon entering the victim's home, systematically killed all the occupants of the house using a weapon that assured the least possibility of drawing the attention of witnesses. He then proceeded in a knowledgeable way to pour gasoline about the house and out into the yard. Testimony at the trial revealed that he understood the use of fire to destroy evidence. Before setting the fire, however, he secured the keys to Bonnie Knowles car for the purpose of his getaway.

**The Defendant's actions and all other evidentiary circumstances considered show a direct conscious plan to kill and avoid apprehension. These actions do not indicate a person functioning under the influence of extreme mental or emotional disturbances**. In regard to the influence of alcohol, other than the expert's opinion, the record does not reflect it to have been a factor in the commission of the murders.

2. Except for the solicited opinions of the Defendant's expert that the Defendant's capacity to conform his conduct to the requirements of the law was substantially impaired, this mitigating circumstance is unsupported by any other evidence in the record.

**To the contrary, these facts reveal that all the actions by the Defendant leading up to the killings, the nature of the killings themselves, the methodical steps taken to destroy evidence, to effectuate a getaway, and to establish an alibi were the product of deliberate thought. These actions clearly show that the Defendant knew what he was doing and that it was unlawful.** Again the presence of alcohol as a mitigating factor is unsupported by the record except for the expert's opinion.

THE COURT finds there is nothing in the record to demonstrate that the Defendant could not conform his conduct to the requirements of law.

3. The expert has offered an opinion as a mitigating circumstance that the Defendant suffers brain damage. Other than this opinion there exists no corroborating evidence to suggest the presence of this damage or its degree, nor its actual relationship to the murders.

**4. Additional mitigating circumstances offered in evidence are that the Defendant was and may still be a hyperactive personality, and that he**

**may have suffered physical and sexual abuse as a child. Also the expert testified that the Defendant was an impulsive person with memory problems and impaired social judgment.**

**Taking all these mitigating circumstances in a light most favorable to the Defendant, the Court finds they have little if any connection to the murders. The record speaks clearly of an individual who went about the killings and the destruction of evidence in a deliberate, methodical and efficient manner to such an extent that detection was nearly avoided**. But for a lady picking roses early one morning who happened to see the Defendant running from Bonnie Knowles' burning car, the case might not have been successfully prosecuted.

While addressing meaningful facts, the record reflects another that enlightens upon the issues of the Defendant's intentions and his capacity to understand what he was doing was unlawful. That fact was the Defendant's cutting of the telephone lines. This was admitted by the Defendant to witness Hughes as being done before the Defendant entered the home of the victims.

**THE COURT, therefore, finds the aggravating circumstances established by the proper burden of proof to substantially outweigh all mitigating circumstances reflected in the record**.

*Pittman*, 646 So. 2d at 170, fn. 1 & 2 (e.s.).

On direct appeal, the Florida Supreme Court also noted

. . . In mitigation, Pittman presented the testimony of his mother that he was a difficult child to deal with and that she had disciplined him severely. A clinical psychologist testified that Pittman's father was a paranoid schizophrenic; that as a child Pittman suffered from a severe attention deficit disorder with hyperactivity; and that Pittman has organic personality syndrome, which causes paranoia and an unstable mood. After hearing this testimony, the jury recommended the death penalty for each murder conviction by a vote of 9 to 3. In his sentencing order, the judge found two aggravating circumstances for each murder: (1) previous conviction of another capital or violent felony, and (2) the murders were heinous, atrocious, or cruel. [n1] The judge then expressly rejected the mitigating factors of Pittman's being under the influence of extreme mental and emotional disturbance and concluded that the aggravating factors outweighed the proven mitigating factors. [n2]

*Pittman*, 646 So. 2d at 169-170 (footnotes omitted).

In imposing the death sentence, the trial court rejected Pittman's claim that his

conduct - the careful preparation and execution of this triple homicide - was mitigated by any mental health theory. The facts and circumstances of the murders - including Pittman's use of gasoline and fire to destroy evidence - refuted the mental health theory presented in an effort to reduce Pittman's culpability. Indeed, the truth of the matter is closer to the testimony presented by Pittman's mother as "a child most women would not want to have to raise" (DA-R/4357-58) and responsible for most of his fights (DA-R/4364). At the time of trial, it was established that Pittman's I.Q. is a lot higher than many people Dr. Dee dealt with; Pittman was capable of making the decision whether to kill or not (DA-R/4476; 4487), and the night of May 14 was the first night in months that Pittman had visited his father's house - a fact confirmed by Pittman's own testimony. (DA-R/3885). In this case, each victim was stabbed numerous times and bled to death. In addition, Bonnie Knowles' throat was cut. *Pittman*, 646 So. 2d at 173. Pittman had made threats about his in-laws over a prolonged period of time, waited for the first opportunity to confront them in the early morning hours at their home, cut the telephone wires, killed the three members of the Knowles' household, and burned the house to destroy evidence.

The trial court's sentencing order addressed the defense mitigation claims of brain damage, hyperactivity, physical and sexual abuse as a child, his impulsivity with memory problems in paragraphs (3) and (4) of the mitigating circumstances section of his sentencing order (DA-R/5180). The alleged mental and emotional problems urged by the defense were eclipsed by comparison to the "deliberate, methodical, and efficient manner to such an extent that detection was nearly avoided." (DA-R/5181) On direct appeal, the Florida Supreme Court examined the sentencing order and also held:

> The order also provides a reasoned judgment for its rejection of alcohol

use and brain damage as mitigating factors in this case, and for its acceptance of the mitigating circumstances that Pittman was a hyperactive personality, that he may have suffered physical and sexual abuse as a child, and that he was an impulsive person with memory problems and impaired social judgment. Finally, the order states with particularity the reasons that this mitigation did not outweigh the aggravating circumstances. We have examined the sentencing order and find no error.

*Pittman*, 646 So. 2d at 172.

Pittman failed to establish any deficiency of counsel and resulting prejudice under *Strickland* and the state court's decision is not an unreasonable application of *Strickland*. Pittman not only brutally slaughtered three members of the Knowles' family, but he previously had been convicted of aggravated assault in 1985. "Pittman stabbed his in-laws to death in the middle of the night after taking the precaution of cutting the phone lines. Clearly, these murders justify the sentences imposed in this case." *Pittman*, 646 So. 2d at 173.

The Florida Supreme Court also found that Pittman failed to establish any resulting prejudice based upon his allegations of deficient performance. The state courts' determination that Pittman failed to establish prejudice is entitled to considerable deference in federal court. See, *Woodford v. Visciotti*, 537 U.S. 1149, 123 S. Ct. 957 (2003). As for the second prong of *Strickland*, "[a] petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high." *Van Poyck v. Sec'y, Fla. Dept. of Corr.*, 290 F.3d 1318, 1322 (11th Cir. 2002).

Pittman cites no Supreme Court precedent that suggests, much less establishes, that defense counsel could be considered ineffective in this case. Instead, the cases cited by Pittman are easily distinguishable from the instant case. For example, in *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527 (2003), trial counsel failed to discover that the defendant suffered consistent abuse during the first six years of his life; was the victim of "physical

torment, sexual molestation, and repeated rape during his subsequent years in foster care,;" was homeless for portions of his life; and had diminished mental capacities. 539 U.S. at 528-29, 535.

In *Porter v. McCollum*, 558 U.S. 30, 130 S. Ct. 447 (2009), trial counsel collected no records, conducted no interviews, and had only one short meeting with his client concerning the penalty phase; a reasonable investigation would have revealed that the defendant was abused as a child, served heroically in the Korean War but experienced trauma therefrom, had a long-term substance abuse problem, and had impaired mental health and mental capacity. 130 S. Ct. 447, 449, 453.

Similarly, *Sears v. Upton*, 130 S. Ct. 3259, 3261 (2010), which is not an AEDPA case, does not suggest the state courts incorrectly decided this case. Sears' counsel conducted a facially deficient investigation and evidence relating to Sears' cognitive impairments and childhood difficulties was not brought to light when he was sentenced to death. In postconviction, the defense presented unrebutted testimony which established that Sears suffered from significant frontal lobe damage and that Sears did not have the normal or idyllic childhood as depicted during the penalty phase. *Sears*, 130 S. Ct. at 3261.

The Eleventh Circuit has affirmed findings of no prejudice where, as here, (1) the new mitigation evidence did not establish any statutory mitigating factors, (2) the new mitigation evidence did not reduce the weight of the statutory aggravating factors, and (3) the jury had heard some non-statutory mitigation of the same character the new mitigation presented, just in less detailed form. *See, Boyd v. Commissioner, Alabama Dept. of Corr.,* 697 F.3d 1320, 1341 (11th Cir. 2012), citing, *inter alia*, *Robinson v. Moore*, 300 F.3d 1320, 1346-48 (11th Cir. 2002).

In this case, Pittman's dysfunctional family background, mental health, sexual abuse and substance addiction were presented in mitigation. (DA-R/4315–4458). Defense counsel presented Dr. Dee to testify about Pittman's mental health, including addiction and sexual abuse. (DA-R/4417-98). There was nothing of such compelling magnitude developed during the postconviction hearing which could have altered the outcome in this case. See, *Sochor v. Sec'y, Dept. of Corr.*, 685 F.3d 1016, 1030 (11th Cir. 2012) (holding that where the death sentence is supported by substantial aggravation [HAC and prior violent felony], a habeas petitioner faces an especially heavy burden to establish that the mitigation that was not presented due to counsel's deficient performance would have sufficiently altered the sentencing balance to establish prejudice under *Strickland*).

Pittman's memorandum relies, primarily, on *Porter* and *Sears* (Doc. 15 at 26-28). However, Pittman appears to raise similar arguments, based on *Porter* and *Sears*, that were addressed at length and rejected by the Eleventh Circuit in *Ponticelli v. Sec'y, Fla. Dept. of Corr.,* 690 F.3d 1271, 1294-1302 (11th Cir. 2012).

In this case, the mental health mitigation presented during the postconviction hearing was largely cumulative to Dr. Dee's penalty phase testimony and must be balanced against the likelihood of additional damaging testimony. Both the Supreme Court and the Eleventh Circuit have held that it is reasonable for a state court to conclude that a petitioner suffers no prejudice when the evidence is either weak or cumulative of the testimony presented at trial**.** *Ponticelli*, 690 F.3d at 1296, citing, *inter alia*, *Cullen v. Pinholster*, —— U.S. ——, 131 S. Ct. 1388, 1409–10 (2011); *Wong v. Belmontes*, 558 U.S. 15, 130 S. Ct. 383, 387 (2009). Furthermore, Dr. Dee inquired of Pittman about his drug abuse and Pittman denied it. Accordingly, Pittman failed to meet his burden under *Strickland. See, Cummings v. Sec'y,*

*Fla. Dept. of Corr.,* 588 F.3d 1331, 1357 (11th Cir. 2009), citing, *inter alia*, *Stewart v. Sec'y, Dept. of Corr.*, 476 F.3d 1193, 1210-11 (11th Cir. 2007) (denying claim of ineffective assistance of trial counsel for failure to discover and inform defense mental health expert of defendant's childhood abuse and mistreatment because defendant never told his counsel about the abuse and mistreatment and, in fact "indicated just the opposite of poor treatment" (quotation marks omitted)).

Moreover, drug abuse "has little mitigating value and can do as much or more harm than good in the eyes of the jury." *Crawford v. Head*, 311 F.3d 1288, 1321 (11th Cir. 2002); *see also*, *Suggs v. McNeil*, 609 F.3d 1218, 1232 (11th Cir. 2010) (observing that "evidence of historical drug and alcohol use" is "unfavorable"). Both the Supreme Court and the Eleventh Circuit have "rejected [the] prejudice argument [ ] where mitigation evidence was a two-edged sword or would have opened the door to damaging evidence." *Ponticelli*, 690 F.3d at 1296, citing, *inter alia*, *Cummings v. Sec'y, Fla. Dept. of Corr.*, 588 F.3d 1331, 1367 (11th Cir. 2009) (internal quotation marks omitted); *see also*, e.g., *Cullen*, 131 S. Ct. at 1409-10; *Belmontes*, 130 S. Ct. at 387-88. Here, as in *Ponticelli*, in view of these precedents, it cannot be said that the decision of the Supreme Court of Florida to reject Pittman's claim under *Strickland* "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *See, Ponticelli*, 690 F.3d at 1297, citing *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011).

Furthermore, as in *Ponticelli*, even if Pittman's IAC/penalty phase claim was eligible for *de novo* review, it would still fail. *Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420 (2009); *Reese v. Sec'y, Fla. Dept. of Corr.*, 675 F.3d 1277, 1291 (11th Cir.2012) (quoting *Berghuis v. Thompkins*, —— U.S. ——, 130 S. Ct. 2250, 2265 (2010).

74

Even on *de novo* review, Pittman cannot establish deficient performance and that he suffered resulting prejudice under *Strickland*. The defense not only investigated Pittman's background, but also presented evidence at both the guilt and penalty phases (including the extensive testimony of Pittman himself at the guilt phase, DA-R/3786-3895). Pittman failed to establish that trial counsel's performance was deficient.

Pittman failed to show prejudice under *Strickland*. Here, as in *Cullen*, "[t]he State presented extensive aggravating evidence." In Florida, "the heinous, atrocious, or cruel [and] the cold, calculated, and premeditated aggravators ... are two of the most serious aggravators set out in the statutory sentencing scheme." *Larkins v. State*, 739 So. 2d 90, 95 (Fla. 1999). The postconviction evidence does not undermine the application of these aggravators. Additional substance abuse testimony likely could have caused some jurors to vote in favor of death. *See*, *Suggs*, 609 F.3d at 1231. Pittman's behavior before, during, and after the murders suggests that he was in control of his actions. Before the murders, Pittman threatened to kill members of the Knowles' family. Pittman cut the telephone line and torched the house to destroy evidence. There "is no reasonable probability that the additional evidence Pittman presented in state postconviction would have changed the outcome. See, *Cullen*, 131 S. Ct. at 1409.

Ground three does not warrant habeas corpus relief.

## GROUND IV

**THE TRIAL COURT ERRED BY FAILING TO GRANT DEFENSE MOTIONS TO SUPPRESS THE STATE'S IDENTIFICATION EVIDENCE BECAUSE OF THE UNDULY SUGGESTIVE PRETRIAL IDENTIFICATION PROCEDURES.**

Pittman repeats a claim that he raised on direct appeal in state court, alleging that the trial court erred in admitting identification testimony by three witnesses: Dennis Waters,

William Smith and Barbara Davis. Pittman alleges that the identification testimony was influenced by unduly suggestive identification procedures. (Petition, Doc. 14 at 54-61; Memorandum, Doc. 15 at 28-37). On direct appeal, the Florida Supreme Court determined that none of the identifications were unduly suggestive under the "totality of the circumstances" test of *Neil v. Biggers,* 409 U.S. 188, 199, 93 S. Ct. 375, 382 (1972). The Florida Supreme Court found that the first and second witnesses [Waters and Smith] "had a sufficient opportunity to view the wrecker and had given fairly accurate descriptions before the in-person identification. The third witness's [Barbara Davis'] identification of Pittman from the photo-pack was preceded by a general but accurate description of Pittman; the identification was made within hours of the original viewing of Pittman; and the photographs in the photo-pack were sufficiently similar to Pittman." *Pittman v. State*, 646 So. 2d 167, 171 (Fla. 1994).

Again, the issue before this Court is whether the state court's adjudication of this claim either (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Pittman's "suggestive identification" claim was based on three separate instances. The first two concerned the separate identifications of the homemade wrecker by Waters and Smith. The third concerned Barbara Davis, who identified Pittman as the man she saw running away from the burning Toyota on the morning of the murders. Barbara Davis' identification was based on a photo-pack that Pittman alleged was impermissibly suggestive.

As previously noted, Pittman's "suggestive identification" claim was raised on direct

appeal. *See*, Initial Brief, Case No. SC78605, Issue II (A32/41-54). On direct appeal, *Pittman*

*v. State*, 646 So. 2d 167, 171 (Fla. 1994), the Florida Supreme Court applied the "totality of

the circumstances" test of *Neil v. Biggers,* 409 U.S. 188, 93 S. Ct. 375 (1972) and denied the

"suggestive identification" claim as follows:

> In his second claim, Pittman asserts that the trial court erred in admitting identification testimony that was influenced by unduly suggestive identification procedures. This claim is based on three separate instances. First, a witness testified that he saw a brown Toyota abandoned on the side of the road early on the morning of the murders. The witness also testified that he saw a homemade wrecker approach the Toyota minutes before it was set on fire. Later that evening, the police drove the witness to Pittman's house to view Pittman's wrecker. The wrecker had been disassembled, [FN4] and the witness was unable to confirm whether it was the wrecker he had seen that morning. Later, after the police had reassembled the wrecker, the witness was brought back to Pittman's house and this time made a positive identification. Second, another witness testified that he saw a homemade wrecker stop near his house in the early morning hours on the day of the murders; that the driver, whom he later identified as Pittman, got out of the wrecker, shook out the contents of a gas can, returned to the wrecker and then drove off. This witness first identified the wrecker several weeks after the murders from a photo-pack that included photographs of Pittman's wrecker only. Finally, another witness identified Pittman as the man she saw running away from the burning Toyota on the morning of the murders. Her identification was based on a photo-pack that, according to Pittman, was impermissibly suggestive because no other photograph in the photo-pack closely resembled Pittman.

> [FN4] Pittman disassembled the wrecker early in the morning after the murders and shortly before he turned himself in to the police.

> In *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972), the United States Supreme Court stated that the test for allegedly suggestive identification procedures is "whether under the 'totality of the circumstances' the identification was reliable."

The Court also set out the following factors to aid in an evaluation of the likelihood of misidentification:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty

demonstrated by the witness at the confrontation, and the length
of time between the crime and the confrontation.

*Id.* **We have reviewed the record and find that, under the facts of this case, none of the identifications described above were unduly suggestive under the *Neil* test. The first and second witnesses had a sufficient opportunity to view the wrecker and had given fairly accurate descriptions before the in-person identification. The third witness's identification of Pittman from the photo-pack was preceded by a general but accurate description of Pittman; the identification was made within hours of the original viewing of Pittman; and the photographs in the photo-pack were sufficiently similar to Pittman.** [FN5]

> [FN5] In fact, at one point during the suppression hearing the trial judge remarked that three of the people displayed in the photopack "could have been the defendant's brother if not the defendant himself."

*Pittman,* 646 So. 2d at 171 (e.s.).

As previously noted, Pittman's first two sub-claims relate to the allegedly "suggestive identification" of Pittman's homemade wrecker. In state court, Pittman failed to cite any Supreme Court case holding that it is improper to either show a witness an inanimate object, such as an automobile or truck, or show a witness multiple photos of an inanimate object, such as an automobile or a wrecker truck. Pittman failed to identify any "clearly established federal law" from the United States Supreme Court applying the "suggestive identification" doctrine to the identification of inanimate objects. Again, the "only Supreme Court decisions against which a state court decision is to be measured are those on the books at the time the state court decision was issued." *Evans*, 2012 WL 5200326 (11th Cir. 2012), citing *Greene v. Fisher*, —— U.S. ——, 132 S. Ct. 38, 45 (2011); *Cullen v. Pinholster*, —— U.S. ——, 131 S. Ct. 1388, 1399 (2011).

In the absence of a clear holding by the Supreme Court about an issue of federal law, the federal habeas court cannot say that a decision of a state court was an unreasonable

application of clearly established federal law. See, *Wright v. Van Patten*, 552 U.S. 120, 126, 128 S. Ct. 743, 747 (2008) ("Because our cases give no clear answer to the question presented, let alone one in Van Patten's favor, it cannot be said that the state court unreasonably applied clearly established federal law.") (internal quotation marks omitted); *Schriro v. Landrigan*, 550 U.S. 465, 478, 127 S. Ct. 1933, 1942 (2007) (The Arizona Supreme Court did not unreasonably apply federal law because "we have never addressed a situation like this."); *Carey v. Musladin*, 549 U.S. 70, 77, 127 S. Ct. 649, 654 (2006) ("Given the lack of holdings from this Court regarding the potentially prejudicial effect of spectators' courtroom conduct of the kind involved here," the denial of relief by the California Court of Appeal "was not contrary to or an unreasonable application of clearly established federal law.").

Assuming that the state court's decision -- denying Pittman's challenge to the identification of the homemade wrecker by Waters and Smith (and Smith's recognition of Pittman on the TV news as the same man that Smith saw at the Majik Market with the wrecker and gas can) -- is subject to further review, Pittman has not established any basis for habeas relief under the AEDPA.

A. *Dennis Waters' Identification of Pittman's Wrecker*

At the motion to suppress hearing on Waters' identification of the wrecker, the parties relied on the depositions of Waters (DA-R/5262-92) and Detective Teal (DA-R/5203-14), as well as Detective Cosper's testimony at the hearing. (DA-R/5057-61). Detective Cosper testified that Waters was taken to the disassembled wrecker on McDonald Road on May 15 and did not identify it. Waters did identify it on May 16, *after* it was reassembled. (DA-R/5057-61). As Teal drove Waters to Plant City, Waters described the wrecker he had seen (older

model Ford, flatbed on back, dual wheels, primer color around it, blue boom on the back). (DA-R/5208). From the road, Waters said he didn't think he could identify this vehicle as the one he had seen. They did not get out of the car to look. (DA-R/5209).

Waters testified in deposition that he recalled seeing a homemade wrecker near the abandoned car. (DA-R/5269). Moments later, the wrecker was gone and the car was on fire. The wrecker had been "bondoed" on the hood and there was a boom on the back. (DA-R/5281). The truck was dark colored. (DA-R/5283). Waters thought it looked like a wrecker Robert Barker used to have. (DA-R/5285). Teal subsequently drove him to Barker's place (but Waters didn't know at that time it was Barker's place).

There were two vehicles in the yard, torn apart, and Waters couldn't identify either. On May 16, Chief Hunter called and wanted Waters to look at a vehicle at Barker's place. When Waters saw the front of the truck, it looked like the one he'd seen on the fifteenth. (DA-R/5288). The truck was black and blue. (DA-R/5290).

Pittman cited no Supreme Court case holding that it is improper either to show a witness an inanimate object, such as an automobile or truck, or show a witness multiple photos of an inanimate object, such as an automobile or a wrecker truck. Instead, Pittman relied on inapposite decisions pertaining to suggestive photo displays or lineups to make an identification of a human being. Dennis Waters made no identification -- either out of court or in court -- of Pittman. Rather, Waters testified about the homemade wrecker he had observed in the early morning hours near the abandoned car on Prairie Mine Road, just minutes before the abandoned vehicle was burned because of Pittman's arson.

Assuming that any "clearly established federal law" applied to hold improper an allegedly suggestive view of an inanimate object or photo display of an inanimate object,

Pittman still cannot show any entitlement to relief. Pittman implied that Waters made the identification because he knew that he was going was Bob Barker's place and had been told the wrecker had been reassembled. Actually, Waters was able to make the identification on the second visit because an assembled vehicle looks quite different from a disassembled vehicle (as David Pittman understood when he followed his sister Bobbie Jo's advice to disassemble his vehicle that a witness had seen at the crime scene). Moreover, Teal's deposition testimony was that they did not even get out of the car to look at the disassembled vehicle on the first visit. (DA-R/5209).

The innocuous comment of Chief Hunter that the wrecker had been reassembled and an invitation to Waters to go back to the Barker place adds nothing; any time the police ask a witness to attend a lineup or a show up or photo display, the witness presumably understands it is for the purpose of making an identification and that the police suspect what is to be viewed is relevant to the case. Further, to the extent Pittman wanted to explain to the jury that Waters' identification was based on factors other than his observations at the time of the offense, that his visits to the Barker place and viewing of disassembled and then reassembled vehicle might have colored his testimony, Pittman was free to do so for, as stated in *Manson v. Brathwaite*, 432 U.S. 98, 97 S. Ct 2243, 53 L.Ed.2d 140 (1977), such argument is typical "grist for the jury mill." 53 L.Ed.2d at 155.

Finally, even if Waters' identification of the wrecker were improper, any error would be harmless. *See*, *Brecht*. Barbara Davis placed Pittman at the scene of the burning vehicle; William Smith identified Pittman at the Majik Market in the wrecker; Pittman separately confessed to both Pounds and Hughes; and Pittman previously threatened members of the

Knowles family and boasted about using fire to destroy evidence.[8] The state court's decision was neither an unreasonable application of clearly established federal law, nor based on an unreasonable determination of the facts.

B. *William Smith's Identification of Pittman and his Wrecker*

At the suppression hearing, the parties relied on the depositions of Joyce and William Smith (DA-R/5049) and Detective Cosper's testimony. (DA-R/5050-61).

Joyce Smith testified that between 6:30 and 7:00 a.m., she saw a man standing by a wrecker behind the Majik Market. (DA-R/5225). She identified a photo of the wrecker. (DA-R/5228). William Smith stated that between 6:30 and 6:45, he saw a wrecker parked behind the Majik Market. (DA-R/5243). When Smith saw the television news clip of the man arrested, Smith recognized him as the same man in the truck. (DA-R/5244). Smith noticed the truck by the racket made by the cable. (DA-R/5245). The man shook a gas can on the ground and set it back in the truck. (DA-R/5246). Two or three weeks later, the police showed Smith pictures of the truck, but not of the man. (DA-R/5252). Detective Cosper showed Smith photos of the wrecker and Smith identified it. (DA-R/5052-53).

---

[8] Pittman spoke to Pounds about the car fire, saying there was no way fingerprints could be lifted from the car due to the fire and water used to extinguish it. (DA-R/1897-98). Pittman also told Marie how you could burn an automobile to get rid of fingerprints. (DA-R/2548. Polk County Correctional Officer William Hunter testified that while Pittman was incarcerated, Pittman complained about problems with the Knowles family. (DA-R/2791-92). Pittman felt his in-laws were responsible for keeping Marie from him; Pittman was adamant he would resort to violence to resolve the problem. (DA-R/2792). Pittman stated if necessary he would "kill them." (DA-R/2793). Pittman said he had a lot of knowledge about stealing cars and he would burn the car if in a rush and the fire would take care of any evidence. (DA-R/2794-95). Fire Marshall's crime lab analyst expert Victor Higg uncovered evidence of flammable liquids on Pittman's shoes and clothing. (DA-R/2724-25; 2737-39).

William Smith testified in deposition and at trial that the man he saw with a wrecker and gas can at the Majik Market between 6:30 and 6:45 a.m. was the same person that he saw on television being arrested for the crimes. (DA-R/5055, DA-R/1801). Smith was able to make an in-court identification of Pittman. (DA-R/1802) The police provided no photos of Pittman or other people for Smith to view and did not involve Smith in any lineup procedure.

There was no suggestive identification procedure utilized by the police to allow Smith to identify Pittman. The police did show photographs of Pittman's wrecker to Smith.  Pittman has not shown that the impermissible suggestive identification procedure doctrine applies in a context other than identifying people. The fact that other people may have had a homemade wrecker in the area is irrelevant to Smith's testimony; Smith saw Pittman with a wrecker and there was no suggestive procedure influencing the identification of Pittman.

Even if Smith's identification of the wrecker (and Smith's recognition of Pittman on the news as the same man with the wrecker) was improper, which it was not, any error would be harmless. See, *Brecht*. The state court's decision was neither an unreasonable application of clearly established federal law, nor based on an unreasonable determination of the facts.

C. *Barbara Davis' Identification of Pittman*

The Florida Supreme Court did not unreasonably apply clearly established federal law and did not unreasonably determine the facts when it rejected Pittman's claim under the test of *Neil v. Biggers*.[9]  The Florida Supreme Court found that Barbara Davis' "identification of Pittman from the photo-pack was preceded by a general but accurate description of Pittman;

---

[9]  See also, *Hawkins v. Sec'y, Fla. Dept. of Corr.*, 219 Fed. Appx. 904, 907 (11th Cir. 2007) (unpublished) (noting that "[t]he state court's findings on each of the *Biggers* factors are entitled to a presumption of correctness, and [the petitioner must show] that those findings were clearly erroneous."

the identification was made within hours of the original viewing of Pittman; and the photographs in the photo-pack were sufficiently similar to Pittman." *Pittman,* 646 So. 2d at 171.

Barbara Davis testified that the person coming up the embankment from the burning car passed by her about fifteen feet away. She saw the right side of his face and he had long brown-blonde hair. His face had dents or holes in his right cheek and she looked at him for one-half to one minute. (DA-R/4996-99). Davis also testified that she was shown photographs at the Sheriff's Office. She initially selected a photo, told them she was not positive, waited 35 to 45 minutes and looked at a second set of photos depicting the right side of the face. The police did not tell her if the photos in the two sets were the same people. She made a positive identification and the police did not tell her she picked the right or wrong person. (DA-R/5003-06).

Homicide Detective Land testified that he and Detective Hamlin prepared a photo-pack including a photo of Pittman and five other similar photos. Barbara Davis was shown the photographs prior to interviewing her. First, they showed her frontal photos and she was "pretty positive" but "would feel better" if she could see a side view. (DA-R/5031-34). The detective prepared a second set of photographs of the same people but shuffled the order. Davis was shown the second photo-pack and immediately and positively selected Pittman. Davis initialed and put the date on Pittman's photographs from each photo-pack. (DA-R/5035-36, Ex. 1 & 2).

Detective John Hamlin also testified that the detectives selected photographs of Pittman and five unknowns with same hair length in the same age group who looked "close to" Pittman. On the first photographs, Davis "could almost swear that was him" but, would be

84

more comfortable looking at the side view. (DA-R/5046-47). The same people were included in the second set -- arranged in a different order -- and Davis was not told this. Davis made a positive ID of Pittman. (DA-R/5048-49). That was the only testimony relied on at the suppression hearing.

The trial court commented that the characterization of the face having "dents" or "holes" or dimples seemed to be a semantic distinction involving a lady not of great sophistication and that the witness seemed to be describing the same feature with a different vocabulary. (DA-R/5068). Further, if the photographs were intended to be suggestive, it was "highly subtle" because the six young white males had hair length varying an inch or two with similar nose and cheek features and, indeed, three of the people "could have been the defendant's brother if not the defendant himself." (DA-R/5069).

Barbara Davis got a good look at Pittman as he walked by -- it was daylight and the sun had come up (DA-R/4993); she was able to describe the man she saw to police; she identified him twice (frontally and on the side) in photo displays in which the police did not suggest who to select; and she was able to make an in-court identification as well. (DA-R/1719). The photo display contained similar-looking men and did not highlight any difference in clothing or appearance among those displayed.

Even if the procedure used was unduly suggestive and improper, which it was not and the state court found it was not, exclusion of the pretrial identification would not be required so long as under the totality of circumstances the identification was reliable. *See*, *Manson v. Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243 (1977). The Florida Supreme Court determined that none of the identifications were unduly suggestive under *Neil* and that Barbara Davis' "identification of Pittman from the photo-pack was preceded by a general but accurate

description of Pittman; the identification was made within hours of the original viewing of

Pittman; and the photographs in the photo-pack were sufficiently similar to Pittman." *Pittman*,

646 So. 2d at 171. Furthermore, error, if any, would be harmless. *See*, *Brecht*.

Once again, Pittman failed to establish that the state court's decision was an

unreasonable application of clearly established Federal law or was based on an

unreasonable determination of the facts. See, 28 U.S.C. § 2254(d).

Ground four does not warrant habeas corpus relief.

### GROUND V

**THE TRIAL COURT ERRED BY EXCLUDING EVIDENCE AND THE TESTIMONY OF GEORGE HODGES THAT HIS STEP SON CONFESSED TO THE CRIME FOR WHICH MR. PITTMAN WAS ON TRIAL**.

Pittman renews a claim presented on direct appeal -- that the trial court erred by

excluding the hearsay testimony from another death row inmate, George Hodges,[10] who

_____

[10] Hodges was convicted of first degree murder and sentenced to death for killing Betty Ricks, a 20-year old store convenience clerk. In 1986, Ricks filed a criminal complaint against Hodges for indecent exposure. After Hodges' efforts to dissuade Betty Ricks from pursuing the criminal case failed, Hodges shot Ricks twice in the head and neck with a rifle, killing her. See, *Hodges v. Attorney General, State of Fla.,* 506 F.3d 1337, 1339 (11th Cir. 2007).

Hodges' stepson, Jesse Watson, testified at Hodges' jury trial. On Hodges' direct appeal, the Florida Supreme Court summarized the facts adduced at trial, which included:

Hodges worked on the maintenance crew of a department store located across the road from the convenience store. A co-worker told police that she saw Hodges' truck at the convenience store around 5:40 a.m. on January 8. **Hodges, however, claimed to have been home asleep at the time of the murder because he did not have to work that day. His stepson, Jesse Watson, and his wife, Jesse's mother, supported his story. The police took a rifle from the Hodges' residence that turned out not to be the murder weapon.** The investigation kept coming back to Hodges,

alleged that his stepson, Jesse Watson, sent a letter to Hodges in which Watson implicated himself in the Knowles' family murders. (Petition, Doc. 14 at 61-66; Memorandum, Doc. 15 at 37-43). Hodges claimed to have destroyed the letter. In state court, Pittman conceded that Jesse Watson was available to testify; Watson denied having written any such letter and Watson denied committing the Knowles murders.

Pittman's challenge to the exclusion of Hodges' hearsay testimony was raised on direct appeal. *See*, Initial Brief, Case No. SC78605, Issue III (A32/54-69). The Florida Supreme Court denied relief as follows:

> In his third claim, Pittman asserts that the trial court erred by excluding the hearsay testimony of George Hodges, a death row inmate who alleged that his stepson had implicated himself in the Knowles family murders. Early in the trial, the prosecution received an unsolicited letter from Hodges. In this letter, Hodges stated that he had received a letter from his stepson in which the stepson stated that he had killed three people in a failed burglary attempt and that he then burned the house. The trial judge gave defense counsel a few days in which to investigate the allegations. Then, at a hearing on the matter, the judge held that Hodges' testimony concerning what his stepson had told him was hearsay that did not fit within any exception and was therefore

---

however, and the police arrested him for this murder in
February 1989.

* * *
        As did his mother's, Watson's trial testimony
differed from his original statement. He testified that
he and Hodges had identical rifles and that his, not
Hodges', had been given to the police. He said that he
awakened before 6:00 a.m. the morning of the murder and
heard Hodges drive up in his truck. Hodges then came into
the kitchen carrying his rifle. When asked why he did not
originally tell the police about this, he responded that
he had wanted to protect Hodges. Watson also said that,
two months after the murder, he saw the rifle in the back
of Hodges' truck, wrapped in dirty plastic, and that
there was a hole in the ground near the tool shed. He
also testified that, several months later, Hodges told
him that he had shot the girl at the convenience store.
*Hodges*, 595 So. 2d at 930-31 (e.s.).

inadmissible. [FN6] **We find that the trial judge correctly excluded Hodges' testimony as substantive evidence under the hearsay rule and that there is no applicable hearsay exception.**

> [FN6] Although Pittman argued that section 90.804(2)(c), Florida Statutes (1989)("A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement."), applied to the statement by Hodges' stepson, **the trial judge found that the stepson was available to testify and that the statement lacked corroboration and trustworthiness**.

*Pittman*, 646 So. 2d at 171-72 (e.s.).

Section 90.804(2)(c), Florida Statutes, provides an exception to the hearsay rule for "statements against interest." One of the requirements for that exception to apply is that the declarant [Jessie Watson] must be unavailable. That requirement was not satisfied in Pittman's case because Watson was available. Another requirement of § 90.804(2)(c) is that there must be corroborating circumstances showing the trustworthiness of the statement. This requirement was also lacking -- Hodges first told Investigator Spote that Jessie Watson did not specify how the victims were killed and Hodges then changed his story to say that Watson claimed in the letter that they were stabbed. The purported letter from Watson to Hodges does not exist; Hodges tore it up. Hodges claimed to have received the letter from Watson in December 1990, yet Hodges failed to notify any prison authorities or law enforcement about it. Watson denied under oath writing any such letter and denied any involvement, as did Gibbons.

A violation of a state law or rule does not present a cognizable claim for federal habeas corpus relief. See, *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6, 103 S. Ct. 843, 853 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a

finely tuned review of the wisdom of state evidentiary rules"). The Florida Supreme Court properly rejected Pittman's claim on an adequate and independent state law ground.

Years after his direct appeal was final, Pittman sought to relitigate his exclusion of evidence claim in his state habeas petition, citing *Holmes v. South Carolina*, 547 U.S. 319, 319-20, 126 S. Ct. 1727 (2006). In denying this sub-claim, the Florida Supreme Court clearly applied a procedural bar.[11] *See Pittman v. State*, 90 So. 3d at 818. Again, the Florida

---

[11] In *Pittman*, 90 So. 3d at 818, the Florida Supreme Court stated, in pertinent part:

B. Whether this Court Erred in Affirming the Exclusion of Certain Evidence

In this claim, Pittman asserts that this Court erred in affirming the trial court's ruling on an evidentiary issue. This Court ruled as follows:

> In his third claim, Pittman asserts that the trial court erred by excluding the hearsay testimony of George Hodges, a death row inmate who alleged that his stepson had implicated himself in the Knowles family murders. Early in the trial, the prosecution received an unsolicited letter from Hodges. In this letter, Hodges stated that he had received a letter from his stepson in which the stepson stated that he had killed three people in a failed burglary attempt and that he then burned the house. The trial judge gave defense counsel a few days in which to investigate the allegations. Then, at a hearing on the matter, the judge held that Hodges' testimony concerning what his stepson had told him was hearsay that did not fit within any exception and was therefore inadmissible. We find that the trial judge correctly excluded Hodges' testimony as substantive evidence under the hearsay rule and that there is no applicable hearsay exception.

*Pittman*, 646 So.2d at 171-72 (footnote omitted).

Pittman asserts that this ruling is contrary to United States Supreme Court precedent. [FN 11] **This claim, however, is procedurally barred.** See, e.g., *Porter v. Crosby*, 840 So.2d 981, 984 (Fla. 2003)("[C]laims raised in a habeas petition which petitioner has raised in prior proceedings and which have been previously decided on the merits in those proceedings are procedurally barred in the habeas petition."). A habeas petition is not a

Supreme Court properly denied this claim on an adequate and independent state law ground.

Furthermore, Pittman has not established that the state court's adjudication of his exclusion

of evidence claim on direct appeal either (1) "resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by

the Supreme Court of the United States" or (2) "resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."

On direct appeal (A32/54-55; 59; 61), Pittman cited both *Chambers v. Mississippi,* 410

U.S. 284, 93 S. Ct. 1038 (1973) and *Washington v. Texas,* 388 U.S. 14, 87 S. Ct. 1920

(1967).  In *Chambers*, an individual named McDonald gave a sworn confession that he was

responsible for the murder that Chambers was charged with committing. *Id.* at 287,  93 S.

Ct. at 1042. McDonald later repudiated the confession. *Id.* at 288, 93 S. Ct. at 1042. At trial,

Chambers called McDonald as a witness but was kept from cross-examining him because

Mississippi's "voucher" rule prevented a party from impeaching his own witness, unless the

---

second appeal.

> [FN11] Pittman cites two cases to support this claim: *Holmes v. South Carolina*, 547 U.S. 319, 319–20, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006)(holding that a defendant's rights are "abridged by evidence rules that infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve"), and *Williamson v. United States*, 512 U.S. 594, 600, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994)(holding that whereas a statement against interest is admissible under the federal hearsay rule, a hearsay statement that is collateral to a statement against interest is not admissible).

*Pittman*, 90 So. 3d 794, 818

witness was adverse, and the trial court ruled that McDonald was not adverse. *Id.* at 291, 295-96. The trial court also prevented Chambers from calling, on hearsay grounds, several friends of McDonald who heard him confess. The Supreme Court held that Chambers' due process rights were violated by the application of the hearsay rule to bar statements that "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Chambers*, 410 U.S. at 302.

A criminal defendant's right to offer testimony is not unlimited.[12] *Chambers* noted that the defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability." *Chambers*, 410 U.S. 284, 302. The accused "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S. Ct. 646 (1988). There is no defense "right" to present uncorroborated and untrustworthy evidence to the trier of fact from witnesses who cannot be cross-examined because they have no knowledge of the substantive truth of their testimony. *Chambers* bears no factual or constitutional similarity to the case at hand. In *Chambers*, Mississippi prohibited the introduction of the hearsay statement against penal interest. Florida law did not. See, *Baker v. State*, 336 So. 2d 364 (Fla. 1976). *Baker* was codified in the Florida Evidence Code adopted by chapter 76-237, Laws of Florida; *See also*, *Henyard v. State*, 992 So. 2d 120,

---

[12]   The Compulsory Process Clause does not require criminal courts to admit evidence that is irrelevant, *Crane v. Kentucky*, 476 U.S. 683, 689-90, 106 S. Ct. 2142 (1986), testimony by persons who are mentally infirm, *see Washington*, 388 U.S. at 23 n. 21, 87 S. Ct. 1920, or evidence that represents a half-truth, see *United States v. Nobles*, 422 U.S. 225, 241, 95 S. Ct. 2160 (1975). The Supreme Court has acknowledged the "power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability -- even if the defendant would prefer to see that evidence admitted." *Crane*, 476 U.S. at 690.

126, n.3 (Fla. 2008) (noting that Section 90.804(2)(c), Florida Statutes, modified *Baker* and required outside corroborating circumstances indicating the truthfulness of the statement).

The hearsay statements at issue in *Chambers* "bore persuasive assurances of trustworthiness," 410 U.S. at 302, 93 S. Ct. at 1049, and all were corroborated by evidence from witnesses available to testify of their own knowledge. In this case, unlike *Chambers*, there was no evidence that Jessie Watson confessed to anybody else nor was there any other witness (unlike *Chambers*) who claimed to have seen Watson commit the crimes. Aaron Gibbons had not confessed to anyone that he committed the crime. Hodges contacted Watson's mother, but had not mentioned anything about her son admitting to a murder. In the alleged letter from Watson to Hodges, Watson did not mention how they broke into the house, or who the people were, or who killed the people, or how Watson and Gibbons got to the house, nor was there any mention of stealing or burning a car. According to employment records, Jesse Watson worked at Seminole Fertilizer from 7:00 a.m. to 7:00 p.m. on the day of the murder. Watson was at work at 7:00 a.m. when the Knowles' vehicle was burned at 6:40 a.m. There was no evidence to connect Watson or Gibbons to the crime at all, aside from Hodges' claim of a destroyed letter. (DA-R/3535-40; Defense Exhibits 18A & B, deposition and taped statement of Jessie Watson; Defense Exhibits 11A & B, deposition and typed interview of Aaron Gibbons; Defense Exhibit 22A, p. 12).

*Washington v. Texas* is of no benefit to Pittman either. As the Eleventh Circuit noted in *Callahan v. Campbell*, 427 F.3d 897, 931 (11th Cir. 2005), in *Washington*, the witness the defendant wanted to call was prevented from testifying by state law because he had been convicted as a participant in the same crime. 388 U.S. at 16-17, 87 S. Ct. at 1922. In holding the statute violated the Sixth Amendment right to compulsory process, the Supreme Court

did not hold a defendant could never be prevented from calling any witness. *See*, *Id.* at 23, 87 S. Ct. at 1925. Instead, the state statute violated the Constitution because it was an "arbitrary rule[ ]that prevent[ed] [a] whole categor[y] of defense witnesses from testifying on the basis of a prior categor[y] that presume[d] them unworthy of belief." *Id.* at 22, 87 S. Ct. at 1925. Unlike *Washington*, Pittman has never claimed the existence of any arbitrary rule that excluded a whole category of witnesses.

Pittman's memorandum (Doc. 15 at 38) also cites to *Holmes v. South Carolina*, 547 U.S. 319, 126 S. Ct. 1727 (2006), a Supreme Court case decided twelve years after the Florida Supreme Court's decision on direct appeal. *See*, *Pittman v. State,* 646 So. 2d 167 (Fla. 1994). Again, the "only Supreme Court decisions against which a state court decision is to be measured are those on the books at the time the state court decision was issued." *Evans*, 2012 WL 5200326, citing *Greene v. Fisher*, ––– U.S. –––, 132 S. Ct. 38, 45 (2011).

When Pittman sought to relitigate his exclusion of evidence claim in his state habeas petition, citing *Holmes*, the Florida Supreme Court clearly applied a procedural bar. The Florida Supreme Court rejected Pittman's exclusion of evidence claim on an adequate and independent state law ground and any attempt by Pittman to rely on the retroactive application of a new rule is barred under *Teague*.

Moreover, *Holmes* would also reconfirm that the Florida Supreme Court's decision is not contrary to, or an unreasonable application of, clearly established federal law. In *Holmes*, the Supreme Court found a South Carolina rule that excluded evidence implicating third parties unconstitutional because the rule impermissibly based exclusion not on the strength of the evidence at issue, but instead, on the strength of the prosecution's case as a whole. However, the Supreme Court also contrasted the challenged rule with another South

Carolina rule, which properly excluded:

> evidence which can have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another . . . [B]efore such testimony can be received, there must be such proof of connection with it, such a train of facts or circumstances, as tends clearly to point out such other person as the guilty party.

*Holmes*, 547 U.S. at 328, 126 S. Ct. 1727 (quoting *State v. Gregory*, 198 S.C. 98, 16 S.E.2d 532, 534–35 (1941)). The Supreme Court noted that "[s]uch rules are widely accepted," *Holmes*, 547 U.S. at 328, 126 S. Ct. 1727, and allow trial judges to exclude evidence whose probative value is outweighed by "certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 326.

In state court, and here, Pittman also cited to *Pettijohn v. Hall*, 599 F.2d 476 (1st Cir. 1979), a pre-AEDPA case in which the Court granted habeas relief for the denial of the Sixth Amendment right to call witnesses. Again, circuit precedent does not constitute "clearly established Federal law," as determined by the Supreme Court, 28 U.S.C. § 2254(d)(1). Therefore, it cannot form the basis for habeas relief under AEDPA. See, *Parker v. Matthews*, ——— U.S. ———, 132 S. Ct. 2148, 2155 (2012); *Carey v. Musladin*, 549 U.S. 70, 77, 127 S. Ct. 649, 654 (2006).

In *Pettijohn*, the defendant was convicted of armed robbery solely on the basis of the victim's eyewitness identification. Another eyewitness to the crime, Griffin, who was familiar with the defendant, selected the photo of another man to police and, when the police told him it was not the right one, selected the remaining photo of the defendant. At a suppression hearing, Griffin expressed doubt as to whether he could independently identify Pettijohn as the robber without relying on the prior photo display. The trial court ruled that Griffin's identification was inadmissible due to impermissibly suggestive police tactics. At trial, the

defense sought to call Griffin and introduce his prior identification of another man, but the court ruled against these efforts. While the state courts had focused on impeachment, they failed to consider it as relevant to the issue that another man perpetrated the crime. The federal habeas court held that Pettijohn was denied the opportunity to present a defense. Only Griffin and the victim were eyewitnesses to the crime and Pettijohn could support his version of the event in no other way. Critical in the case was the reliable character of the testimony -- Griffin had observed the crime from a relatively close area and his first identification of another was made free of any suggestive police practices. Here, Pittman was not denied the opportunity to call as a defense witness any eyewitness to the crime, unlike *Pettijohn*.

Moreover, *Pettijohn* was found distinguishable in *Perry v. Rushen*, 713 F.2d 1447, 1454 (9th Cir. 1983). In *Perry,* no one had ever identified Wolfe (the person urged as a possible perpetrator) as the assailant. The trial court did not commit constitutional error in excluding evidence that Wolfe looked similar to the defendant and was in the area an hour earlier. There was no violation of due process or right of compulsory process; the exclusion of evidence based on its lack of probability and tendency to confuse the jury was not improper. Florida's rules of evidence are in compliance with *Chambers* and the trial court did not err in excluding unreliable hearsay which lacked corroboration and trustworthiness and would only confuse the jury.[13]

---

[13]  At trial, defense counsel also expressed a concern about looking "stupid" to the jury if he spent the morning cross-examining Marie Pridgen regarding her motive and that of Allen Pridgen to kill and then, based on Hodges' claimed letter, now urge that Watson had committed the murders. (DA-R/2819).

Pittman's petition also refers to the trial court's denial of an additional continuance.

Error, if any, was harmless. See, *Brecht*. The state court's decision was not contrary to, nor an unreasonable application of, Supreme Court precedent.

Ground five does not warrant habeas corpus relief.


### GROUND VI

**MR. PITTMAN WAS DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL DURING HIS DIRECT APPEAL PROCEEDINGS.**

Pittman next raises a claim of ineffective assistance of appellate counsel for failing to assert that some of the prosecutor's arguments were improper. (Petition, Doc. 14 at 66-71; Memorandum, Doc. 15 at 43-44). In addition, Pittman's memorandum includes an IAC/appellate counsel sub-claim based on an alleged improper aggravator. (Doc. 15 at 43, citing *Stringer v. Black*, 112 S. Ct. 1130 (1992) and *Maynard v. Cartwright*, 108 S. Ct. 1853 (1988).

Again, in reviewing an ineffective assistance claim, this Court applies a "doubly" deferential standard that takes into account § 2254's deference to state courts and the ordinary deference to counsel, affirming if "there is any reasonable argument that counsel" acted pursuant to prevailing professional standards. See, *Harrington v. Richter*, 562 U.S. ——, 131 S. Ct. 770, 788 (2011). The standard of review applicable to ineffective assistance of appellate counsel claims mirrors the *Strickland v. Washington*, 466 U.S. 668 (1984), standard for claims of trial counsel ineffectiveness. Appellate counsel need not raise meritless issues on direct appeal. *Owen v. Sec'y, Dept. of Corr.*, 568 F.3d 894, 915 (11th Cir.

---

(Doc. 14 at 66). The State addressed the continuance sub-claim in detail on direct appeal (A33/60-66); this matter of state law provides no basis for federal habeas relief.

2009). Rather, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751-52, 103 S. Ct. 3308 (1983).

Any substantive challenges to the prosecutor's comments are procedurally barred. Furthermore, this Court's inquiry is limited to whether the state court unreasonably applied a holding of the Supreme Court, *Williams*, 529 U.S. at 412, 120 S. Ct. at 1523, and the Supreme Court has never held that a prosecutor's closing arguments were so unfair as to violate the right of a defendant to due process.[14] *Reese v. Sec'y, Fla. Dept. of Corr.,* 675 F.3d 1277, 1287-1288 (11th Cir. 2012). Thus, even if substantive review of the prosecutor's comments were available, which it is not, Pittman would not be entitled to habeas relief because "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]." *Reese*, 675 F.3d at 1288, citing *Knowles*, 556 U.S. at 122, 129 S. Ct. at 1419.

Although Pittman raised a claim of ineffective assistance of appellate counsel in his

---

[14] In *Reese*, 675 F.3d at 1291, the Eleventh Circuit further noted that "*Darden* explains that a defendant must establish that the "prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." 477 U.S. at 181, 106 S. Ct. at 2471 (citations and internal quotation marks omitted). To determine whether a prosecutor's statements during the sentencing phase are "sufficiently egregious to result in the denial of due process," we consider the comments in the context of the entire trial and examine "(1) whether the remarks were isolated, ambiguous, or unintentional; (2) whether there was a contemporaneous objection by defense counsel; (3) the trial court's instructions; and (4) the weight of aggravating and mitigating factors." *Land v. Allen*, 573 F.3d 1211, 1219–20 (11th Cir. 2009) (relying on *Romine v. Head*, 253 F.3d 1349, 1369-70 (11th Cir. 2001)).

state habeas petition in the Florida Supreme Court, Case No. SC08-2486, Claim I (D50/7-25), his argument on the "improper aggravator" sub-claim (D50/35-37) did not mention any case, state or federal, at all. As a result, Pittman's current arguments on the "improper aggravator" sub-claim, now citing *Stringer v. Black*, 112 S. Ct. 1130 (1992) and *Maynard v. Cartwright*, 108 S. Ct. 1853 (1988) (Doc. 15 at 43), are procedurally barred. Furthermore, the trial court found the prior violent felony aggravator based upon the contemporaneous murder of each Knowles family member. (DA-R 5176). In denying Pittman's IAC/improper aggravator sub-claim, the Florida Supreme Court stated:

> D. Whether Appellate Counsel Was Ineffective in Failing to Argue that Pittman's Death Sentences Were Based on an Improper Aggravator
>
> In this claim, Pittman asserts that the trial court erred in finding that the prior violent aggravating circumstance was established by each of the contemporaneous murders. He asserts that appellate counsel was ineffective in failing to raise this claim on appeal. **This claim, however, warrants no relief. The underlying issue has already been decided adversely to Pittman**. *See, e.g., Bevel v. State*, 983 So.2d 505, 517 (Fla. 2008)("This Court has repeatedly held that where a defendant is convicted of multiple murders, arising from the same criminal episode, the contemporaneous conviction as to one victim may support the finding of the prior violent felony aggravator as to the murder of another victim.")(quotation marks omitted). **Appellate counsel cannot be blamed for failing to raise a meritless claim**. *See Groover v. Singletary*, 656 So.2d 424, 425 (Fla. 1995).

*Pittman*, 90 So. 3d at 819 (e.s.).

As to the IAC sub-claim regarding the prosecutor's comments, the Florida Supreme Court ruled:

> E. Whether Appellate Counsel Was Ineffective in Failing To Argue that the Prosecutor Used Improper Argument in the Penalty Phase
>
> The gist of this claim is that the prosecutor made improper comments to the jury during the penalty phase closing argument, and that appellate counsel was ineffective in failing to raise this issue on appeal. This claim, however, warrants no relief. Generally, appellate counsel cannot be deemed

ineffective for failing to raise a claim that was not preserved. See, e.g., *Johnson v. Singletary*, 695 So.2d 263, 266 (Fla. 1996)("[A]ppellate counsel cannot be ineffective for failing to raise claims which were not preserved due to trial counsel's failure to object."). An exception to this rule is where the alleged error rises to the level of fundamental error. *See Owen v. Crosby,* 854 So.2d 182, 188 (Fla. 2003). Fundamental error is error that reaches "down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." *Spencer v. State*, 842 So.2d 52, 74 (Fla. 2003)(quoting *Brown v. State*, 124 So.2d 481, 484 (Fla. 1960)). To constitute fundamental error, improper comments "must be so prejudicial as to taint the jury's recommended sentence." *Fennie v. State*, 855 So.2d 597, 609 (Fla. 2003)(quoting *Thomas v. State*, 748 So.2d 970, 985 n. 10 (Fla. 1999)).

**In the present case, trial counsel voiced no objection to most of the prosecutor's comments underlying this claim. None of those comments rise to the level of fundamental error, and appellate counsel cannot be deemed ineffective for failing to raise them on appeal. *See Rutherford v. Moore*, 774 So.2d 637, 643 (Fla. 2000)("If a legal issue 'would in all probability have been found to be without merit' had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective."). As to those comments to which counsel did object, to the extent that any of those comments were improper, none was of such a nature as to undermine confidence in the correctness of the result, and appellate counsel cannot be deemed ineffective for failing to raise those comments on appeal.**

*Pittman*, 90 So.3d 794, 819-820 (e.s.).

In this case, state appellate counsel filed a 98-page initial brief raising ten separate allegations of error. The Florida Supreme Court's decision -- which included the decision that appellate counsel was not ineffective where none of the prosecutor's unobjected-to comments constituted fundamental error; and even if any of the objected-to comments were improper, "none was of such a nature as to undermine confidence in the correctness of the result" -- was not contrary to, or an unreasonable application of, clearly established Federal law.

Pittman again has argued that the State allegedly made improper comments on several occasions. The comments Pittman complained of either were not objected to, or if objected to, were proper. As a general rule in Florida, failure to lodge a contemporaneous objection bars review of a claim on appeal. *McDonald v. State*, 743 So. 2d 501, 505 (Fla. 1999). The sole exception to this rule is where the comments rise to the level of fundamental error. *McDonald,* 743 So. 2d at 505.

Pittman argues that the prosecutor impermissibly made an improper "Golden Rule" argument. (Doc. 14 at 68). In his state habeas petition, Pittman cited to the following comments made without objection:

> But what does that allow you to consider in deciding whether the crime is heinous, atrocious or cruel? Well, the law allows you to consider such things as the fear and emotional strain on the victims at time of and prior to their death. In other words, what sort of fear do you feel that Barbara Knowles experienced when she was coming down the hallway that night and met David Pittman coming out of Bonnie Knowles' room with a knife in his hand? What sort of fear do you feel she experienced when he raised the knife and started bringing it down towards her chest to stab her three times?

> The emotional fear and strain put on the person who was killed is a valid consideration.

> What sort of fear do you feel Clarence Knowles experienced as he picked up the telephone to probably what he was doing was calling for help or starting to call for help, not knowing that the phone wires had been cut. When he saw Pittman approaching him, as he is standing there with that telephone and he sees Pittman approaching him with that knife in his hand after having already killed two people, what sort of fear and emotional strain was going through Clarence Knowles as that knife came up and started coming down towards him?

> Dr. Melamud told you that the victims would not necessarily have all died instantly. What sort of suffering did they feel or did they experience after the knife went in their body the first time and the knife was withdrawn and it went in again and it was withdrawn and it went in again?

> For Bonnie Knowles eight times, for Barbara Knowles three times, and

for Clarence Knowles five times. (DA-R/4546-48).

Appellate counsel was not ineffective for failing to raise comments made without any objection. Further, such comments were proper in the context of the instant case and did not rise to the level of fundamental error. The comments did not reach down into the validity of the jury's recommendation of death to the extent the death recommendation could not have been obtained without the assistance of the alleged error.

Prosecutors are permitted to review evidence and fairly discuss and comment upon properly admitted evidence and logical inferences from that evidence. As the trial court found, where Pittman first raised this argument in his 3.851 motion, "[i]n this case, the prosecutor's argument, addressing the 'HAC' aggravator, did not extend beyond the evidence and did not 'unduly create, arouse and inflame the sympathy, prejudice and passions of [the] jury to the detriment of the accused.'" (D22/3334). Indeed, these comments were proper. First, the comments were *directly relevant* to the HAC aggravator. The trial court instructed the jury on the HAC aggravator (DA-R/4613).[15] A victim's suffering and awareness of his or her impending death certainly supports the finding of the heinous, atrocious, or cruel aggravating circumstance. Moreover, the Florida Supreme Court upheld the HAC aggravator:

> Pittman also argues that the heinous, atrocious, or cruel aggravating factor is not applicable under the facts of this case. The record reflects that each victim was stabbed numerous times and bled to death. In addition, Bonnie Knowles' throat was cut. We have previously held that numerous stab wounds will support a finding of this aggravator. We find no error in the application of this aggravator under the facts of this case.

*Pittman*, 646 So. 2d at 172-73 (citations omitted).

---

[15]   Trial counsel conceded that the State could properly argue the HAC aggravator (DA-R/4505).

The prosecutor's comments were directly related to an aggravator upon which the jury was instructed. The jury was not asked to place themselves in the victims' positions. In *Reese v. Sec'y, Fla. Dept. of Corr.*, 675 F.3d 1277, 1292-1293 (11th Cir. 2012), the Eleventh Circuit rejected a substantive due process claim, noting that even under *de novo* review:

> We agree with the Supreme Court of Florida that the prosecutor did not impermissibly invite "the jury to place themselves in the victim's shoes." *Reese I*, 694 So.2d at 685. The prosecutor instead legitimately urged the jury to consider the victim's experience to determine whether the offense was "especially heinous, atrocious, or cruel" under Florida law. To prove that statutory aggravating factor, the State had to prove, beyond a reasonable doubt, that Reese's murder of Austin was "extremely wicked or shockingly evil"; "outrageously wicked and vile"; or effected by means "designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others." *State v. Dixon*, 283 So.2d 1, 9 (Fla. 1973). The victim's fear, pain, and emotional strain before her death are all relevant to the heinous nature of a murder. "The State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991)(internal quotation marks omitted). *Reese*, 675 F.3d 1277, 1292-1293.

In his state habeas petition (D50 at page 40) and as he repeats here (Doc. 14 at page 68), Pittman presented a single sentence claiming the following as error:

> The State next argued the premeditated nature of the crime as nonstatutory aggravation. Defense counsel objected to the State's remarks but the trial court overruled it.

Pittman offered no argument why relief should be granted on this ground. As such, this issue was waived. *Bryant v. State*, 901 So. 2d 810, 827-28 (Fla. 2005) (cursory argument insufficient to preserve issue for review).

Furthermore, the comment Pittman complained of was proper. The prosecutor commented:

David Pittman did not have to kill Bonnie Knowles. David Pittman did not have to kill Barbara Knowles. And David Pittman did not have to kill Clarence Knowles. He made a voluntary choice. When he came out of Bonnie Knowles' room and saw Barbara Knowles there in the hallway, David Pittman had two choices. He could choose to turn and run and flee the house, or he could choose to kill. (DA-R/4548-49).

The objected-to comments were a proper response to Pittman's mitigation expert, Dr. Dee, who opined that Pittman could not control his behavior and opined that Pittman's ability to conform his conduct to the requirements of the law was substantially impaired (DA-R/4451, 4455, 4457, 4467, 4475-76, 4491-93).[16] The prosecutor put his argument in "perspective" for the jury explaining the fact that Pittman had clear choices to make during the murders showed the "fallaciousness of Dr. Dee's arguments" (DA-R/4550-51).

Pittman next urged that the prosecutor argued facts outside the record and injected an improper element of emotion into the jury's deliberations. An objection was lodged to the following:

Well, there's such a thing as punishment. There is such a thing as punishment fitting the crime. If you give David Pittman a life sentence, David Pittman may be in state prison but David Pittman is still alive. David Pittman can still talk, walk, watch television, read books, eat, have visitors, see friends. Even though he's sitting in state prison he's breathing and he's still alive.

Bonnie and Clarence and Barbara Knowles are dead. As I said, a life sentence, even three life sentences in this case, does not fit the crime. Except for Marie Pridgen, who is still alive, David Pittman literally wiped out an entire family. Three of the four members of a family are dead because of his acts and his actions. (DA-R/4552).

The comments pointed out Pittman murdered most members of the Knowles family and that the punishment should fit the crime. The prosecutor's comments were brief, and if

---

[16]  This mitigation claim by the defense was presented in counsel's opening statement and argued in his closing (DA-R/4267-71, 4600-06).

any error existed, it was harmless in this triple murder case. Prior violent felony and HAC aggravators were established. See *Brecht*.

Pittman next argues:

> The prosecutor also improperly denigrated the proper statutory and non statutory mitigating factors, literally arguing on several occasions, "So what?" (Doc. 14 at 69).

Beyond this single sentence in his state habeas petition, Pittman offered no explanation as to why relief should be granted. (D50 at 41).   Therefore, this issue was waived. Further, there was no objection. Appellate counsel is not ineffective for failing to raise unpreserved issues. Furthermore, the prosecutor's comments of "So what?" were in response to Dr. Dee's testimony and were proper in the context of rebutting mitigation. (DA-R/4556). The comments were fair rebuttal and, even if error, did not rise to the level of fundamental error.

Pittman next urged relief for another unpreserved claim. He claims the prosecutor improperly argued that the right to present mitigation should be considered as non-statutory aggravation. Again, there was no objection. Thus, appellate counsel was not ineffective for failing to raise this unpreserved issue. Further, the comments were not error:

> The testimony that you heard yesterday, I'm not sure if the purpose is to make it appear that there are other people or other places or other things that are to some extent at fault in this case besides Mr.Pittman. Is it the school system that's at fault because they didn't teach him to read and write correctly, or is it the parents at fault because they abused him and didn't bring him up correctly? Or is someone else at fault in this case besides Pittman?

> The only person on trial is David Pittman. The person who committed these crimes is David Pittman. Not his mother, not his father, not his sister, not the school system, and not society. David Pittman is the one who went in that house and killed three people. Not anyone else, not any other system or group of people. Let me close by asking you one question. Why are we here today? Are we here today because David Pittman has problems? No.

104

We're here today in a penalty phase of a first degree murder case because David Pittman killed three people. And please don't forget that fact. Don't get caught up in all this peripheral stuff about his "problems" that you forget why we're even here, what caused us to be involved in this particular phase of the trial to begin with. (DA-R/4559-60).

Attorneys are permitted wide latitude in their closing arguments. Counsel may advance any legitimate argument. The prosecutor's explanation of why the jury should reject the mitigation offered in this case was not presented in a derogatory manner or with inflammatory labels; it was a proper argument as to why the jury should not be swayed by the defense witnesses in light of the nature of the crimes. The comments did not suggest that Pittman's upbringing should be considered or weighed as an aggravating circumstance. The prosecutor was not arguing aggravating circumstances at this point in the closing argument, but was addressing the weight of the mitigation. An argument that jurors should reject mitigation based on the evidence is not the same as an argument that non-statutory aggravating factors existed. *See, Perez v. State*, 919 So. 2d 347, 375 (Fla. 2005).

Last, Pittman relied on yet another comment made without any objection. At the end of his argument, the prosecutor shortly remarked:

This man murdered three people. If we're going to have a death penalty in the State of Florida, let's enforce it. (DA-R/4560).

Relief was not warranted as this comment did not constitute any error, much less fundamental error, in this triple murder case. This comment did not reach down into the validity of the verdict itself to the extent that the jury recommendation of death could not have been obtained without the assistance of the alleged error. This is especially so here, as there was less than a unanimous death recommendation. The comments were brief and made at the end of the prosecutor's argument and did not otherwise permeate the State's closing

argument. Thus, it could not and did not invalidate the entire trial. Further, the comments did not appeal to the fears or emotions of the jurors nor can it be said it inflamed their passions or prejudices.

To establish prejudice, the petitioner has the burden to show more than that the error had "some conceivable effect on the outcome of the proceeding." *Marquard v. Sec'y, Fla. Dept. of Corr.,* 429 F.3d 1278, 1305 (11th Cir. 2005) (quotation omitted). "Rather, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (quotation omitted). Because the omitted argument would not have succeeded, appellate counsel was not ineffective for failing to raise that non-meritorious argument. See, *Owen v. Sec'y, Fla. Dept. of Corr.,* 568 F.3d 894, 915 (11th Cir. 2009). Error, if any, was harmless. See, *Brecht.*

Petitioner has not established that the state court's adjudication of this claim either (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Ground six does not warrant habeas corpus relief.

## GROUND VII

### THE TRIAL COURT ERRED BY FAILING TO FIND UNREBUTTED NONSTATUTORY MITIGATION WHICH WAS CLEARLY ESTABLISHED BY THE EVIDENCE.

Pittman alleges that the trial court erred by rejecting Pittman's "unrebutted non-statutory mitigation." (Petition, Doc. 14 at 71; Memorandum, Doc. 15 at 44-46).

On direct appeal, Pittman argued that the trial court erred in allegedly "failing to weigh

Pittman's abusive and traumatic childhood." *See*, Initial Brief, Case No. SC78605, Issue IX

(A32/89-93, at page 93). The Florida Supreme Court found no error on the part of the trial

court and explained:

> In his fifth and sixth penalty phase issues, Pittman contends that the trial court erred in refusing to find the two statutory mitigating circumstances presented and for failing to consider and weigh several nonstatutory mitigators. After a review of the record, we find no error on the part of the trial judge. **Given all the evidence presented at trial, we conclude that the judge could have reasonably rejected the expert's testimony concerning Pittman's mental and emotional condition. Further, it is clear that the trial judge did consider the nonstatutory mitigation urged by Pittman but found it to have little weight as a mitigating factor**.

*Pittman*, 646 So. 2d at 173 (e.s.).

Pittman has not established that the state court's adjudication of this claim either (1)

"resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States"

or (2) "resulted in a decision that was based on an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The Constitution does not require a sentencer to accept, but only to consider, relevant

mitigating circumstances, and a state is not required to ascribe any specific weight to any

particular evidence considered by the sentencer. *Harris v. Alabama*, 513 U.S. 504, 512, 115

S. Ct. 1031, 1035 (1995); *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S. Ct. 1078 (1990).

The trial court and jury in this case were not limited in their consideration of potential

mitigating factors. *Buchanan v. Angelone*, 522 U.S. 269, 277, 118 S. Ct. 757, 762 (1998)

(finding general jury instruction that jury is to consider all the evidence in mitigation

constitutionally permissible because the instruction did not limit or foreclose the jury from

considering any evidence offered in mitigation). The fact the court considered the mitigation

is enough.[17] The state court was not required to give them particular weight, or, for that matter, even list them in the sentencing order.

Since it is clear that the trial judge did consider Pittman's background as mitigating evidence, his disagreement is simply with the weight assigned to these factors. Federal courts have rejected such habeas claims even prior to the enactment of the AEDPA. See, *Atkins v. Singletary*, 965 F.2d 952, 962 (11th Cir. 1992) ("Acceptance of nonstatutory mitigating factors is not constitutionally required; the Constitution only requires that the sentencer consider the factors.").

In this case, the trial court articulated the concerns about brain damage, hyperactivity, physical and sexual abuse as a child, and impulsivity with memory problems in paragraphs (3) and (4) of the mitigating circumstances section of his sentencing order. (DA-R/5180). To the extent that Pittman urged that these factors should have been found and given the weight to overcome the aggravating factors found, he simply argued with the trial court's resolution that what was proffered was insubstantial. The alleged mental and emotional problems urged could permissibly be discounted on a weighing analysis by comparison to the "deliberate, methodical, and efficient manner to such an extent that detection was nearly avoided." (DA-R/5181). Both the jury and judge were permitted to reject as meaningless the view of Dr. Dee

---

[17] Pittman's reliance upon *Eddings v. Oklahoma*, 455 U.S. 104, 113-114, 102 S. Ct. 869, 876-77 (1982) is misplaced. *Eddings* simply provided that its decision in *Lockett* also meant that "a sentencer may not, as a matter of law, refuse to consider proposed mitigating evidence." In *Johnson v. Texas*, 509 U.S. 350, 113 S. Ct. 2658 (1993), the Court emphasized that *Lockett* and its progeny "stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instructions or by limiting the inquiries to which it is relevant so severely that the evidence could never be part of the sentencing decision at all." *Johnson*, 509 U.S. at 368. Pittman was not prevented from presenting any mitigating evidence below, He presented his background to the jury and trial court.

that Pittman was in all of his activities (eating, doing work, etc.) under the influence of extreme mental or emotional disturbance when Pittman was clever enough to cut the telephone lines prior to killing the three members of the Knowles family.

The trial court considered the matters presented and disagreed with the weight that the defense would attribute to them. With respect to Pittman's alleged sexual abuse as a child, Dr. Dee relied on Pittman's admission to him of being raped at age eight or nine. (DA-R/4465). Dr. Dee explained that when a male child is homosexually abused "it's almost as if he has to demonstrate to himself that he is masculine and not feminine. He feels that he has been used as a woman." (DA-R/4465). However, the trial judge considered all this and found "they have little if any connection to the murders." (DA-R/5180). Further, "[t]he record speaks clearly of an individual who went about the killings and the destruction of evidence in a deliberate, methodical, and efficient manner to such an extent that detection was nearly avoided." (DA-R/5180-81). In addition, the trial court could permissibly conclude that conduct occurring when Pittman was aged eight or nine did not reduce his moral culpability in the circumstances of this triple homicide. With respect to the alleged physical abuse from Pittman's mother, Frances Marie Pittman testified that David Pittman received spankings as a child; she paddled all her children. (DA-R/4392). She claimed she hit the children "on the butt." (DA-R/4394). On one of her children (a seventeen-year-old, six foot four inch teen), she used a fan belt, but not on Petitioner. (DA-R/4395). Other family members, Freddy Joe Farmer (DA-R/4293), William Pittman (DA-R/4301), Barbara Farmer (DA-R/4315), Eugene Pittman (DA-R/4335), and Bobbi Jo Pittman (DA-R/4340-41) all described spankings, paddlings or being hit on the butt. Barbara Farmer never saw beatings (DA-R/4315).

At the penalty phase, Dr. Dee described Pittman's hyperactivity and "being to some

extent impulsive." Pittman's hyperactivity did not cause him to commit the murders. (DA-R/4475). Dr. Dee conceded such people in society can lead lawful, peaceful lives. It is not that the trial judge refused to consider and weigh the proposed mitigation -- he did. The trial court simply concluded that other factors were more enlightening as to Pittman's abilities and intentions.

In *Morris v. Sec'y, Dept. of Corr.*, 677 F.3d 1117, 1130-1132 (11th Cir. 2012), the Eleventh Circuit rejected a similar claim under the AEDPA and stated, in pertinent part:

> Morris's next claim is that the state trial court erred in failing to consider his history of illegal drug use as a nonstatutory mitigating factor in its sentencing order, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. Morris relies on *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and its progeny for the now well-established proposition that the sentencer in a capital case must consider any relevant mitigating evidence. *Id.* at 608, 98 S.Ct. 2954; *Eddings v. Oklahoma*, 455 U.S. 104, 113-14, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)("Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence."); see also *Glock v. Moore*, 195 F.3d 625, 637 n. 20 (11th Cir. 1999).

> **The operative word, however, is "consider." The Supreme Court has made clear that the sentencer need not accept or ascribe any specific weight to the evidence that it considers. "Acceptance of nonstatutory mitigating factors is not constitutionally required; the Constitution only requires that the sentencer consider the factors." *Atkins v. Singletary*, 965 F.2d 952, 962 (11th Cir. 1992)(citing *Blystone v. Pennsylvania*, 494 U.S. 299, 308, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990)); accord *Harris v. Alabama*, 513 U.S. 504, 512, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995**) ("[T]he Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer."). As the Supreme Court later stated in *Johnson v. Texas*, 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993), "Lockett and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence," *Id.* at 361, 113 S.Ct. 2658.

> Morris was in no way prevented from presenting to both the judge and jury evidence of his past drug use as potential mitigating evidence, and the Florida Supreme Court made a factual finding that the trial court did consider

that evidence. *Morris* I, 811 So.2d at 667. For us to grant relief on this claim, Morris would have to provide clear and convincing evidence rebutting the Florida Supreme Court's unambiguous factual finding that "the trial court did find and weigh the prior history of drug abuse and addiction." *Id.*; see 28 U.S.C. § 2254(e). In addition, the district court made its own factual finding that "[t]his Court's review of the record demonstrates that the trial court considered and weighed Morris' prior history of drug abuse and addiction, but gave the mitigating factor little weight." 2009 WL 3170497, at *29. This factual finding is itself reviewed for clear error. *Spencer*, 609 F.3d at 1177.

Morris has not met his substantial burden of rebutting these factual findings. Indeed, Morris does not even argue that the state trial court failed to weigh the evidence. He says instead that "it is not clear how the court considered the nonstatutory mitigation. The court stated that the prior drug use in the past is not mitigating yet the court weighed the mitigation giving it little weight." Morris seems to argue that the state trial court's confusing language itself amounted to constitutional error, because it "contributed to the court's finding that the mitigation [was] entitled to little weight." Thus, Morris concedes that the trial court did consider and weigh his past drug use as mitigating evidence, but makes the pained argument that the "trial court went into the analysis with the preconceived notion that the drug use was not mitigation." **When a trial court considers mitigating evidence during sentencing, as the trial court did here with respect to Morris's past drug use, there simply is no constitutional error of the kind Morris now urges us to recognize. *See Harris*, 513 U.S. at 512, 115 S.Ct. 1031; *Blystone*, 494 U.S. at 307-08, 110 S.Ct. 1078; *Atkins*, 965 F.2d at 962. Accordingly, the Florida Supreme Court's decision denying relief on this claim was not contrary to or an unreasonable application of clearly established federal law.**

*Morris*, 677 F.3d 1117, 1130-1132 (e.s.).

Here, as in *Morris*, Pittman has not established that the state court's adjudication of this claim either (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Ground seven does not warrant habeas corpus relief.

**GROUND VIII**

**MR. PITTMAN'S CONVICTION AND SENTENCE OF DEATH STAND IN VIOLATION OF DUE PROCESS AND THE EIGHTH AMENDMENT BECAUSE HE IS ACTUALLY INNOCENT OF THE CRIME.**

Pittman alleges that his conviction and sentence stand in violation of Due Process and the Eighth Amendment because he is "actually innocent" of the crimes. (Petition, Doc. 14 at 72-78; Memorandum, Doc. 15 at 47-49). For the following reasons, Pittman is not entitled to any relief on his claim of "actual innocence."

First, section 2254(a) permits a federal court to entertain only those applications alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." Pittman has not established that a freestanding claim of actual innocence exists apart from any claim of constitutional error at trial. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400, 113 S. Ct. 853 (1993); *See also*, *House v. Bell,* 547 U.S. 518, 555, 126 S. Ct. 2064, (2006); *District Attorney's Office for Third Judicial Dist. v. Osborne*, —— U.S. ——, ——, 129 S. Ct. 2308, 2321–2322 (2009).

Second, Pittman can obtain habeas relief under the AEDPA only if the state court's determination was contrary to, or an unreasonable application of, "clearly established Federal law, as determined by the Supreme Court of the United States." The "only Supreme Court decisions against which a state court decision is to be measured are those on the books at the time the state court decision was issued." *Evans*, 2012 WL 5200326 (11th Cir. 2012), citing *Greene v. Fisher*, —— U.S. ——, 132 S. Ct. 38, 45 (2011). The Supreme Court has

not decided whether "actual innocence" constitutes a freestanding federal constitutional claim. *See*, *Osborne*, ⸺ U.S. ⸺, ⸺, 129 S. Ct. 2308, 2321–22 (2009) (stating, "Whether such a federal right exists is an open question. We have struggled with it over the years, in some cases assuming, *arguendo*, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet.") The state court cannot have contravened or unreasonably applied, "clearly established Federal law, as determined by the Supreme Court of the United States," by rejecting a claim that the Supreme Court has not determined is even cognizable.

Third, Pittman states that he "presented at the postconviction evidentiary hearing newly discovered evidence which demonstrates his innocence." (Petition, Doc. 14 at 74). Again, the state court's denial of Pittman's newly discovered evidence claim could not be unreasonable under AEDPA as there is no Supreme Court authority establishing a freestanding "actual innocence" right. Furthermore, the state courts denied Pittman's "newly discovered" claim raised under state law. In addition to failing to exhaust any cognizable federal constitutional claim, questions of state law do not raise issues of constitutional dimension for federal habeas corpus purposes. See, *Reese v. Sec'y, Fla. Dept. of Corr.,* 675 F.3d 1277, 1290 (11th Cir. 2012), citing *Carrizales v. Wainwright*, 699 F.2d 1053, 1054–55 (11th Cir. 1983).

Even assuming that a freestanding "actual innocence" claim were cognizable and fairly presented, Pittman's allegations fall far short of the type and quantity of evidence necessary to establish "a truly persuasive demonstration of 'actual innocence.'" *Herrera*, 506 U.S. 390, 417, 113 S. Ct. 853, 869 (1993). On direct appeal, the Florida Supreme Court summarized the facts adduced at trial and noted:

When the authorities investigated they found the home of Clarence and Barbara Knowles fully engulfed in fire. After the fire was extinguished, the police entered the house and discovered the bodies of Clarence and Barbara, as well as the body of their twenty-year-old daughter, Bonnie. ...A subsequent investigation revealed that the fire was the result of arson, that the phone line to the house had been cut, and that Bonnie Knowles' brown Toyota was missing.

A construction worker testified that, when he arrived at work at 6:30 a.m. on the morning of the fire, he noticed a brown Toyota in a ditch on the side of the road near his job site. Other testimony revealed that the location of the Toyota was about one-half mile from the Knowles' residence. The worker also observed a homemade wrecker, which he later identified as belonging to Pittman, pull up to the Toyota and, shortly thereafter, saw a cloud of smoke coming from that direction. Another witness who lived near the construction site also saw the smoke and observed a man running away from a burning car. This witness later identified Pittman from a photo-pack as the man she saw that morning. Investigators determined that the car fire, like the earlier house fire, was the work of an arsonist.

Carl Hughes, a jailhouse informant, testified that Pittman told him that he had gone to the Knowles' house on the evening of the murders to speak with Bonnie Knowles about the problems he was having with her family. Bonnie let Pittman in the house and, when she refused his sexual advances, he killed her to stop her cries for help. Pittman then admitted to killing Barbara Knowles in the hallway outside Bonnie's bedroom and to killing Clarence in the living room as Clarence tried to use the phone. Pittman also told Hughes that he burned the house, stole the Toyota and abandoned it on the side of the road, and later returned to the Toyota and burned it as well.

*Pittman*, 646 So. 2d at 168.

In addition to construction worker Dennis Waters' observation of the wrecker and

William Smith's observations of the wrecker, gas can, and the suspect,[18] also identifying

Pittman that critical morning was Barbara Davis. She identified Pittman as the man next to

---

[18]   William Smith, who lived near the Majik Market on Highway 60, testified that between 6:30 and 6:45 a.m., he saw a home-made wrecker come to a stop behind the store (DA-R/1793). A white male got out of the vehicle and picked up a five gallon gas can, shook it on the ground and set it back in the truck. (DA-R/1795). Later, on the 6:00 news, Smith saw Pittman had been arrested and he told his wife that it was the same person that he had seen earlier. (DA-R/1801) .

the passenger side of the burning car and who came up the embankment at a "jog-like" pace. Davis lived in an apartment on Prairie Mine Road next to where the Toyota was abandoned and burned. (DA-R/1699-1700). At approximately 6:40 a.m. on the morning of the fire, Davis was outside picking roses when she saw a ball of smoke. (DA-R/1702-03). When she subsequently approached the location of the fire, she saw a man coming up the embankment from beside the car. (DA-R/1704-05). The man was right next to the passenger side of the car - an inch or two away from it. (DA-R/1704). The man went across the parking lot, taking "big steps at record speed." (DA-R/1705). Davis saw the right side of the man's face; she described him as a white male with acne or indents in his face, a long and pointed nose, and dirty blonde hair hanging down on his head. (DA-R/1705, 1711-12, 1714). Later that day, the police took her to Bartow where she identified Pittman's photo from two separate photo-packs; the first group of photos were front view only and the second group were right-side profile photographs. (DA-R/1714-16, 1720). Davis identified Pittman in court. (DA-R/1719).

Pittman also admitted committing the murders to David Pounds, whom he met while in state prison. (DA-R/1894). Pounds testified Pittman told him how the victims were killed and, admitted "Yeah, I did it but there's no way they can pin it on me. My alibi is too good." (DA-R/1895- 97). Pittman spoke to Pounds about the car fire, saying there was no way that fingerprints could be lifted from the car due to the fire and the water used to extinguish it. (DA-R/1897-98). Pittman had previously told Marie how you could burn an automobile to get rid of fingerprints. (DA-R/2548).

Polk County Correctional Officer William Hunter testified that while Pittman was incarcerated, Pittman complained to him about problems he had with the Knowles family. (DA-R/2791-92). Pittman felt his in-laws were responsible for keeping Marie from him and

he was adamant he would resort to violence to resolve the problem. (DA-R/2792). Pittman stated if necessary he would "kill them." (DA-R/2793). Pittman told Hunter that he had a lot of knowledge about stealing cars and he would burn the car if he was in a rush and that the fire would take care of any evidence. (DA-R/2794-95). The Fire Marshal's crime lab analyst expert Victor Higg uncovered evidence of flammable liquids on Pittman's shoes and clothing. (DA-R/2724-25, 2737-39).

In state postconviction, Pittman's claim of "newly discovered" evidence was based, first, on Carlos Battles, a former DCF investigator, who related hearsay statements given by Pittman's ex-wife, Marie Pridgen, in 1998, concerning her daughter, Cindy Pittman. The murders were committed in 1990. In 1998, Marie Pittman told Battles that Cindy needed counseling for sexual abuse and that Cindy had witnessed her grandmother being killed by her brother-in-law. Cindy was four years old when her grandparents were murdered in 1990 and the statement Marie gave to the DCF investigator was eight years after the murders.

Pittman presented hearsay testimony from Chastity Eagan, who was 13 when she and her mother lived with Marie and Allen Pridgen and 15 when she dated David Pridgen. David Pridgen testified in postconviction. David Pridgen denied any involvement in the Knowles' murders; he'd been in the Gulf War and was stationed at Fort Bragg, North Carolina at the time of the murders. In addressing the allegation of comments purportedly made to Chastity years ago, David Pridgen explained that he may have been talking about the war and about the killing and how it upset him.[19]

---

[19] On postconviction appeal, *Pittman*, 90 So. 3d 794, 804, fn. 7, the Florida Supreme Court noted that the following witnesses testified for the defense regarding the Chastity Eagan hearsay claim: "Chastity Eagan, whose mother lived with Marie Pridgen for more than a year, testified that Marie did not act upset that her mother, father and sister had

Pittman's claim of "newly discovered" evidence was raised in his postconviction motion and on appeal. See, Initial Brief, Case No. SC08-146 (D47/96-97). In affirming the trial court's denial of postconviction relief, the Florida Supreme Court stated, in pertinent part:

### I. Newly Discovered Evidence Claim

In this claim, Pittman asserts that the postconviction court erred in denying relief on his newly discovered evidence claim. This Court has held that two requirements must be met in order for a conviction to be set aside on the basis of newly discovered evidence: (1) to be considered newly discovered, the asserted evidence must have been unknown to the trial court, to the party, or to counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of due diligence; and (2) the newly discovered evidence must be of such a nature that it would probably produce an acquittal on retrial. *Jones v. State*, 709 So.2d 512, 521 (Fla. 1998). To reach this latter conclusion, the trial court is required to consider all newly discovered evidence that would be admissible at trial and then evaluate the weight of both the newly discovered evidence and the evidence that was introduced at trial. With respect to a trial court's ruling on a newly discovered evidence claim following an evidentiary hearing, as long as the court's findings are supported by competent, substantial evidence, a reviewing court will not "substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court," *Blanco v. State*, 702 So.2d 1250, 1252 (Fla. 1997)(quoting *Demps v. State*, 462 So.2d 1074, 1075 (Fla. 1984)), but the court's application of law to facts is subject to *de novo* review. *Preston v. State*, 970 So.2d 789, 798 (Fla. 2007).

Pittman asserts that newly discovered evidence with respect to investigator Carlos

---

been killed but rather said she was glad they were dead because they had been working with a state agency to take her kids from her and that Marie had received some money after their deaths and had gone on a spending spree and that David Pridgen had said he killed three people; Rosa Greenbaum, a criminal defense investigator, testified that she had tried to locate Chastity Eagan before the July 2006 evidentiary hearing but that Ms. Eagan's probation officer did not know where she could be located; and David Wayne Pridgen testified that he was at Fort Bragg, North Carolina, when the murders took place and that he did not recall telling Ms. Eagan that he had killed three people but that he may have been referring to his tour of duty in the Gulf War.

The following witness testified for the State: John Van Shuman, a friend of David Pridgen's, testified that he had never heard David say that he killed three people."

Battles shows that Pittman is entitled to a new trial. He asserts that the postconviction court erred in denying relief on this claim. This issue was addressed at the evidentiary hearing below and the postconviction court ruled as follows:

> The Defendant raises a claim of newly discovered evidence of innocence with respect to information obtained by Carlos Battles when he was employed by the Department of Children and Family Services as a child protection investigator. At the evidentiary hearing the Defense introduced Battles' case file of the investigation as Defense Exhibit 1. In the case file, Battles listed information that Marie Pittman had told him that Cindy Pittman needs counseling for sexual abuse and that Cindy had witnessed her grandmother being killed by her brother-in-law. At the evidentiary hearing, Battles testified that this stood out in his mind that the child had witnessed a murder. The defense argues that information that Cindy may have witnessed the murders is inconsistent with the State's theory of prosecution and consistent with other theories such as Marie and her husband being involved in the murder. The defense argues that Defense Exhibit 1 and the testimony of Battles is newly discovered evidence under *Jones.*

> This claim of newly discovered evidence involves hearsay statements from Marie Pridgen given to a Battles in 1998. Cindy Pittman was four years old when her grandparents were murdered in 1990, and the statement Marie made to DCF investigators was eight years after the murders. Battles testified that he never questioned Cindy about the allegation, and he had no idea if the child actually saw a murder. Detective Cosper testified at the evidentiary hearing that Marie Pittman never told him that Cindy had witnessed the murders. The Court finds no credible basis that this information meets the *Jones* requirements as newly discovered evidence. In particular, the Court does not find that this evidence is of such a nature that it would probably produce an acquittal on retrial.

> Based on this record, we conclude that Pittman has failed to show that the postconviction court erred in denying this claim. Specifically, Pittman has failed to show that the asserted evidence is of such a nature that it would probably produce an acquittal on retrial. *See Jones*, 709 So.2d at 521. Under the above standard of review, Pittman has failed to show that the asserted evidence meets the *Jones* standard for newly discovered evidence.

*Pittman*, 90 So. 3d at 813-15.

Pittman has not presented any freestanding federal constitutional claim that is cognizable in this proceeding. The state court cannot have contravened or unreasonably

applied, "clearly established Federal law, as determined by the Supreme Court of the United States," by rejecting a claim that the Supreme Court has not determined is even cognizable. Pittman has not established that the state court's adjudication of this claim either (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Ground eight does not warrant habeas corpus relief.

### PITTMAN'S REPLY

Nothing in Pittman's reply convinces this Court that Pittman is entitled to habeas corpus relief.

**Accordingly, the Court orders**:

That Pittman's petition is denied.  The Clerk is directed to enter judgment against Pittman and to close this case.

### CERTIFICATE OF APPEALABILITY AND
### LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

The Court declines to issue a certificate of appealability pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts because Petitioner has failed to make a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c)(2).

Because Petitioner is not entitled to a certificate of appealability, Petitioner is not

entitled to appeal in forma pauperis.

Petitioner is required to pay the $505.00 appellate filing fee unless the appellate court grants Petitioner in forma pauperis status on appeal.

ORDERED at Tampa, Florida, on February 20, 2015.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE